RUSSEL DAVID MYRICK 270803
The RDM Legal Group
7979 Ivanhoe Ave, Ste 200
La Jolla, CA 92037-4505
Tel. No. 888-482-8266
Fax No. 858-244-7930
Email: russel@rdmlg.com

SAMUEL P. KING, JR. 1396
735 Bishop Street, Suite 304
Honolulu, Hawaii 96813
Tel. No. 808-384-6325
Fax No. 808-533-4745
Email: sam@kingandking.com
Pro Hac Vice

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIENNE SEPANIAK KING and CHRISTOPHER EDWARD SEPANIAK KING,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>Defendant. | ) Civ. No. 3:21-cv-04573-EMC<br>)<br>) PLAINTIFFS' MEMORANDUM IN<br>) OPPOSITION TO DEFENDANT'S MOTION<br>) TO DISMISS UNDER FEDERAL RULE OF<br>) CIVIL PROCEDURE 12(b)(6)<br>)<br>) Hearing Date: 11/4/21<br>) Hearing Time: 1:30 p.m.<br>) Courtroom: 5<br>)<br>) Judge: Hon. Edward M. Chen<br>)<br>) Date Complaint Filed: June 14, 2021<br>) Date First Amended Complaint Filed: September<br>)   10, 2021<br>)<br>) Trial Date: None set<br>) |

TABLE OF CONTENTS

**I. Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II. Improperly Filed 12(b)(6) Motion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**III. Standard for Evaluating 12(b)(6) Motion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**IV. The Motion Should be Denied as To Plaintiffs' Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing Causes of Action.** . . . . . . . . . . . . . . 2

     **A. Plaintiffs have identified the contract (TOS) terms which FACEBOOK breached.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     **B. Provision 4.2 of the TOS is a binding contractual provision on FACEBOOK**. . . . . . 3

     **C. Whether FACEBOOK acted appropriately under TOS provision 4.2 is not an issue subject to resolution by pretrial motion.** . . . . . . . . . . . . . . . . . . . . . . . . . 5

     **D. The Cause of Action for Breach of Implied Covenant of Good Faith and Fair Dealing should not be dismissed on a 12(b)(6) motion.** . . . . . . . . . . . . . . . . . . . . . . . . 7

     **E. Provision 4.3 of the TOS does not apply to the facts of this case.** . . . . . . . . . . . . . . 8

     **F. KING has alleged pecuniary harm based on the loss of the content of the King Facebook Account.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**V. Plaintiffs' Breach of Contract and Breach of Implied Breach of Covenant of Good Faith and Fair Dealing causes of action are not barred by 47 USC 230(c)(1).** . . . . . . . . . . . . 11

**VI. Section 230(c) has been misconstrued by the appellate courts and does not provide the immunity claimed by FACEBOOK.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**VII. KING has a cognizable claim under the CDA (Claim 2).** . . . . . . . . . . . . . . . . . . . . 20

**VIII. The Motion should be denied as to KING's causes of action for Intentional and Negligent Infliction of Emotional Distress.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**IX. The Motion should be denied as to KING's causes of action for Conversion.** . . . . . . . . . . 21

**X. The Motion should be denied as to CKING's causes of action for Intentional, Reckless, Grossly Negligent, and/or Negligent Infliction of Emotional Distress.** . . . . . . . . . . . 22

**XI. Conclusion**

TABLE OF AUTHORITIES

**Cases**

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 11-13, 14, 16

*Caraccioli v. Facebook, Inc.*, 167 F. Supp.3d 1056 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4

*Commercial Mortgage & Finance Corporation v. Greenwich Savings Bank*,
    145 S.E.2d 249 (Ga.Ct.App. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Ebeid v. Facebook, Inc.* (2019 WL 2059662 (N.D. Cal. May 9, 2019) . . . . . . . . . . . . . . . . . . . 5

*King v. Facebook, Inc.*, 2019 WL 6493968 (N.D.Cal. Dec. 3, 2019). . . . . . . . . . . . . . . . . . 3, 4, 6

*Kohler v. Leslie Hideman, Inc.*, 80 F.3d 1181 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Locke v. Warner Bros., Inc.*, 66 Cal.Rptr.2d 921 (2nd Div. 1997). . . . . . . . . . . . . . . . . . . . . 6, 7-8

*Malwarebytes, Inc. v. Software Group USA, LLC, (Statement of Justice Thomas re: denial*
    *of certiorari)*, 592 U.S. ___ (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Prager University v. Goole LLC*, 951 F.3d 991 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . 18

*Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Robinson v. United States*, 175 F. Supp. 2d 1215 (E.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . 10

*Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989) . . . . . . . . . . . . . . . . . 18

*Smith v. Trusted Universal Standards in Electronic Transactions, Inc.* (D.N.J. 2011) . . . . . . . . . . . 8

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995) . . . . 14

*Young v. Facebook, Inc.*, 2010 WL 4269304 (N.D.Cal. Oct 25, 2010) . . . . . . . . . . . . . . . . . . 3-4, 8


**Treatises**

Corbin, *Contracts*, Sec. 647 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Restatement 2d of Contracts*, Sec. 228 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Restatement (Second) of Torts*, Sec. 911, Comment e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Williston, *Contracts* (4th Ed.), Sec. 38:23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6


**Articles**

Bellia, *Justice Scalia, Implied Rights of Action, and Historical Practice*, Notre Dame Law
    Review, Vol. 92:5, p. 2076 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Newcombe, *Implied Private Rights of Action: Definition, and Factors to Determine Whether*
    *a Private Action Will Be Implied from a Federal Statute*, Loyola University Chicago Law
    Journal, Vol. 49, p. 117 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Preis, *How the Federal Cause of Action Relates to Rights, Remedies, and Jurisdiction*,
    Florida Law Review, Vol. 67:2, p.848 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


**Statutes**

Cal. Civ. Code Sec. 3355 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

47 USC 230(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

47 USC 230(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

47 USC 230(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-14, 15, 16-18

47 USC 230(c)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18


**Jury Instructions**

California Civil Jury Instruction 1620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

California Civil Jury Instruction 1621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Plaintiffs ADRIENNE SEPANIAK KING ("KING") and CHRISTOPHER EDWARD SEPANIAK KING ("CKING") respond with this Memorandum in Opposition ("MIO") to Defendant's Motion to Dismiss First Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6) filed September 24, 2021, ("Motion") as follows:

### I. Introduction

Defendant FACEBOOK states that its Motion is based on three general propositions: 1) that Plaintiffs fail to identify any contractual duty or contract provision between FACEBOOK and KING that was breached, and that, in fact, FACEBOOK has "sole discretion" under provision 4.2 of its contract with KING (the parties agree that FACEBOOK's Terms of Service ("TOS"), a copy of which was filed with this Court on September 24, 2021, constitute the contract between FACEBOOK and KING) to suspend or permanently disable accounts (Motion, p. 2); 2) that FACEBOOK is not responsible for destroying KING's Facebook Account content because provision 4.3 of the TOS provides that FACEBOOK is not liable for any "lost" data of KING (Motion, pp. 6, 9, & 14); and 3) that FACEBOOK is immune from all of Plaintiffs' claims pursuant to 47 USC 230(c)(1) (a provision of the Communications Decency Act ("CDA") (Motion, p. 1). There are too many subissues to mention, but these are the three basic claims made by FACEBOOK supporting its Motion. None of these three propositions is valid.

### II. Improperly Filed 12(b)(6) Motion

As an initial matter, this Court should deny FACEBOOK's 12(b)(6) motion because it is mostly based on affirmative defenses. A 12(b)(6) motion is intended to challenge the causes of action set forth in a complaint (or in this case KING's First Amended Complaint ("FAC")) without filing an Answer – the facts alleged in the FAC are assumed to be true for purposes of a 12(b)(6) motion. A 12(b)(6) motion cannot rely on affirmative defenses which have not yet been pled and are required to be pled in an Answer pursuant to FRCP Rule 8(c). The proper method of challenging the FAC in this case based on affirmative defenses is for FACEBOOK to first file its Answer and then file a FRCP Rule 12(c) motion if FACEBOOK considers such motion to be appropriate after its Answer is filed. *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003).

This Court should deny FACEBOOK's 12(b)(6) motion because it relies on affirmative defenses, require FACEBOOK to file an Answer stating its affirmative defenses, and meanwhile require FACEBOOK to answer discovery requests already served on FACEBOOK by Plaintiffs requiring FACEBOOK to answer such basic questions pertinent to this case as: what did KING upload to the King Facebook Account which caused the account to be disabled?; what FACEBOOK Community Standard(s) was(were) allegedly violated by what was uploaded?; how was(were) the Community Standard(s) violated?; what happened to KING's account content (data) and can the content be recovered?; etc.  If this Court does not dismiss FACEBOOK's Motion as requested herein, Plaintiffs make the following arguments in opposition to the Motion.

**III. Standard for Evaluating 12(b)(6) Motion**   The standard by which this Court should make a determination regarding FACEBOOK's 12(b)(6) motion is set out quite well and in detail in *Caraccioli v. Facebook, Inc.*, 167 F. Supp.3d 1056, 1061 (2016), a case cited by FACEBOOK:

> Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotations omitted).  The factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." *Id.* at 556–57, 127 S.Ct. 1955.  A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir.2008).
>
> When deciding whether to grant a motion to dismiss, the court must generally accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  The court must also construe the alleged facts in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir.1988).  However, "courts  are not  bound  to accept as true a legal conclusion couched as a factual allegation." *Iqba*l, 556 U.S. at 678, 129 S.Ct. 1937.
>
> Also, the court generally does not consider any material beyond the pleadings for a Rule 12(b)(6) analysis. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).  Exceptions to this rule include material submitted as part of the complaint or relied upon in the complaint, and material subject to judicial notice. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–69 (9th Cir.2001).

**IV. The Motion Should be Denied as To Plaintiffs' Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing Causes of Action.**

**A. Plaintiffs have identified the contract (TOS) terms which FACEBOOK breached.**

Although FACEBOOK continues to claim that Plaintiffs have not identified the contract terms

which FACEBOOK has breached, this is clearly not true.  In the FAC, Plaintiff identified provisions 3.1 and 4.2 of the TOS as having been breached by FACEBOOK.  Provision 3.1 states the requirements KING must meet to continue to have an active account with FACEBOOK.  In the FAC, KING alleges that she is in compliance with all the requirements of provision 3.1, so FACEBOOK breached the TOS by disabling the King Facebook Account.  Of course, one of the requirements of provision 3.1 is that a person cannot maintain a FACEBOOK account if "We've previously disabled your account for violations of our Terms of Service," but the fact that FACEBOOK disabled KING's account does not establish that KING is in violation of provision 3.1 because it is yet to be determined if FACEBOOK properly disabled KING's account.  The issue of whether FACEBOOK properly disabled KING's account requires consideration of provision 4.2 as discussed next in the next section of this MIO.

### B. Provision 4.2 of the TOS is a binding contractual provision on FACEBOOK.

As stated above, the parties agree that the TOS constitutes the contract between FACEBOOK and KING.  There is no doubt that provision 4.2 is part of the TOS, so why would FACEBOOK claim that it is not a binding provision applicable to FACEBOOK?  FACEBOOK's claim is that provision 4.2 "places restrictions on users" and does "not create affirmative obligations" on FACEBOOK (Motion, pp. 5-6).  For this proposition, FACEBOOK cites three cases: *Caraccoli v. Facebook,* Inc., 167 F. Supp. 3d 1056 (2016); *Young v. Facebook, Inc.*, 2010 WL 4269304 (N.D.Cal. Oct 25, 2010); and *King v. Facebook, Inc.*, 2019 WL 6493968 (N.D.Cal. Dec. 3, 2019) (Motion, pp. 4-5).  None of these cases support FACEBOOK's claim.

In the *Young* case, the Plaintiff complained about two alleged breaches of contract by FACEBOOK.  First, she claimed that FACEBOOK failed to follow its "Facebook Principles," but the "Facebook Principles" were not contract provisions which were part of Facebook's "Statement of Rights and Responsibilities" (the precursor to FACEBOOK's TOS (*see* provision 5.1 of the TOS stating that the "Terms of Service" were formerly "known as the Statement of Rights and Responsibilities")) (*see fn. 6* in *Young*).  Second, Young claimed that FACEBOOK failed to protect her from "bullying" tactics employed by her ex-boyfriend, but the Court in *Young* pointed out that the provisions in FACEBOOK's Statement of Rights and Responsibilities saying users should not "bully" other users was a restriction on users and did not constitute an "affirmative obligation" of FACEBOOK.  In fact, the Statement of Rights and Responsibilities contained a disclaimer in capital letters stating that FACEBOOK did  not

guarantee that bullying would not occur.  Provision 4.2 clearly has nothing to do with provision involved in the *Young* case.  Note that at least in the *Young* case, FACEBOOK told Ms. Young specifically what conduct she engaged in which resulted in the disabling of her account.  KING has yet to receive such satisfaction from FACEBOOK in this case.

In the *Carraccoli* case, the Plaintiff was not even a user of FACEBOOK and was complaining about abusive behavior by a FACEBOOK account-holder against him.  The Court cited to *Young* stating that FACEBOOK's Terms of Service did not constitute an "affirmative obligation" on FACEBOOK to protect the Plaintiff from such abuse.  This was not a correct citation to *Young* because *Young*, as stated above, did not involve any provisions that were part of the Terms of Service.  The Terms of Service to which the Plaintiff in *Carraccoli* referred were provisions which applied to FACEBOOK's not being liable for its users' bullying, etc.  In the KING case, KING is a user of FACEBOOK, and she is specifically alleging that FACEBOOK violated provision 4.2 of its Terms of Service (the contract between KING and FACEBOOK).  The allegation of the FAC is that FACEBOOK violated its contractual obligations to KING under provision 4.2 by improperly applying provision 4.2 to the King Facebook Account and improperly disabling the King Facebook Account and destroying all of KING's content.  FACEBOOK's obligations under provision 4.2 were not an issue in *Carraccoli*.

In the *King* case, FACEBOOK's "Terms of Use" (not Terms of Service which apply in this case) which applied in the *King* case stated,  "Facebook may for 'any reason' and in its 'sole discretion' remove content and suspend or block user accounts."  In fn 5, the Court in *King* further referred to two provision in the Terms of Use which stated, "You understand and agree that the Company may, but is not obligated to, review the Site and may delete or remove (without notice) any Site Content or User Content in its sole discretion, for any reason or no reason, including User Content that in the sole judgment of the Company violated this Agreement or the Facebook Code of Conduct, or which might be offensive, illegal, or that might violate the rights, harm, or threaten the safety of users or others," and "Facebook may, in its sole discretion, remove or disable access to any User Content."  In the KING case, the "Terms of Use" which were cited in *King* are not part of the TOS applicable to the KING case.  FACEBOOK admits it acted under provision 4.2 of the TOS in disabling the King Facebook Account, and FACEBOOK does not cite in the KING case to any provisions were at issue in *King*.  As in the *Carraccoli* case, FACEBOOK's obligations under provision 4.2 were not an issue in *King*.

4

FACEBOOK has also made reference to *Ebeid v. Facebook, Inc.* (2019 WL 2059662 (N.D. Cal. May 9, 2019). The *Ebeid* case in no way comes close to approaching the facts or the law in KING's case. In the breach of contract discussion in the *Ebeid* case, the Court noted that the Plaintiff's claim was that Facebook failed to "boost" his posts (in effect, a "boost" is a process whereby posts were turned into ads) despite Facebook's having notified Plaintiff that his posts were boosted. Plaintiff's only "evidence" that his posts were supposedly not "boosted" was that Plaintiff's past boosts reached more people than his more recent boosts. As the Court noted, this was thin evidence at best. Worse yet for Plaintiff's case was that Facebook specifically reserved the right to reject and remove any ad for any reason and that Facebook specifically did not guarantee that ads would be received (a point which was conceded by Plaintiff). On these facts, the Judge in *Ebeid* held that Plaintiff did not allege which contract Facebook supposedly breached, much less the breach of a specific provision therein. In KING's case, KING is alleging that she had a contract (the TOS) with FACEBOOK which provided for her having a Facebook Account, that the contract provided that her account could only be permanently disabled for certain reasons stated in the contract (as set forth in paragraph 4.2 of the TOS), that FACEBOOK stated a reason for disabling KING's Facebook Account, that the reason stated by FACEBOOK was not true, and that FACEBOOK breached its contract with KING by disabling her Facebook Account for an invalid reason and destroying KING's Facebook Account's entire contents in the process. In *Ebeid*, FACEBOOK was specifically permitted by contract to reject and remove the Plaintiff's ads for any reason. No such provision applies in KING's case. In KING's case, FACEBOOK can only take action against KING for the reasons set forth in paragraph 4.2 of the TOS as more fully explained in the next section of this MIO.

### C. Whether FACEBOOK acted appropriately under TOS provision 4.2 is not an issue subject to resolution by pretrial motion.

FACEBOOK's real argument about provision 4.2 is not that it does not create an affirmative obligation on FACEBOOK, but that provision 4.2 is a promise between the parties which gives FACEBOOK "sole discretion" to disable an account (Motion, pp. 4-5). This argument is completely fallacious, and there is nothing in the TOS or in case law which supports FACEBOOK's position. First, provision 4.2 does not use the term "sole discretion" or "sole" anything. The second paragraph of provision 4.2 states, "If we determine that you have clearly, seriously or repeatedly breached our Terms

or Policies, including in particular our Community Standards, we may suspend or permanently disable access to your account."  FACEBOOK argues that "if we determine" means it has "sole discretion" to disable an account.  When FACEBOOK wants to use the term "sole discretion" in any of its contracts or documents with users, it knows how to do so – in the *King* case cited above, FACEBOOK used the term "sole discretion" in two provisions which were considered in that case.  No such term is used in provision 4.2.

Second, the "if we determine" language of provision 4.2 fits into the category of contract language referred to by the commentators and case law as a "satisfaction clause".  *Kohler v. Leslie Hideman, Inc.*, 80 F.3d 1181, 1186-1187 (7th Cir. 1996).  In *Kohler*, the term under consideration was actually "sole discretion," and the Court held that such language would be considered as a "satisfaction clause."  The Court noted that there are two kinds of satisfaction clauses – ones which are purely subjective, and ones which contain objective factors.  Purely subjective clauses involve "feelings, taste, or judgment."  If a subjective clause is involved, the contract obligor (in this case, FACEBOOK) who gets to make the call of "dissatisfaction" against the contract obligee (in this case, KING) must make a "good faith" claim of dissatisfaction.  Corbin, *Contracts*, Sec. 647; Williston, *Contracts* (4th Ed.), Sec. 38:23; *Restatement 2d of Contracts*, Sec. 228; *Locke v. Warner Bros., Inc.*, 66 Cal.Rptr.2d 921, 925-926 (2nd Div. 1997).  The Restatement specifically states that the dissatisfaction claim must be "honest" at the very least and that a mere statement of dissatisfaction is not sufficient to establish "honesty."  The Restatement goes on to provide that if the word "honest" is not used in the contract or there is a question about whether mere "honesty" is sufficient, then a higher "reasonableness" standard applies.  The question of "good faith" (or "honesty" or "reasonableness") is a jury question, *Commercial Mortgage & Finance Corporation v. Greenwich Savings Bank*,  145 S.E.2d 249, 252 (Ga.Ct.App. 1965).  An issue which is a jury question is obviously not capable of determination through a pretrial motion under Rule 12(b)(6).  If the "if we determine" language of provision 4.2 is a subjective clause, a jury makes the determination about whether FACEBOOK made a "good faith" or "honest" decision about whether the King Facebook Account failed to follow FACEBOOK's Community Guidelines.

In this case, it is far from clear that the "if we determine" language of provision 4.2 is a "subjective" clause.  It appears, in fact, to be a clause which contains "objective factors" because there

is an objective formula which applies to FACEBOOK's "determination," namely, whether an account "clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards."  Under the case law, this language of the contract sets an "objective" standard, and a jury would consider whether FACEBOOK was "reasonable" in its application of this standard.  *See also* Corbin, *Contracts*, Sec. 648.

Of course, the major problem we have in this case is that FACEBOOK is stonewalling any discovery whatsoever on how it made its "determination" pursuant to provision 4.2.  As the FAC states, FACEBOOK only claimed that the King Facebook Account failed to follow FACEBOOK's Community Standards, but refused to state any more.  During litigation in this case, FACEBOOK has continued to stonewall, even to the extent of delaying meeting for a Rule 26(f) conference to a date less than 30 days before the hearing on the Motion before this Court to avoid having to respond to Plaintiffs' discovery requests before the hearing date set for the Motion.  Until we have the facts underlying FACEBOOK's determination, no decision can be made about whether FACEBOOK acted in "good faith" or "honestly" or "reasonably" depending on which standard applies.  Certainly, FACEBOOK's claim that is has "sole discretion" which cannot be questioned by anyone is not supported by the language of the contract, the commentators, the Restatement, or case law.  KING has denied in the FAC that she violated any of FACEBOOK's Community Standards at all (a fact which is assumed to be true for purposes of the Motion).  FACEBOOK has refused to provide any facts which at least show at a minimum "good faith" or "honesty" in making its decision to disable the King Facebook Account, and, as the Restatement provides, a mere statement of dissatisfaction without any facts to back up such a claim is insufficient to establish "good faith" or "honesty."  On this basis, KING is entitled to discovery, this Court is entitled to know the underlying facts upon which FACEBOOK based its "determination," and no pretrial ruling on a 12(b)(6) motion is possible at this time on KING's cause of action for breach of contract by FACEBOOK.

**D. The Cause of Action for Breach of Implied Covenant of Good Faith and Fair Dealing should not be dismissed on a 12(b)(6) motion.**

KING's cause of action for breach of implied covenant of good faith and fair dealing is not subject to a 12(b)(6) pretrial ruling.  In *Locke*, the Court held, "The implied covenant of good faith and fair dealing obligated Warner to exercise that  discretion  honestly  and  in good faith," and "Whether

Warner violated the implied covenant and breached the contract . . . is a question for the trier of fact." 66 Cal.Rptr.2d at 927.  Also *see Young*, 790 F.Supp.2d at 1118 ("It is at least conceivable that arbitrary or bad faith termination of user accounts, or even termination of user accounts with no explanation at all, could implicate the implied covenant of good faith and fair dealing."), and *See Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*, Slip Op., pp. 15-16 (D.N.J. 2011), denying Defendant Comast's 12(b)(6) motion under the CDA:

> The Court finds that a reasonable jury could conclude that Comcast acted in bad faith when it failed to respond to Plaintiff's repeated requests for an explanation why it continually blocked Plaintiff's outgoing email.  Notwithstanding the fact that Plaintiff no longer alleges that Comcast told him that he would not have to worry about email blockages if he subscribed to a higher level of service, the Court finds no explanation for Comcast's failure to respond after Plaintiff contacted Comcast to ascertain the reason for the second blockage.  Put simply, the Court is not convinced that an internet service provider acts in good faith when it simply ignores a subscriber's request for information concerning an allegedly improper email blockage.
>
> Moreover, even if, as Comcast argues, the Subscriber Agreement precludes Comcast from liability for monitoring Plaintiff's emails, there is no reason why Comcast could not articulate its immunity (or provide another rationale for the blockage) when asked to do so by a paying customer.  Therefore, because a reasonable jury could conclude that Comcast acted in bad faith when it failed to respond to Plaintiff's requests, Comcast is not entitled to immunity under the CDA. (See casetext.com, Slip Op., pp. 15-16).

## E. Provision 4.3 of the TOS does not apply to the facts of this case.

KING claims as part of FACEBOOK's breach of contract that along with improperly disabling the King Facebook Account, FACEBOOK also improperly destroyed the content of the King Facebook Account.  In response to this claim, FACEBOOK claims that provision 4.3 of the TOS protects FACEBOOK from destruction of the content ("data") of any account (Motion, p. 6).  Actually, provision 4.3 states, "We cannot predict when issues might arise with our Products.  Accordingly, our liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data . . . ."  This provision is set forth in Sec. 3 of the TOS entitled, "Limits on liability."  Clearly, as a matter of contract interpretation, a limitation of liability for "lost" data stemming from an inability to "predict when issues might arise with our Products" has nothing to do with the intentional destruction of account data based on a breach of contract.  If KING establishes at trial that the King Facebook Account content was destroyed because of FACEBOOK's breach of provision 4.3 of the TOS, KING will have established that the content was

not "lost" but "destroyed."  In this context, "lost" means unexpectedly ("cannot predict") unavailable, not intentionally destroyed by breach of contract.

**F. KING has alleged pecuniary harm based on the loss of the content of the King Facebook Account.**

FACEBOOK argues that KING has not alleged any "damages" or "pecuniary harm" caused by FACEBOOK's alleged breach of contract (Motion, p. 6).  KING has alleged in the FAC, paragraph 26, that she has suffered damages as a result of FACEBOOK's breach of contract because the following content is no longer available to her:

> [A]ll her contacts with family and friends over the many years she has had through the King Facebook Account, all the photographs she has sent to others and others have sent to her about families, her grandchildren, trips, and lives, and all other content that was saved on the King Facebook Account, all of which document irreplaceable memories and emotional events.  Further, any and all content she shared has been deleted from the Facebook pages of all of her friends.  Not only is the King Facebook Account gone, but any reference to KING anywhere in *facebook.com* is also gone.  When KING attempted to log on to the King Facebook Account with her name and phone number, the response was the KING's name and phone number were "not valid."  KING was particularly upset to be declared by FACEBOOK to be "not valid."  If a "friend" of KING's looks for KING's name on Facebook, the following message appears: "Didn't find what you're looking for?  We're temporarily hiding some results for this search query."  KING has suffered emotional distress from the damage to her reputation and name by being banned by FACEBOOK to the wonderment and suspicion of her Facebook friends. *See also* ¶ 24).

These are not insignificant damages – the entire content of her Facebook Account which clearly had nothing to do with whatever FACEBOOK is claiming was a failure of KING's Facebook Account to "follow" FACEBOOK's Community Guidelines.  Where does it state in the Terms of Service that FACEBOOK can destroy the entire content of a user's account because of a failure of the account to "follow" FACEBOOK's Community Guidelines, even if FACEBOOK would otherwise be justified in disabling the account?  In KING's case, for purposes of FACEBOOK's 12(b)(6) motion, KING's Facebook Account did NOT fail to follow FACEBOOK's Community Guidelines so FACEBOOK is liable for breach of contract for unjustifiably disabling KING's Facebook Account and for destroying the content of her Facebook Account which is owned by her.  Damages for this kind of loss is not measured by "fair market value."  Damages are measured by Cal. Civ. Code Sec. 3355 which states:

> In estimating damages, except as provided by Sections 3355 and 3356, the value of property, to a buyer or owner thereof, deprived of its possession, is deemed to be the price at which he might have bought an equivalent thing in the market nearest to the place where the property ought to have been put into his possession, and at such time after the breach of duty upon which his right to damages is founded as would suffice, with reasonable diligence, for him to make such a purchase.

The property destroyed by FACEBOOK in this case and now unavailable to KING, such as personal memorabilia, is not valued according to its "sentimental value" but according to its "peculiar value." *Robinson v. United States*, 175 F. Supp. 2d 1215, 1230-1233 (E.D. Cal. 2001).  As explained in *Restatement (Second) of Torts*, Sec. 911, Comment e:

> e. Peculiar value to the owner. The phrase "value to the owner" denotes the existence of factors apart from those entering into exchange value that cause the article to be more desirable to the owner than to others.  Some things may have no exchange value but may be valuable to the owner; other things may have a comparatively small exchange value but have a special and greater value to the owner.  The absence or inadequacy of the exchange value may result from the fact that others could not or would not use the thing for any purpose, or would employ it only in a less useful manner.  Thus a personal record or manuscript, an artificial eye or a dog trained to obey only one master, will have substantially no value to others than the owner.  The same is true of articles that give enjoyment to the user but have no substantial value to others, such as family portraits. Second-hand clothing and furniture have an exchange value, but frequently the value is far less than its use value to the owner.  In these cases it would be unjust to limit the damages for destroying or harming the articles to the exchange value.
>
> Real property may also have a value to the owner greater than its exchange value. Thus a particular location may be valuable to an occupant because of a business reason, as when he has built up good will in a particular neighborhood.
>
> Even when the subject matter has its chief value in its value for use by the injured person, if the thing is replaceable, the damages for its loss are limited to replacement value, less an amount for depreciation. (See § 928).  If the subject matter cannot be replaced, however, as in the case of a destroyed or lost family portrait, the owner will be compensated for its special value to him, as evidenced by the original cost, and the quality and condition at the time of the loss.  Likewise an author who with great labor has compiled a manuscript, useful to him but with no exchange value, is entitled, in case of its destruction, to the value of the time spent in producing it or necessary to spend to reproduce it.  In these cases, however, damages cannot be based on sentimental value. Compensatory damages are not given for emotional distress caused merely by the loss of the things, except that in unusual circumstances damages may be awarded for humiliation caused by deprivation, as when one is deprived of essential articles of clothing.  If the article was wantonly destroyed, punitive damages can be awarded

These damages alleged by KING are not only related to her emotional damages but are also damages to her property and reputation – damages which have "peculiar value" to KING and which are to be

determined by a jury, not to be judged in a 12(b)(6) motion.  In addition to damage to property, KING has properly alleged "bad faith" and wanton destruction by FACEBOOK which could support a finding of punitive damages by a jury.

FACEBOOK claims that there is no contract provision which requires FACEBOOK to maintain the content of the King Facebook Account (Motion, p. 9) and that KING had no "possessory interest" in the King Facebook Account (Motion, p. 13).  FACEBOOK does not seriously claim that KING did not own the contents (data) of the King Facebook Account.  In fact, FACEBOOK recognizes a user's ownership interest in a Facebook account in provision 3 of the TOS.  FACEBOOK is arguing that it had unfettered "sole discretion" to disable the King Facebook Account and that once it did disable the King Facebook Account, KING had not claim to the content (data) in the King Facebook Account.  There are at least two problems with this position.  First, as has already been argued above, FACEBOOK did not have unfettered sole discretion to disable the King Facebook Account.  Second, there is nothing in the TOS which states that *all* past content (data) of an account must be destroyed (removed, made unavailable, etc.) if only *some* recent content violated FACEBOOK's Terms of Service which would justify the disabling of an account.  In fact, provision 2 of the TOS states, "We can remove or restrict access to content that is in violation of these provisions."  Provision 2 does not state that FACEBOOK can remove or restrict access to content which is NOT in violation of the TOS.

## V. Plaintiffs' Breach of Contract and Breach of Implied Breach of Coevenant of Good Faith and Fair Dealing causes of action are not barred by 47 USC 230(c)(1).

FACEBOOK claims that all of Plaintiffs' claims fail "for a second, independent reason: the claims alleged are barred as a matter of law by Sectin 230(c)(1) of the CDA. 47 USC 230(c)(1)." (Motion, p. 16).  For this proposition, FACEBOOK cites *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009).  Not only does *Barnes* not stand for this claimed proposition, the case actually stand for the exact opposite proposition – that regardless of whether Sec. 230(c)(1) is an immunity statute or not, it does not provide immunity for claims of breach of contract.  In *Barnes*, Ms. Barnes complained to Yahoo that her ex-boyfriend was posting nude pictures of her without her permission and posing as her in chat rooms trying to get men to "solicit" her.  Barnes complained to Yahoo and heard nothing until a local news organization was going to broadcast a story about the problem.  Barnes then heard from the Yahoo

11

Director of Communications, Ms. Osako, who said that she would "personally walk the statements over to the division responsible for stopping unauthorized profiles and they would take care of it," 570 F.3d at 1098-1099.  Barnes claimed in her Complaint that she relied on this statement from Ms. Osako and took no further action.  After two months passed and Yahoo did nothing, Ms. Barnes filed suit.  Her Complaint was based on two causes of action – "Negligent Undertaking" (Sec. 323 of the *Restatement 2d of Torts* as adopted in Oregon) and "Promissory Estoppel" (Sec. 90 of the *Restatement 2d of Contracts* as adopted in Oregon), 570 at 1099.  The District Court dismissed both causes of action pursuant to Yahoo's 12(b)(6) motion, and Barnes appealed to the Ninth Circuit.

The Ninth Circuit agreed with Yahoo that Sec 230(c)(1) provided immunity for Yahoo on the Negligent Undertaking Claim because this claim fell within the "publishing or speaking" immunity provided to Yahoo by Sec. 230(c)(1), but the Ninth Circuit disagreed with Yahoo that Sec 230(c)(1) provided "immunity" for Yahoo on the "Promissory Estoppel" claim.  The Court explained the difference between a tort claim and a contract claim with respect to Sec 230(c)(1):

> The difference is that the various torts we referred to above each derive liability from behavior that is identical to publishing or speaking: publishing defamatory material; publishing material that inflicts emotional distress; or indeed attempting to depublish hurtful material but doing it badly.  To undertake a thing, within the meaning of tort, *is* [emphasis in original] to do it.
> 
> Promising is different because it is not synonymous with the performance of the action promised.  That is, whereas one cannot undertake to do something without simultaneously doing it, one can, and often does promise to do something without actually doing it at the same time.  Contract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publications.  Contract law treats the outwardly manifested intention to create an expectation on the part of another as a legally significant event.  That event generates a legal duty distinct from the conduct at hand, be it the conduct of a publisher, or a doctor, or of an overzealous uncle. [Foot note deleted.]

570 F.3d at 1107.  As the Court notes, "In a promissory estoppel case, *as in any other contract case*, the duty the defendant allegedly violated springs from a contract – an enforceable promise – not from any non-contractual conduct or capacity of the defendant [emphasis added]" *Id*.

The Court also viewed the inapplicability of Sec 230(c)(1) to a contract claim from a different viewpoint as well – waiver:

One might also approach this question from the perspective of waiver. The objective intention to be bound by a promise—which, again, promissory estoppel derives from a promise that induces reasonably foreseeable, detrimental reliance—also signifies the waiver of certain defenses. A putative promissor might defend on grounds that show that the contract was never formed (the lack of acceptance or a meeting of the minds, for example) or that he could not have intended as the evidence at first suggests he did (unconscionability, duress, or incapacity, for example). Such defenses go to the integrity of the promise and the intention it signifies; they usually cannot be waived by the agreement they purport to undermine. But once a court concludes a promise is legally enforceable according to contract law, it has implicitly concluded that the promissor has manifestly intended that the court enforce his promise. By so intending, he has agreed to depart from the baseline rules (usually derived from tort or statute) that govern the mine-run of relationships between strangers. Subsection 230(c)(1) creates a baseline rule: no liability for publishing or speaking the content of other information service providers. Insofar as Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline.

570 F.3d 1108-1109. The Court concludes after this two-part analysis:

Therefore, we conclude that, insofar as Barnes alleges a breach of contract claim under the theory of promissory estoppel, subsection 230(c)(1) of the Act does not preclude her cause of action. Because we have only reviewed the affirmative defense that Yahoo raised in this appeal, we do not reach the question whether Barnes has a viable contract claim or whether Yahoo has an affirmative defense under subsection 230(c)(2) of the Act.

570 F.3d at 1109.

In the KING case, if this Court agrees with KING, as argued above, that FACEBOOK had a contractual obligation under the FACEBOOK TOS provision 4.2 to disable the King Facebook Account based on the standard set out in paragraph 4.2 (and not mere "sole discretion" as FACEBOOK argues) and based at a minimum on a "good faith" or "honest" determination by FACEBOOK, and accepts, as it must for purposes of FACEBOOK's 12(b)(6) motion, that KING did nothing to justify FACEBOOK's disabling the King Facebook Account pursuant to paragraph 4.2, then KING has stated a valid breach of contract claim against FACEBOOK which, according to the holding in *Barnes*, is not barred by Sec 230(c)(1), assuming that Sec. 230(c)(1) is properly construed as an "immunity" statute. The reason is that, even if FACEBOOK has an immunity claim under Sec. 230(c)(1), FACEBOOK has agreed to treat KING (and all other FACEBOOK users) according to its promise set out in paragraph 4.2 and by doing so it has "waived" any immunity it might otherwise have under Sec. 230(c)(1). This *Barnes* analysis of inapplicability of Sec. 230(c)(1) to a breach of contract claim applies equally to a claim of breach of the

implied covenant of good faith and fair dealing which is a type of breach of contract claim.

## VI. Section 230(c) has been misconstrued by the appellate courts and does not provide the immunity claimed by FACEBOOK.

How did the Big Tech companies become so rich and powerful?  At one time, back in the 90s when the Big Tech companies were trying to get started and were Little Tech companies, they were threatened with extinction as the *Barnes* case explains, 570 F.3d at 1101.  In *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995) (unpublished), the Court held that "an internet service provider could be held liable for defamation" (*Barnes*, 575 F.3d at 565) based on the fact that the internet provider took on the responsibility to provide *any* editing function of the content uploaded to its platform at all, even if the editing was basically limited to excluding the uploading of pornographic material.  Congress saved the Little Tech companies by passage of Sec 230 of the CDA.  By Congress' action, Little Tech became Big Tech, but it was not Congress' action which resulted in Big Tech's becoming so big, so powerful, and so abusive of Free Speech.  What has caused Big Tech to become powerful enough to block presidents of the United States from uploading anything at all to their platforms, or to block any reference to Hunter Binden's laptop to protect the presidential run of his father, or to block any dissenting views regarding the effectiveness of masks or vaccines in the fight against COVID-19, or generally to block a whole host of conservative views (like those expressed by KING) and ride roughshod over Free Speech?  This was not the doing of Congress; this was the doing of the federal courts which have completely misconstrued and misinterpreted Sec. 230.  It was never the intent of Congress to give Big Tech such power and be able to have the unfettered abusive power to stifle Free Speech which exists today.  In fact, when Congress enacted the CDA, Congress specifically stated its desire to promote Free Speech in its Findings and Policy statements set out in 42 USC 230(a) & (b):

> (a) Findings – The Congress finds the following:
> (1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent *an extraordinary advance in the availability of educational and informational resources to our citizens*.
> (2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.
> (3) The Internet and other interactive computer services offer *a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity*.

14

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) *Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.*

(b) Policy

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to *preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services*, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer. [Emphasis added.]

It was clearly Congress' intent to promote "a true diversity of political discourse," "cultural development," and provide a "myriad avenues for intellectual activity" with "a minimum of governmental regulation." Congress wanted to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services" which included a "free market" for goods and service and for Free Speech. Unfortunately, the federal courts have misconstrued Sec. 230(c)(1) to hand Big Tech on a "silver platter" "immunity" which Congress never intended to supply, and this has led to the perversion of the Findings and Policy set out in Sec. 230(a) & (b) that we see today with Big Tech stifling, limiting, and controlling Free Speech in any manner it chooses. Big Tech consists of "private entities," after all, the courts have held, which are not limited by constitutional protections for Free Speech.

The federal courts have overlooked the text of Sec. 230(c) and have ignored the fact that Sec 203(c) is a two-part statute. Sec. 230(c) is a two-part statute because it applies in two different situations – 1) to material which providers of interactive computer services (like FACEBOOK and other Big Tech platforms) have left "up" on their websites, and 2) to material which providers of interactive computer services have decided will be "not up" on their websites (either because the "not up" material is banned by the providers from being uploaded in the first place or because the material is taken down by the

providers after being uploaded).  Sec. 230(c)(1) (which is cited by FACEBOOK for absolute immunity protection for all actions taken by FACEBOOK against KING) is simply a definitional provision, *Barnes*, 570 F.3d at 1100, which provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  This provision protects Big Tech from liability *by inference* because Big Tech is defined not to be a publisher or speaker for material it is "hosting or distributing" (the material that is "up").  Sec. 230(c)(2)(A) provides that "[n]o provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."  This provision protects Big Tech from liability, not by definitional inference but, by specific statutory text referring to "no liability" for action taken to bar or take down material (the material that is "not up"), with qualification as discussed below.

Justice Thomas summarized this two-part structure of Sec. 203(c) in his Statement supporting denial of cert in *Malwarebytes, Inc. v. Software Group USA, LLC*, 592 U.S. ___ (2020) (pp. 3-4), as follows: "In short, the statute suggests that if a company unknowingly leaves up illegal third-party content, it is protected from publisher liability by Sec. 230(c)(1); and if it takes down certain third-party content in good faith, it is protected by Sec. 230(c)(2)(A)."  Justice Thomas goes on to say about his simple, straightforward, textual summary of Sec. 230's two-part structure, "This modest understanding is a far cry from what has prevailed in court.  *Adopting the all too common practice of reading extra immunity into statutes where it does not belong . . .*, courts have relied on policy and purpose arguments to grant sweeping protection to Internet platforms [emphasis added]."  In other words, the problem, as Justice Thomas sees it, is that the "immunity" that the federal courts have granted Big Tech by interpreting 230(c)(1) to grant immunity for "*any* editing decision" Big Tech  makes (that is, any decision to leave up OR to block or take down) (which is the very sweeping immunity being claimed by FACEBOOK in the KING case) is an improper interpretation of Sec 230(c)(1).  As Justice Thomas states later in his *Malwarebytes* Statement:

The decisions that broadly interpret §230(c)(1) to protect traditional publisher functions also eviscerated the narrower liability shield Congress included in the statute. Section 230(c)(2)(A) encourages companies to create content guidelines and protects those companies that "in good faith . . . restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Taken together, both provisions in §230(c) most naturally read to protect companies when they unknowingly *decline* to exercise editorial functions to edit or remove third-party content, §230(c)(1), and when they *decide* to exercise those editorial functions in good faith, §230(c)(2)(A).

But by construing §230(c)(1) to protect any decision to edit or remove content, *Barnes v. Yahoo!, Inc.*, 570 F. 3d 1096, 1105 (CA9 2009), courts have curtailed the limits Congress placed on decisions to remove content, see *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, *3 (MD Fla., Feb. 8, 2017) (rejecting the interpretation that §230(c)(1) protects removal decisions because it would "swallo[w] the more specific immunity in (c)(2)"). With no limits on an Internet company's discretion to take down material, §230 now apparently protects companies who racially discriminate in removing content. *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 Fed. Appx. 526 (CA9 2017), aff 'g 144 F. Supp. 3d 1088, 1094 (ND Cal. 2015) (concluding that "'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune'" under §230(c)(1)).

To summarize the correct interpretation of Sec. 230, Sec. 230(c)(1) only properly applies to material that is left "up" by Big Tech, which is not the issue in the KING case. Sec. 230(c)(2)(A) is the subsection of Sec. 230 which applies when the issue involves material that is "not up" (either because Big Tech blocks the material or takes the material down). The issue in the KING case involves material which was taken down (it is now "not up"), so Sec. 230(c)(1)'s "immunity by definitional inference" which is applicable to material that is "up" does not apply; the question in the KING case is whether Sec. 230(c)(2)(A) immunity applies to protect FACEBOOK on a 12(b)(6) motion. In fact, in the breach of contract section of the *Barnes* decision discussed above, the Court specifically stated that even though Sec. 230(c)(1) immunity did not apply to breach of contract claims, there was still the possibility of Sec. 230(c)(2)(A) immunity (which, of course, is not an issue to be decided by a pretrial motion like 12(b)(6) or summary judgment because the jury issue of "good faith" is involved). After KING obtains discovery from FACEBOOK about why it disabled the King Facebook Account, then the issue of "good faith" can be further litigated.

With respect to this last question, FACEBOOK's Sec. 230 immunity claim in a 12(b)(6) motion succeeds only if FACEBOOK clearly meets the two qualifications set out in Sec. 230(c)(2)(A) – first, FACEBOOK must act in "good faith" in its decision to "restrict access" to its website (its "not up"

decision), and second, the "good faith" determination must be made in part based on a consideration of whether the "not up" material was "constitutionally protected."  On this second qualification, another way to state the issue is that if the "not up" material is clearly material that would be "constitutionally protected" if the Free Speech Clause did apply to Big Tech (as it applies to governmental action), then it would be difficult, if not impossible, for Big Tech to claim "good faith" in disallowing the material to be "up."  In other words, the Free Speech Clause applies to Big Tech, not as a constitutional issue directly (because Big Tech companies are "private" entities) but as a statutory construction issue.  Put another way, the "trade-off" provided to Big Tech by Congress in Sec. 230 was that Congress would protect Big Tech from law suits for "up" material as long as Big Tech did not throw "constitutionally protected" material in the "not up" category.  This would be an interpretation of Sec. 230 completely consistent with the intent of Congress stated in Secs. 230(a) & (b).  Otherwise, why is the term "constitutionally protected" included in Sec. 230(c)(2)(A) in the first place?  Up to now, litigants have been complaining about Big Tech's abuse of Free Speech in the wrong way – litigants have been claiming that Big Tech is so Big that it has become "like a governmental entity" to which the Free Speech Clause should apply.  This argument has consistently failed *(see for example, Prager University v. Goole LLC*, 951 F.3d 991 (9th Cir. 2020)) and probably rightly so – crossing the line between "private" action and "governmental" action as a matter of *constitutional* law is a difficult argument to make and applies in limited circumstances where government has clearly "partnered" with private enterprise.  *See for example, Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956), and *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989).  As we understand it, this "partnering" argument is one being made by the latest Trump lawsuit filed in Florida based on supposed evidence of collusion between Big Government and Big Tech.  Our analysis of that claim is "good luck with that."  The correct argument is that Congress set a standard *by statute* which incorporates by reference the law applicable to the Free Speech Clause banning Big Tech from barring Free Speech material from being "up".  Free Speech case law applies to Big Tech not through the Constitution directly (because Big Tech companies are "private" entities) but through Sec. 230 directly as a *statutory* dictate.  Big Tech gets to be Big, but only by complying with the statutory mandates that allowed Big Tech to get Big.  Conservatives especially have been attempting to apply Free Speech protection to Big Tech through the Constitution

18

and failing every time.  They have  not  seen  that the answer to protecting Free Speech from Big Tech abuse is right in front of their faces as a matter of statutory construction, not constitutional protection. Congress thought about protecting Free Speech from inappropriate Big Tech intrusion when it enacted Sec. 230 – the problem, as clearly stated by Justice Thomas, is that the courts have failed to interpret Sec. 230 correctly.  The courts are the problem creating Big Tech abuse of Free Speech, not Congress.

On this construction of Sec. 230, Big Tech is not allowed to exercise its "sole discretion" to take down any content it feels like taking down.  Even if FACEBOOK's argument that provision 4.2 should be construed, as a matter of contract interpretation, to allow it to have unfettered "sole discretion" to take down any material it feels like taking down any time it feels like doing it, such a provision would be disallowed by Sec. 230(c)(2)(A) which permits Big Tech to take down only material that is not otherwise "constitutionally protected."  Because FACEBOOK has refused in this case to provide discovery, we do not know what material which was uploaded to the King Facebook Account caused FACEBOOK to disable the King Facebook Account.  If the material uploaded to the King Facebook Account was otherwise "constitutionally protected," then FACEBOOK was not authorized to take it down and was not authorized to disable the King Facebook Account.  Until discovery is complete in this case, no decision can be made on whether FACEBOOK is entitled to immunity for what it did to KING, and it would be inappropriate to grant a 12(b)(6) motion or any other pretrial motion (like 12(c) or summary judgment) because the facts of the case are not yet known.  In other words, FACEBOOK does not get to keep stonewalling discovery requests in this case.

Of course, Plaintiffs are aware that this Court will probably refuse to accept the analysis out in this section of this MIO because it feels constrained by Ninth Circuit precedent giving FACEBOOK the kind of broad immunity about which Justice Thomas complains above (Justice Thomas specifically refers to the *Barnes* case as one misinterpreting Sec. 230(c)(1) to give Big Tech immunity not intended by Congress), but the argument in this section of the MIO is made to preserve the issue for appeal to an *en banc* panel of the Ninth Circuit and ultimately, if necessary, for cert application where Justice Thomas will obviously be an enthusiastic recipient.  The days of Big Tech's abuse of Free Speech are numbered once a proper reading of Sec. 230 becomes the law of the land.  This case at this level of litigation may not be where the abuse of Free Speech ends and Free Speech is vindicated, but vindication is coming. Meanwhile, as argued above, Sec. 230(c), does not apply to KING's breach of contract claims.

**VII. KING has a cognizable claim under the CDA (Claim 2).**

Based upon the analysis in Part VI above, and again to preserve this issue for the record, KING does have a separate federal claim for damages under the CDA.  Sec. 230(c)(2) specifically addresses "Civil Liability".  We argue, as does Justice Thomas, that Sec. 230(c)(1) does not apply to material which an interactive computer service (Big Tech) decides will be "not up" (material that is either taken down or barred from uploading).  If the limited protection provided by Sec. 230(c)(2)(A) does not apply to a decision by an interactive computer service to either take down or bar material, then Sec. 230(c)(2) provides a basis for an implied federal cause of action.  Just as Congress provided protection for an interactive computer service in Sec. 230(c)(1) for any material left "up," the intent of Congress was to provide an implied federal cause of action against an interactive computer service for a decision to block or take down material, especially material that is "constitutionally protected," not covered by Sec. 230(c)(2)(A).  *See* Bellia, *Justice Scalia, Implied Rights of Action, and Historical Practice*, Notre Dame Law Review, Vol. 92:5, p. 2076 (2017); Preis, *How the Federal Cause of Action Relates to Rights, Remedies, and Jurisdiction*, Florida Law Review, Vol. 67:2, p.848 (2016); Newcombe, *Implied Private Rights of Action: Definition, and Factors to Determine Whether a Private Action Will Be Implied from a Federal Statute*, Loyola University Chicago Law Journal, Vol. 49, p. 117 (2017).

**VIII. The Motion should be denied as to KING's causes of action for Intentional and Negligent Infliction of Emotional Distress.**

FACEBOOK argues that KING has failed to allege facts which support a claim of "outrageous conduct" necessary to support a cause of action for Intentional Infliction of Emotional Distress (Motion, pp. 9-10).  FACEBOOK, of course, chooses to trivialize the fact that it embarrassed KING before all her FACEBOOK friends by disabling the King Facebook Account and intentionally destroying the content of the King Facebook Account.  Being publically embarrassed and humiliated publically by a Big Tech company on the internet for supposedly violating its "Community Standards" is hardly a trivial assault on KING's psyche.  Obviously, FACEBOOK itself considers a violation of its "Community Standards" a serious matter – how can FACEBOOK then argue that disabling a user's account for violation of its Community Standards is a trivial matter?  This is a matter for a jury to decide and not subject to evaluation by a 12(b)(6) motion or any other pretrial motion.  FACEBOOK falls back on it claim that its "conduct is expressly permitted by Facebook's Terms of Service and federal law" (Motion, p. 10).

KING has already set forth her arguments above disputing FACEBOOK's claim that its conduct is expressly permitted by the TOS or immunized by the CDA.  Of course, we do not yet know the full extent of the motive behind FACEBOOK's conduct toward KING because FACEBOOK up to now has stonewalled on providing discovery.  Certainly before FACEBOOK's motive is assessed, KING is entitled to discovery.  KING, as argued above, has made out a claim for bad faith on the part of FACEBOOK in her FAC.

FACEBOOK also argues that KING has failed to allege facts which support a cause of action for Negligent Infliction of Emotional Distress (Motion, pp. 11-12).  KING has claimed that FACEBOOK destroyed the King Facebook Account content without just cause – either intentionally or negligently. KING has stated in her FAC that she did not violate any of FACEBOOK's Community Standards – this must be accepted as a fact for a 12(b)(6) motion.  Until we obtain further discovery which unjust action of which FACEBOOK is guilty, KING has stated a proper complaint for negligent infliction of emotional distress based on the destruction of the King Facebook Account content which is her property as set forth in Section IV.F of this MIO above.  FACEBOOK had a duty to protect KING's property (the content of the King Facebook Account) independent of any contractual relationship between FACEBOOK and KING.  This was property which KING was entitled to take with her if she ever decided to terminate the King Facebook Account (*see* TOS, provision 3.1 ("You can download a copy of your data at any time before deleting your account.").  KING has properly alleged that she is a "direct victim" of FACEBOOK's negligence.  *See* California Civil Jury Instruction 1620 and the cases cited in support thereof.

**IX. The Motion should be denied as to KING's causes of action for Conversion.**

FACEBOOK argues that KING has failed to state a cause of action for Conversion (Motion, pp. 12-14).  FACEBOOK claims that it did not destroy the content of the King Facebook Account because FACEBOOK had "sole discretion" to disable KING's Account and thereby everything associated with it.  We have already addressed above FACEBOOK's fallacious argument that it had "sole discretion" to disable the King Facebook Account.

FACEBOOK argues that KING never had a "legitimate claim to exclusivity" of the contents of the King  Facebook Account (Motion, p. 14),  but as already argued above,  FACEBOOK  makes  no

serious claim that KING did not own the content of the King Facebook Account.  More to  the  point, FACEBOOK again makes the fallacious argument that KING "contractually agreed that . . . she could be entirely ***excluded*** [FACEBOOK's emphasis] from accessing her account" (*id*.) if FACEBOOK in its "sole discretion" disabled her account.  FACEBOOK has no such "sole discretion."

Finally, FACEBOOK claims it is not liable for "lost" data under TOS 4.3.  This issue has already been addressed in Section IV.E of this MIO above.  TOS 4.3 does not apply to the facts of this case.

## X. The Motion should be denied as to CKING's causes of action for Intentional, Reckless, Grossly Negligent, and/or Negligent Infliction of Emotional Distress.

FACEBOOK argues that CKING's claims set forth in the Fifth Cause of Action in the FAC should be dismissed (Motion, pp. 15-16).  To the extent that FACEBOOK relies on the same arguments it made regarding dismissal of KING's IIED and NIED claims, CKING restates the arguments above regarding why KING's IIED and NIED claims should not be dismissed.  Obviously, CKING's claims are based on his status as a "bystander" to KING's "direct" claims for IIED and NIED.  *See*  California Civil Jury Instruction 1621 and the cases cited in support thereof.  CKING qualifies for "bystander" status because he is the son of KING who resides with KING and witnessed the trauma FACEBOOK caused to KING by FACEBOOK's wrongful conduct.  CKING, as a computer engineer, was even actively involved in assisting KING in trying have the King Facebook Account reestablished, and CKING dealt with FACEBOOK employees who contacted other FACEBOOK employees about the problem.  FACEBOOK cannot claim that it was unaware of CKING's presence in the home with KING because of CKING's direct involvement in attempting to correct the wrong perpetrated by FACEBOOK on KING.

FACEBOOK also claims that CKING's loss of consortium claim should be dismissed (Motion, pp. 15-16).  Under present California law, this appears to be a valid position – that is, that there is no claim of a child for loss of companionship, affection, etc. related to an injured parent.  There are a number of commentators who have urged the California Supreme Court to reverse this position, so the claim is made here for possible appeal at a later time.  CKING's IIED and NIED claims are not affected if his claim for loss of consortium is dismissed.

**XI. Conclusion**

 Based on the foregoing arguments, Plaintiffs urge this Court to make the following orders:

 1) FACEBOOK's 12(b)(6) motion should be dismissed because it relies on affirmative defenses which are not properly considered in a 12(b)(6) motion.

 2) FACEBOOK should be ordered to comply with Plaintiffs' discovery requests regarding the reasons FACEBOOK disabled the King Facebook Account and whether the King Facebook Account content can still be recovered.

 3) If this Court does not dismiss FACEBOOK's 12(b)(6) motion, then the motion should be denied in its entirety (except for FACEBOOK's claim that CKING's "consortium" claim should be dismissed).

 DATED: San Francisco, California, October 8, 2021.

_____/s/ Samuel P. King, Jr._____
SAMUEL P. KING, JR.
Attorney appearing pro hac vice for Plaintiffs
