RUSSEL DAVID MYRICK 270803
The RDM Legal Group
7979 Ivanhoe Ave, Ste 200
La Jolla, CA 92037-4505
Tel. No. 888-482-8266
Fax No. 858-244-7930
Email: russel@rdmlg.com

SAMUEL P. KING, JR. 1396
735 Bishop Street, Suite 304
Honolulu, Hawaii 96813
Tel. No. 808-384-6325
Fax No. 808-533-4745
Email: sam@kingandking.com
Pro Hac Vice

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIENNE SEPANIAK KING and CHRISTOPHER EDWARD SEPANIAK KING,<br><br>    Plaintiffs,<br><br>    vs.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>    Defendant.<br>_____ | ) Civ. No. 3:21-cv-04573-EMC<br>)<br>) PLAINTIFFS' MEMORANDUM IN<br>) OPPOSITION TO DEFENDANT'S MOTION<br>) TO STAY DISCOVERY PENDING MOTION<br>) TO DISMISS FIRST AMENDED<br>) COMPLAINT; EXHIBIT A<br>)<br>) Hearing Date: 12/9/21<br>) Hearing Time: 1:30 p.m.<br>) Courtroom: 5<br>)<br>) Judge: Hon. Edward M. Chen<br>)<br>) Date Complaint Filed: June 14, 2021<br>) Date First Amended Complaint Filed: September<br>)   10, 2021<br>)<br>) Trial Date: None set<br>) |

<u>TABLE OF CONTENTS</u>

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. There is no "good cause" for staying the 30(b)(6) deposition in this case. . . . . . . . . . . . . . . . .  3

III. FACEBOOK's Dismissal Motion is not clearly dispositive of the FAC's Breach of
Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Causes of
ction  – all cases cited by FACEBOOK are distinguishable.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    (*Cross, Caraccioli, Carraccioli (9ᵗʰ Cir. affirmation), and Young (1ˢᵗ dismissal)*  . . . . . . . .  5

    *King*, *Murphy*, *Young (2ⁿᵈ dismissal)*, and *Ebeid*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

IV. Paragraph 4.2 of FACEBOOK's TOS requires that FACEBOOK acted at least
"honestly" or with "good faith" in disabling KING's Facebook Account and more
probably that FACEBOOK acted in a "just and reasonable" manner.  In either case,
KING is entitled to discovery regarding these fact-based determinations . . . . . . . . . . . . . . . . . . .  9

V. FACEBOOK is not entitled to "immunity" pursuant to 47 USC 230(c)(1) on KING's
FAC Breach of Contract and Breach of Implied Covenant of Good Faith and Fair
Dealing causes of action.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18
*Caraccioli v. Facebook, Inc.*, 167 F. Supp.3d 1056 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
*Ebeid v. Facebook, Inc.* (2019 WL 2059662 (N.D. Cal. May 9, 2019) . . . . . . . . . . . . . . . . . . . . . 5, 7
*King v. Facebook, Inc.*, 2019 WL 6493968 (N.D.Cal. Dec. 3, 2019). . . . . . . . . . . . . . . . . . . . . 5, 7, 8
*Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15
*Locke v. Warner Bros., Inc.*, 66 Cal.Rptr.2d 921 (2nd Div. 1997). . . . . . . . . . . . . . . . . . . . . . . . . 12-14
*Workman v. United Parcel Serv. Inc.*, 234 F.3d 998 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 17
*Young v. Facebook, Inc.*, 2010 WL 4269304 (N.D.Cal. Oct 25, 2010) . . . . . . . . . . . . . . . . . . . . . . 5-6

**<u>Treatises</u>**

*Restatement 2d of Contracts*, Sec. 228 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12
Williston, *Contracts* (4th Ed.), Sec. 38:21 & 38:22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**<u>Rules</u>**

FRCP Rule 26(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
FRCP Rule 26(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4
FRCP Rule 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

**<u>Statutes</u>**

Cal. Civ. Code Sec. 1654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
47 USC 230(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO STAY
DISCOVERY PENDING MOTION TO DISMISS FIRST AMENDED COMPLAINT

## I. Introduction

Defendant FACEBOOK moves that this Court stay discovery pending this Court's ruling on its Motion to Dismiss First Amended Complaint ("Stay Motion"). There are three discovery requests pending at this time: 1) Plaintiffs' First Request to Defendant for Answers to Interrogatories and for Production of Documents ("Discovery Request") served on FACEBOOK on October 1, 2021, which is due at the latest by November 1, 2021. This Discovery Request is identical to one originally served on FACEBOOK on September 25, 2021 (*see* Exhibit E to the Declaration of Jason George ("Declaration") filed October 20, 2021, in support of the Stay Motion); 2) Plaintiffs' Discovery Request served on FACEBOOK on October 12, 2021 (again identical to Exhibit E of the Declaration) which is due at the latest by November 15, 2021; and 3) Plaintiffs' Notice of Taking Deposition Upon Oral Examination Pursuant to Federal Rules of Civil Procedure, Rule 30(b)(6) ("Deposition Notice") (*see* Exhibits F & G of the Declaration). The deposition was set for October 29, but this Court recently ruled that the deposition would be stayed pending this Court's ruling on FACEBOOK's Motion to Dismiss First Amended Complaint ("Dismissal Motion") present set before this Court for a hearing on November 4.

On September 26, this Court notified the parties that the Initial Case Management Conference ("CMC") was rescheduled to November 4, 2021, "to be heard alongside the Dismissal Motion. This Court's September 26 notice also advised the parties that the Joint Case Management Statement ("JCMS") was due by October 28, 2021. On September 27, Plaintiffs' counsel emailed Defendant's counsel requesting that the Rule 26(f) conference be held that week or as early as possible because Defendant's counsel had already advised Plaintiffs' counsel several times that FACEBOOK would refuse to provide any discovery and that FACEBOOK was guaranteed to win its Dismissal Motion. Plaintiffs' counsel did not receive a response to his September 27 email, so he again emailed Defendant's counsel on September 29 requesting a Rule 26(f) conference during that week or early the next week. Defendant's counsel responded on September 29 that he would be available the week of October 14 [he probably meant "the week of October 11"]. Plaintiffs' counsel responded on September 29 that such "stalling" was completely unnecessary just to hear Defendant's counsel again refuse to provide any discovery and guarantee that

FACEBOOK would win its Dismissal Motion.  Plaintiffs' counsel did not receive a response to his second September 29 email, so Plaintiffs' counsel emailed Defendant's counsel on October 1 stating that it was obvious that FACEBOOK was stalling for a meaningless 26(f) conference just to avoid having to respond to a Discovery Request before November 4 (any 26(f) conference after October 4 would achieve the discovery stall because answers to interrogatories would be due after November 4).  Plaintiffs' counsel then filed Plaintiffs' Case Management Statement on October 1 pursuant to LR 16-9(a) complaining that FACEBOOK was merely stalling the 26(f) statement to avoid providing any discovery before the November 4 CMC.

After Plaintiffs filed their Case Management Statement, Defendant's counsel advised Plaintiffs' counsel by email dated October 1 that Plaintiffs' Case Management Statement was "not authorized" by FACEBOOK and requested to meet during the week of October 11.  Plaintiffs' counsel responded that he was still willing to talk about discovery at any time, and counsel agreed to have a phone conference on October 12.  Counsel did have a phone conference on October 12 during which time Defendant's counsel, as expected, repeated FACEBOOK's refusal to provide any discovery prior to this Court's ruling on the Dismissal Motion.  While Defendant's counsel referred to the October 12 phone conference as a "Rule 26(f)" conference, Plaintiffs' counsel referred to it as a "talk about discovery" continuing to maintain Plaintiffs' position that FACEBOOK was simply using the October 12 date as a stall tactic to avoid legitimate discovery requests.  After the October 12 phone conference, Plaintiffs' immediately filed an amendment to their Case Management Statement on October 12 and served FACEBOOK again with their Discovery Request on October 12 (an answer to this discovery request would be due by November 15 at the latest).  During the October 12 phone conference, Defendant's counsel made it clear that FACEBOOK would not cooperate with a Rule 30(b)(6) deposition prior to the November 4 hearing.  There is nothing in the FRCP which bars Plaintiffs' setting of a Rule 30(b)(6) deposition at this time, and it was clear that trying to "schedule" a deposition with FACEBOOK, considering its refusal to cooperate with any discovery, would be a waste of time, so Plaintiffs set a 30(b)(6) deposition for October 29 (*see* Exhibits F & G of the Declaration).  This gave FACEBOOK 2 1/2 weeks to provide someone from FACEBOOK to answer the few simple questions requested in the 30(b)(6) deposition notice (the whole deposition could conceivably take less than an hour), and Plaintiffs' counsel's cover letter sent to Defendant's counsel with

the deposition notice stated that Plaintiffs' counsel would be willing to reschedule the deposition to any time convenient to Defendant's counsel as long as the deposition occurred on or before November 2.  On October 18, Defendant's counsel requested that the 30(b)(6) deposition be continued until after the CMC, and Plaintiffs' counsel agreed not to proceed with the 30(b)(6) deposition if FACEBOOK would answer the simple questions set out in the interrogatories.  Defendant's counsel refused.  Plaintiff's counsel reiterated that he would be willing to reset the 30(b)(6) conference at any time on or before November 2. Pursuant to FACEBOOK's following "letter to court" procedure for emergency objection to discovery, this Court ruled that the 30(b)(6) deposition would be put off and its scheduling considered at the Dismissal Motion hearing.  It is expected that FACEBOOK will ignore Plaintiffs' position that a response to interrogatories is due by November 1, 2021.  On October 28, 2021, FACEBOOK recently served its Initial Disclosures on Plaintiffs and did not list one single individual at FACEBOOK who knows anything about this case.  Only the Plaintiffs were listed as persons having any knowledge about this case.  The Initial Disclosures did not state whether the content of the ADRIENNE KING ("KING") Facebook Account is still available for review.

It is with this background that FACEBOOK has filed its Stay Motion.  FACEBOOK complains that Plaintiffs' seek "extensive discovery" (Stay Motion, p. 2) and requests that this Court move from a neutral position in this case and help FACEBOOK out as FACEBOOK files its Dismissal Motion "and, if necessary, any subsequent motion to dismiss" (Stay Motion, pp. 2-3) by staying legitimate discovery requests permitted by the FRCP.  For the reasons set forth below, Plaintiffs object to the stay of any legitimately requested discovery in this case.

## II. There is no "good cause" for staying the 30(b)(6) deposition in this case.

As noted above, FACEBOOK has stalled the 26(f) conference between the parties to defeat any discovery by Plaintiffs prior to the presently scheduled November 4 hearing on FACEBOOK's Dismissal Motion.  It is Plaintiffs' position that the 26(f) conference should have occurred on or before October 1, 2021, so that the presently pending Discovery Request wold be due by November 1, 2021.  Of course, FACEBOOK can easily avoid responding to the Discovery Request by simply responding that the Discovery Request was prematurely served on it before what FACEBOOK claims was the 26(f) conference on October 12.  Assuming that October 12 was the 26(f) conference date, Plaintiffs were fully

3

within their rights under the FRCP to set a Rule 30(b)(6) deposition which Plaintiffs did and set the deposition for October 29 (more than 10 days in advance of the deposition as set forth in this Court's Civil Standing Order on Discovery). Plaintiffs also informed FACEBOOK's counsel that the deposition could be reset for any time on or before November 2 at FACEBOOK's request. Of course, Plaintiffs could not schedule a 30(b)(6) deposition with the cooperation of FACEBOOK because FACEBOOK has made it clear that it refuses to engage in any discovery until this Court has ruled on the Dismissal Motion. Based on this refusal by FACEBOOK, Plaintiffs did the best they could to set the 30(b)(6) at a time which accommodated FACEBOOK.

FRCP Rule 26(d)(1) bans "discovery from any source before the parties have conferred as required by Rule 26(f) . . . ." FACEBOOK contends that the 26(f) conference occurred on October 12. Assuming this is true, after October 12, Plaintiffs were within their rights under the discovery rules to note a 30(b)(6) deposition. Of course, FACEBOOK does not like the setting of a 30(b)(6) deposition because it has no excuse to stall the deposition beyond the November 4 hearing date on its Dismissal Motion.

In order to stay discovery of a properly noted 30(b)(6) deposition, pursuant to FRCP Rule 26(c)(1), FACEBOOK must show "good cause" to protect FACEBOOK from "annoyance, embarrassment, oppression, or undue expense." As this Court can see from the 30(b)(6) deposition notice, the questions to be asked are extremely limited and can be answered in less than an hour at a deposition. These questions can hardly be categorized as causing FACEBOOK "annoyance, embarrassment, oppression, or undue expense." FACEBOOK's claim at p. 2 of its Stay Motion that Plaintiffs are seeking "extensive discovery" in this very simple case is clearly a gross overstatement. All Plaintiffs want to know is what was uploaded on to the King Facebook Account which "failed to follow FACEBOOK's Community Standards," which Community Standard(s) was/were violated, how the specified Community Standard(s) was/were violated, and can KING recover the content of her Facebook Account and, if so, how. As stated, these questions can easily be answered in a 30(b)(6) deposition in less than an hour (counting time spent qualifying the witness). There is no "good cause" which FACEBOOK can present to provide answers to these simple extremely relevant questions. Immediately after this Court rules on the Dismissal Motion, if this Court does not dismiss Plaintiffs' First Amended Complaint ("FAC"), this Court should permit Plaintiffs to proceed with their noted 30(b)(6) deposition.

**III. FACEBOOK's Dismissal Motion is not clearly dispositive of the FAC's Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Causes of Action – all cases cited by FACEBOOK are distinguishable.**

FACEBOOK continues to make its unsubstantiated claim that it is either not subject to, or "immune" from, any claim for breach of contract or breach of the implied covenant of good faith and fair dealing as stated in the FAC. FACEBOOK continues to make its claim in its Stay Motion that because it is guaranteed to prevail in its Dismissal Motion, no discovery should be allowed . FACEBOOK cites a series of federal district court cases and two California cases without any analysis of those cases, which are clearly distinguishable from this case, and which are not even binding on this Court. In particular, FACEBOOK continues to cite to *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D.Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. 2017), and *King v. Facebook, Inc.*, 2019 WL 4221768 (N.D.Cal. Sept. 5, 2019), *aff'd*, 845 F. App'x 691 (9th Cir. 2021); and now cites to *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12 (2021), and *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190 (2017). FACEBOOK has also previously cited to *Young v. Facebook, Inc.*, 2010 WL 4269304 (N.D.Cal. Oct 25, 2010) (*Young's* amended complaint was also dismissed on 5/17/11), and *Ebeid v. Facebook, Inc.* (2019 WL 2059662 (N.D. Cal. May 9, 2019). All of these cases are summarized in Exhibit A attached to this Memorandum in Opposition to FACEBOOK's Stay Motion ("Stay MIO") and are analyzed in detail below.

**(*Cross*, *Caraccioli*, *Carraccioli* (9th Cir. affirmation), and *Young* (1st dismissal)** Of the eight cases referenced above, four (*Cross*, *Caraccioli*, *Carraccioli* (9th Cir. affirmation), *and Young* (1st dismissal)) involve complaints by users of FACEBOOK that FACEBOOK did not protect them from bullying, intimidating, or harassing behavior by other FACEBOOK users, or protect them from content by other FACEBOOK users against them which was "hateful, threatening, or pornographic; incites violence; or contains nudity." In each case, FACEBOOK's contract with the users specifically stated that FACEBOOK did not guarantee that FACEBOOK would be "safe or secure" and specifically stated in capital letters that FACEBOOK "is not responsible for the action, content, information, or data of third persons." This issue was first raised in the first *Young* case in which the Court cited to the capital letter disclaimer and held that FACEBOOK's contract with its users (its "Statement of Rights and Responsibilities" which is now called its "Terms of Service") "do not create affirmative obligations" of FACEBOOK to protect its users from the actions of third persons (other users). Also in the first *Young*

case, the Plaintiff had complained that FACEBOOK was not enforcing its "Principles" which "derived" from its Statement of Rights and Responsibilities,  and the Court held that FACEBOOK's Principles "do not create legal obligations or grant a user the right to enforce those principles in court."  Ever since *Young* used the language "do not create affirmative obligations" and "do not create legal obligations or grant a user the right to enforce those principles in court," FACEBOOK has been claiming that this language applies to *any contractual agreement* FACEBOOK has with its users regarding the maintenance of user accounts.  This is obviously completely disingenuous of FACEBOOK – especially FACEBOOK's claim that any of these four cases apply to Paragraph 4.2 of FACEBOOK's Terms of Service ("TOS") in the KING case.  KING is not complaining about whether FACEBOOK failed to protect her from some third party abuse – she is complaining about FACEBOOK's breach of its agreement directly with her in Paragraph 4.2 about when and under what circumstances FACEBOOK can disable her account.  In fact, *Young* makes the following statement about FACEBOOK's obligations toward its own users and the contractual limits of FACEBOOK's ability to terminate the accounts of is own users:

> As with all contracts, Facebook has an implied duty not to frustrate the other party's [in other words, its user's]  right to receive the benefits of the agreement actually made.  The agreement in this case is to provide users access to Facebook's services subject to certain terms and conditions.  While users do not pay for the services directly, Facebook benefits from user activity through the sale of advertising.  Facebook expressly reserves the right to terminate the accounts of users who 'violate the Spirit of this Statement, or otherwise create risk or possible legal exposure' for Facebook, but it does not expressly reserve the right to terminate an account for any reason, and indicates in its Statement of Principles, that users "should not have their presence on the Facebook Service removed for reasons other than those described in  Facebook's Statement of Rights and Responsibilities."  It is at least conceivable that arbitrary or bad faith termination of user accounts, or even termination of user accounts with no explanation at all, could implicate the implied covenant of good faith and fair dealing.

The reason Young's cause of action in her Complaint for a breach of the implied covenant of good faith and fair dealing was dismissed in *Young* was that Young made no allegation of "bad faith" against FACEBOOK.   In the KING case, KING does make an allegation of "bad faith" in the FAC against FACEBOOK based in part on the very action identified in *Young* as "conceivable" bad faith, that is, termination of a user account with no explanation at all of the reason for the termination.  As this Court is aware, and as KING's FAC alleges, FACEBOOK has refused to state why anything which occurred on KING's  Facebook Account  amounted  to a "failure to follow FACEBOOK's Community Standards."

KING has a right to discovery on the issue of "bad faith" which is a factual issue which cannot be resolved in a 12(b)(6) motion, and KING should be allowed to proceed with discovery without any stay of discovery ordered by this Court.

   ***King*, *Murphy*, *Young* (2nd *dismissal)*, and *Ebeid*** Of the four other cases cited by FACEBOOK referred to above – *King*, *Murphy*, *Young* (2nd *dismissal)*, and *Ebeid*, all four involved contract clauses which gave the internet service provider (three cases involved FACEBOOK and one case involved Twitter) unfettered right to terminate user accounts, and all four involved fact situations where the reasons and underlying facts for the terminations were known.  In *King*, King alleged that the reason FACEBOOK removed content and blocked his account was that King made comments which were critical of FACEBOOK's conduct, and FACEBOOK's "Terms of Use" contract with King stated that FACEBOOK may for "any reason" and in its "sole discretion" remove content and block user accounts.  In *Murphy*, Twitter specifically identified the tweet by King which had violated Twitter's "Hateful Conduct Policy," and Twitter's "Terms of Service" contract with Murphy stated, "We [Twitter] may suspend or terminate your accounts or cease providing you with all or part of the Services at any time for any reason or no reason, including, but not limited to, if we reasonably believe: (i) you have violated Terms or the Twitter Rules."  The Court in *Murphy* repeatedly stated that Murphy had not made out a breach of contract claim because Twitter's Terms of Service stated that Twitter could terminate an account for "any reason or no reason."  In *Young* (2nd *dismissal)*, all of Young's improper conduct was disclosed to her by FACEBOOK, and FACEBOOK's Statement of Rights and Responsibilities stated that FACEBOOK reserved the right to terminate the accounts of users who "violate the letter of spirit of [its Statement of Rights and Responsibilities], or otherwise create risk or possible exposure [for FACEBOOK]."  The Court in *Young* (2nd *dismissal)* stated that FACEBOOK could not be accused of acting in bad faith for failing to disclose the reasons for the termination of Young's account because FACEBOOK sent Young an email detailing exactly what sins had been committed by Young.  In fact, the FACEBOOK email to Young was attached as an exhibit to Young's Complaint, and the Court held, "Particularly in light of this exhibit [to Young's Complaint], Young has not alleged facts indicating that Facebook's termination of her account violated the implied covenant of good faith and fair dealing."  In *Ebeid*, Ebeid claimed FACEBOOK breached his contract with FACEBOOK because FACEBOOK failed to "boost" his posts – a procedure which in effect

made the post an "ad" – and that his ads were suspiciously being reviewed by fewer and fewer FACEBOOK users.  Ebeid also complained that FACEBOOK was constantly blocking his posts.  The posts which FACEBOOK blocked were clearly identified.  FACEBOOK's applicable "Self-Service Ad Terms" stated that FACEBOOK reserved the right to "reject or remove any ad for any reason" and that FACEBOOK did "not guarantee the activity that ads will receive."   Ebeid even conceded that FACEBOOK "had the contractual right to remove or disapprove any post or ad at Facebook's sole discretion."

All four of these cases are clearly distinguishable from the KING case.  In all four of these cases, the specifically stated reasons, and facts underlying those reasons, for FACEBOOK's and Twitter's actions in disabling accounts, etc., were known.  In the KING case, FACEBOOK continues to "hide the ball" and refuse to disclose what supposedly occurred on KING's Facebook Account which "failed to follow FACEBOOK's Community Standards."  Also, in three of these cases, the applicable contract provision gave FACEBOOK or Twitter unfettered rights to terminate accounts and remove content – in *King*, FACEBOOK could act for "any reason" "in its sole discretion"; in *Murphy*, Twitter could terminate an account "at any time for any reason or no reason"; and in *Ebeid* FACEBOOK reserved the right to "reject or remove any ad for any reason."  Paragraph 4.2 of FACEBOOK's TOS in the KING case contains no such language.  Paragraph 4.2 simply states, "If we determine that you have clearly, seriously, or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable your account."  Note, that there is no language in Paragraph 4.2 referring to "sole discretion" or "for any reason or no reason."  In fact, the exact opposite is true – Paragraph 4.2 sets forth a standard by which FACEBOOK agrees to act.  None of the cases considers the proper legal construction or application of Paragraph 4.2 – how to construe Paragraph 4.2 is a matter of first impression before this or any court.

**Conclusion** FACEBOOK tries to get around Paragraph 4.2 in three ways.  First, FACEBOOK claims that all the cases it cites discussed above imply that Paragraph 4.2 does not create an "affirmative obligation" or "legal obligation" on FACEBOOK to maintain KING's Facebook Account.  This argument fails because all the cases cited by FACEBOOK, as discussed above, are distinguishable from the KING case.  Second, FACEBOOK claims that Paragraph 4.2 should be construed under basic contract law to give

it unfettered, sole discretion to do whatever it wants to KING's Facebook Account. Third, FACEBOOK claims that even if Paragraph 4.2 does not grant it sole discretion to act, it is immune from anything it does to KING's Facebook Account under 47 USC 230(c)(1). These second and third arguments are discussed below.

**IV. Paragraph 4.2 of FACEBOOK's TOS requires that FACEBOOK act at least "honestly" or with "good faith" in disabling KING's Facebook Account and more probably that FACEBOOK act in a "just and reasonable" manner. In either case, KING is entitled to discovery regarding these fact-based determinations.**

FACEBOOK argues that Paragraph 4.2 of its TOS is unambiguously read to give it "sole discretion" to do as it pleases to KING's, or any of the other almost 3 billion FACEBOOK users', accounts. FACEBOOK makes this argument even though the words "sole discretion" do not appear anywhere in Paragraph 4.2. Apparently, at one time, FACEBOOK's TOS did contain language which stated that FACEBOOK could remove content and block user accounts for "any reason" or in its "sole discretion" (*see* Exhibit A's summary of the *King* case attached to this Memorandum). For whatever reason, FACEBOOK removed this language and replaced it with the language of Paragraph 4.2 which is: "If we determine that you have clearly, seriously, or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable your account." FACEBOOK's claim that this language unambiguously gives it "sole discretion" to disable any user's account is clearly self-serving. If FACEBOOK intended to give itself "sole discretion" to act, then why did it not put this language in Paragraph 4.2 as it apparently once used to do? Also, why, instead of using "sole discretion" language, did FACEBOOK use language setting a standard which it was to apply in deciding whether to disable an account – namely, "clearly, seriously, or repeatedly breached our Terms or Policies, including in particular our Community Standards." FACEBOOK claims that Paragraph's 4.2 language "if we determine" is the same as "sole discretion," but it clearly is not. There mere fact that FACEBOOK changed the TOS language from the "sole discretion" language it once used to the "if we determine" language it now uses is a matter subject to discovery. Why did FACEBOOK change the language? Was it because FACEBOOK was concerned that it was being too arbitrary with its users and wanted to appear more rational and balanced in making its determinations about whether to disable user accounts? Discovery on this point will assist this Court in clearing up the ambiguity about what "if we

determine" means – does it mean FACEBOOK gets to use its "sole discretion," or does it mean that FACEBOOK will apply the standard that FACEBOOK sets forth in Paragraph 4.2?  Or is FACEBOOK's setting of a standard in Paragraph 4.2 just a massive con on its almost 3 billion users making them think FACEBOOK will be fair when FACEBOOK is just hiding the fact that it will act as arbitrarily as it feels like acting?

FACEBOOK admits that its TOS constitutes the contract between it and KING – in fact, FACEBOOK took great pains to file its TOS with this Court claiming that the TOS was its contract with KING as of October 22, 2020.  KING agrees that the TOS filed by FACEBOOK is the contract between her and FACEBOOK.  The TOS in its present October 2020 format as it now appears before this Court, especially Paragraph 4.2, has never appeared before this Court and has never been discussed in any case of which Plaintiffs are aware where, as in the KING case, it is absolutely unknown what underlying facts FACEBOOK acted upon to disable KING's Facebook Account claiming that her Account "failed to follow FACEBOOK's Community Standards."  FACEBOOK has asked this Court to take judicial notice of the *Fetto v. Facebook* case presently pending in Superior Court of California for the County of San Mateo which does involve Paragraph 4.2.  This is a case which has no binding effect on this Court whatsoever, and KING objects to this Court's taking "judicial notice" of the *Fetto* case without the benefit of the entire pleadings and arguments in the case.  Even if this Court did take "judicial notice" of the *Fetto* case, the reasons for FACEBOOK's action against Plaintiff Fetto appear to be discernable – FACEBOOK on a number of occasions deleted posts by Fetto and then reinstated Fetto on each occasion.  There is no case like the KING case where, as stated above, the facts upon which FACEBOOK acted are completely unknown.  To put the matter simply, the KING case is a case of first impression for this or any court.

Because this is a case of first impression for this Court and because KING's FAC causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing are contract causes of action, this Court should apply basic principles of contract law to Paragraph 4.2 to determine if it should be interpreted to mean that FACEBOOK has unfettered discretion to act in any arbitrary manner it pleases.  As a matter of contract law, FACEBOOK claims that it has unchallengeable discretion to disable any user's account pursuant to Paragraph 4.2.  FACEBOOK claims that because Sec. 4.2 states, "If we determine, . . .," then this means FACEBOOK can do whatever it wants without the application of  any

standard like "good faith" or "honesty" or "reasonableness" to its claimed "sole discretion to act pursuant to Paragraph 4.2. This is simply not the law. Even FACEBOOK admits at pp. 2-3 of its Reply Memorandum in support of its 12(b)(6) motion that a "satisfaction clause" like Sec. 4.2 must at a minimum be exercised in "good faith." FACEBOOK cites Williston on Contracts (4th Ed.), Sec. 38:21. This section states that these kinds of "satisfaction" or "discretion" clauses are common in contracts and are saved as free from "whim, caprice, or fancy" which would void the supposed "contract" as "illusory" for lack of consideration only because the courts have held that, at a minimum, the discretion granted by the clause must be applied "in the exercise of honest judgment." Williston states, "Because of the duty to act in good faith, a party's promise is not illusory; rather, the restraint that the obligation to act in good faith places on the promisor's discretion furnishes good consideration of the parties' agreement." In Sec. 38:22, Williston states that an even higher standard than "honesty" or "good faith" is usually employed "absent an absolute, unequivocal requirement of subjective satisfaction, with no other alternative possible." In this case, Paragraph 4.2 of the TOS sets an objective standard which FACEBOOK drafted into its own TOS for FACEBOOK to follow (FACEBOOK makes the determination to disable if the user has "clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards"), so there is no justification in applying the lowest standard to this provision of the contract because Paragraph 4.2 does not set an "absolute, unequivocal requirement of subjective satisfaction" and sets out the "alternative" objective standard in Paragraph 4.2. Williston states that a "reasonable person" standard  would apply where there is a "possible alternative" set forth.

Sec. 228 of the Restatement 2d of Contracts, comment a, also discusses "satisfaction" clauses and their relationship to the "duty of good faith and fair dealing":

> This Section sets out a special standard of preference for a type of condition that has long been of particular interest and importance – the satisfaction of the obligor himself [in KING's case, the "obligor" is FACEBOOK], rather than a third party. Usually it is the obligee's performance as to which the obligor is to be satisfied, but it may also be something else, such as the propitiousness of circumstances for his enterprise. The agreement will often use language such as "satisfaction" or "complete satisfaction," without making it clear that the test is merely one of honest  satisfaction rather than of reasonable satisfaction. Under any interpretation, the exercise of judgment must be in accordance with the duty of good faith and fair dealing (§ 205), and for this reason, the agreement is not illusory (§ 77). If the agreement leaves no doubt that it is only honest satisfaction that is meant and no more, it will be so interpreted, and the condition does not occur  if the  obligor is honestly, even though  unreasonably,  dissatisfied.  Even so, the

dissatisfaction must be with the circumstance and not with the bargain and the mere statement of the obligor that he is not satisfied is not conclusive on the question of his honest satisfaction.

Even if the standard to be applied in this case is the lowest possible – "honesty" or "good faith" – King is entitled to know whether FACEBOOK acted with "honesty" or in "good faith" in its application of Paragraph 4.2 to her Account. For example, *see Locke v. Warner Bros., Inc.*, 66 Cal.Rptr.2d 921, 925-926 (2nd Div. 1997). In *Locke*, Ms. Locke entered into an agreement with Warner Bros. to submit movies she was interested in developing to Warner Bros. on a "non-exclusive first deal." On each submission by Locke, Warner Bros. had 30 days to approve or reject a submission. Even if Warner Bros. did not accept any of Locke's proposed movies, it was still obligated to pay her $250,000 per year for three years. The agreement also included a $750,000 "pay or play directing deal" which meant the studio could either "play" Locke by using her director's services or "pay" her a fee even if she was not used as a director. Warner Bros. did pay Locke $1.5 million under the agreement and provided her an office and an administrative assistant on the studio lot, but Warner Bros. never developed any of Locke's proposed movies nor hired her to direct any movies. Locke got this agreement as part of a settlement with her breakup with Clint Eastwood. After the end of the agreement, Locke sued Warner Bros. claiming that Warner Bros. never intended to consider any of her movie proposals or hire her as a director and that Warner Bros.' sole motivation in entering into the agreement was to assist Eastwood in settling his litigation with Locke. Unbeknownst to Locke, Eastwood agreed to reimburse Warner Bros. for any money it paid to Locke. Locke's complaint was dismissed on summary judgment. The trial court ruled that "a judge or jury cannot and should not substitute its own judgment for a film studio's when the studio is making the creative decision of whether to develop or produce a proposed motion picture. Such highly-subjective artistic and business decisions are not proper subjects for judicial review." Locke appealed.

On appeal, the California appellate court stated the general applicable contract principle as follows:

"[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." . . . It is settled that in "every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." . . . Therefore, when it is a condition of an obligor's duty that he or she be subjectively satisfied with respect to the obligee's performance, the subjective standard of honest satisfaction is applicable. . . . "Where the contract involves matters of fancy, taste or judgment, the promisor is the sole judge of his

satisfaction.  If he asserts in good faith that he is not satisfied, there can be no inquiry into the reasonableness of his attitude. . . .  Therefore, the trial court erred in deferring entirely to what it characterized as Warner's "creative decision" in the handling of the development deal.  If Warner acted in bad faith by categorically rejecting Locke's work and refusing to work with her, irrespective of the merits of her proposals, such conduct is not beyond the reach of the law. [Citations omitted.]

66 Cal. Rptr. 2d at 925.  Locke presented evidence through a declaration of a witness who talked to a Warner Bros. executive who stated about Locke, "Joe, we're not going to work with her. . . .   That's Clint's deal."  Another witness was told by a Warner Bros. executive that he could not take a script from Locke to decision-makers at Warner Bros. because, "They are not going to make a movie with her here."  The appellate court stated with respect to this evidence:

> Merely because Warner paid Locke the guaranteed compensation under the agreement does not establish Warner fulfilled its contractual obligation.  As pointed out by Locke, the value in the subject development deal was not merely the guaranteed payments under the agreement, but also the opportunity to direct and produce films and earn additional sums, and most importantly, the opportunity to promote and enhance a career.

> Unquestionably, Warner was entitled to reject Locke's work based on its subjective judgment, and its creative decision in that regard is not subject to being second-guessed by a court.  However, bearing in mind the requirement that subjective dissatisfaction must be an honestly held dissatisfaction, the evidence raises a triable issue as to whether Warner breached its agreement with Locke by not considering her proposals on their merits.
>
> .   .   .   .   .   .   .   .

> The above evidence raises a triable issue of material fact as to whether Warner breached its contract with Locke by categorically refusing to work with her, irrespective of the merits of her proposals.  While Warner was entitled to reject Locke's proposals based on its subjective dissatisfaction, the evidence calls into question whether Warner had an honest or good faith dissatisfaction with Locke's proposals, or whether it merely went through the motions of purporting to "consider" her projects.

*Id*. at 926.

In *Locke*, Warner Bros. made the same argument that FACEBOOK makes in the KING case that the implied covenant of good faith and fair dealing was "limited to assuring compliance with the express terms of the contract and cannot be extended to create obligations not contemplated in the contract." *id*.  The appellate court rejected this argument stating that the "agreement did not give Warner the express right to refrain from working with Locke.  Rather, the agreement gave Warner discretion with respect to developing Locke's projects.  The implied covenant of good faith and fair dealing obligated Warner to exercise  that  discretion honestly and in good faith," *id*.  In  the  KING  case,  there  is  no  question  that

Paragraph 4.2 does NOT contain language stating that FACEBOOK can act in its "sole discretion" or that it can disable an account for "any reason or no reason." Instead, Paragraph 4.2 sets out a standard, drafted by FACEBOOK, that it agreed to follow in making the discretionary determination about whether to disable an account. Under California and general contract law, this discretion must be exercised at least "honestly and in good faith." Also, California law is clear that to the extent that any uncertainty exists about how Paragraph 4.2 should be interpreted by this Court, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist,." Cal. Civ. Code. § 1654.

*See also Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181 1186-1187 (7th Cir. 1996), cited in Plaintiffs' Memorandum in Opposition to FACEBOOK's Dismissal Motion at p. 6. In *Kohler*, Owner/Seller [Kohler] of a supposedly authentic painting hired Auctioneer [Hindman] to sell the painting. The interested Buyer hired an agent who doubted the painting's authenticity. Auctioneer made a side agreement with Buyer that if Buyer purchased the painting, Buyer would have 30 days to have an expert determine authenticity. If the painting was determined not to be authentic, the sale could be canceled. Buyer did buy the painting, and Buyer's expert determined that the painting was not authentic. The $90,000 purchase price was not paid, and the painting was returned to Owner. Owner sued Auctioneer claiming that Auctioneer breached the consignment agreement. The consignment agreement contained a paragraph ("Paragraph 14") stating that Auctioneer could rescind a sale when the Auctioneer in its "sole discretion" determined that it or its consignor was subject to liability under a warranty of authenticity. In this diversity case, Illinois law applied, but, as will be seen, the Court's discussion about Illinois law is applicable to the KING case as well. The Court referred to a New York federal court case which considered a consignment clause somewhat similar to the one involved in the *Kohler* case. The New York federal court "found that such a contract provision is highly analogous to a satisfaction clause (typically conditioning one party's performance on that party's satisfaction with the other party's performance). . . . Through a satisfaction clause, a party's exercise of judgment or discretion is a condition for its duty to perform. . . . Because satisfaction clauses involve the same principles of contract law as apply here, we will treat Paragraph 14 as a satisfaction clause.," 80 F.3d at 1186. The Court went on to analyze Paragraph 14 as follows:

> Illinois courts have developed rules for interpreting satisfaction clauses that require a classification. Thus, satisfaction clauses in Illinois come in two categories: those that

14

make the exercise of discretion purely subjective and those that require the exercise of discretion according to objective factors.  The first category includes satisfaction clauses invoking the feelings, taste or judgment of the party exercising discretion.  When a satisfaction clause conveys this sort of subjective discretion, it does not, however, remove all limitations on the exercise of discretion.  The party that has the right to act according to its personal judgment or within its sole discretion must still act in good faith.

On the other hand, a satisfaction clause may fall into the second category when it involves matters susceptible to objective evaluation; mechanical utility is a stereotype of such matters.  When objective considerations control the exercise of discretion, the party to be satisfied must exercise its authority in a just and reasonable way.

These rules do not apply easily to Paragraph 14.  By giving Hindeman, Inc. "sole discretion," this provision suggests that the consignment agreement had defined Hindman, Inc.'s authority subjectively.  The consignment agreement did not define any objective criteria that would control Hindman, Inc.'s exercise of judgment.  Nevertheless, the object of Hindman, Inc.'s discretion was not a purely subjective phenomenon like taste or feeling.  Rather, Hindman, Inc. had to evaluate risk, and demanding such an evaluation impliedly invoked rational analysis.  The Kohlers were not giving Hindman, Inc. a contract right to emulate Chicken Little.  Viewing all of these conditions together, the grant of "sole discretion" to assess risk is somewhat ambiguous as between objective and subjective satisfaction.

Ultimately, for lack of objective criteria, we must conclude that Hindman, Inc.'s exercise of its authority is bounded only by its satisfaction as limited, of course, by good faith.  The principal factor leading us to this conclusion is the agreement's use of the phrase "sole discretion."  This phrase denotes subjectivity.

80 F.3d at 1186-1187.  After this discussion concluding that a "subjective" standard applied which still required "good faith" on the part of the Auctioneer, the Court went to hold, "Hindman, Inc.'s actions towards [the Buyer in making the side agreement] before and after the auction, meet the standard of good faith [with respect to the Seller]," so the Auctioneer did not breach its contract with the Seller.

The *Kohler* case contains a number of lessons for the KING case.  First, the "same principles of law" apply to discretionary or "sole discretion" contracts and to "satisfaction" contracts.  "Discretionary" contracts and "satisfaction" contracts are "highly analogous."  Second, where there is a lack of "objective criteria" set out in a discretionary contract, it is more likely to be analyzed according to a "subjective" standard.  Conversely, if "objective criteria" is set out in the contract provision, then an "objective" standard would apply which would require analysis under a "just and reasonable" standard.  Third, if a "subjective standard" applies, it is "limited, of course, by good faith."  All of these lessons are similar to the law already discussed above citing Williston, The Restatement 2d of Contracts, and the *Locke* case.

Applying these lesson to the KING case, Paragraph 4.2 is clearly a discretionary contract provision.  FACEBOOK admits that its TOS constitutes the contract between KING and FACEBOOK.  FACEBOOK

does not get to "cherry pick" which provisions of the TOS it considers as "binding" on it and which not. Should Paragraph 4.2 be treated as a "subjective" or "objective" discretionary contract provision? Because Paragraph 4.2 sets an objective standard to be followed by FACEBOOK in determining whether to disable a user account or not (whether a user "clearly, seriously, or repeatedly breached our Terms or Policies, including in particular our Community Standards"), Paragraph 4.2 should be analyzed under the "objective" "just and reasonable" standard – in other words, from the facts (which FACEBOOK is presently hiding) did FACEBOOK act in a just and reasonable manner in disabling KING's Facebook Account? Even if this Court were to apply a "subjective" standard for some reason, "good faith" would still be required to be shown by FACEBOOK. In other words, no matter how Paragraph 4.2 is analyzed, whether an objective or a subjective standard is applied, there are underlying facts which must be considered to apply the standard. So far, FACEBOOK refuses to provide any facts, asks this Court to suspend discovery, and claims discovery is not necessary. Clearly, under applicable contract law, KING is entitled to discovery to make these fact-based determinations. At the upcoming November 4 hearing on FACEBOOK's Dismissal Motion, this Court should deny the Dismissal Motion, deny FACEBOOK's Stay Motion, and permit KING to proceed with discovery which has already been sought from FACEBOOK by way of interrogatories, a request for production of documents, and a 30(b)(6) deposition.

## V. FACEBOOK is not entitled to "immunity" pursuant to 47 USC 230(c)(1) on KING's FAC Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing causes of action.

If, as KING argues above, Paragraph 4.2 is a binding contract provision on FACEBOOK in its TOS contract with KING, then FACEBOOK's claim that discovery need not proceed because FACEBOOK is "immune" from the FAC causes of action for Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing, is of no avail. The reason is set out quite elegantly in *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009). In *Barnes*, Yahoo promised that it would stop Barnes' former boyfriend from creating and posting embarrassing content about her. Barnes had spoken to a Yahoo employee who said she would "personally walk the statements over to the division responsible for stopping unauthorized profiles and they would take care of it." Barnes claimed she relied on this statement, took no further action, and then filed suit after two months passed and Yahoo did nothing to stop the offending posts. In the first part of the *Barnes* decision, the Court holds that Yahoo, treated as a "publisher or speaker" was immune from suit under 47 USC 230(c)(1) for any harm caused by content posted by Barnes ex-boyfriend,

16

but in the second portion of the *Barnes* decision, the Court considers whether Yahoo is immune when it

is treated as a promisor in a contract with Barnes

In the second portion of the *Barnes* case, the Court held that the promise made to Barnes by Yahoo

through its employee amounted to "promissory estoppel."  The Court noted that "promissory estoppel"

was a "subset of a theory of recovery based on a breach of contract and serves as a substitute for

consideration. . . . Thus, aside from consideration, ordinary contract principles usually apply." 570 F.3d

at 1106.  The *Barnes* Court then explained why a contract claim is not barred by 47 USC 230(c)(1):

> As we explained above, subsection 230(c)(1) precludes liability when the duty the
> plaintiff alleges the defendant violated derives from the defendant's status or conduct as
> a publisher or speaker.  In a promissory estoppel case, as in any other contract case, the
> duty the defendant allegedly violated springs from a contract—an enforceable
> promise—not from any noncontractual conduct or capacity of the defendant. See *GTE
> Corp.*, 347 F.3d at 662 ("Maybe [the] plaintiffs would have a better argument that, by its
> contracts ..., [the defendant] assumed a duty to protect them.").  Barnes does not seek to
> hold Yahoo liable as a publisher or speaker of third party content, but rather as the
> counter-party to a contract, as a promisor who has breached.
>
> How does this analysis differ from our discussion of liability for the tort of
> negligent undertaking? . . .  After all, even if Yahoo did make a promise, it promised to
> take down third-party content from its website, which is quintessential publisher conduct,
> just as what Yahoo allegedly undertook to do consisted in publishing activity.  The
> difference is that the various torts we referred to above each derive liability from behavior
> that is identical to publishing or speaking: publishing defamatory material; publishing
> material that inflicts emotional distress; or indeed attempting to depublish hurtful material
> but doing it badly.  To undertake a thing, within the meaning of the tort, is to do it.
> Promising is different because it is not synonymous with the performance of the action
> promised.  That is, whereas one cannot undertake to do something without simultaneously
> doing it, one can, and often does, promise to do something without actually doing it at the
> same time.  Contract liability here would come not from Yahoo's publishing conduct, but
> from Yahoo's manifest intention to be legally obligated to do something, which happens
> to be removal of material from publication.  Contract law treats the outwardly manifested
> intention to create an expectation on the part of another as a legally significant event.  That
> event generates a legal duty distinct from the conduct at hand, be it the conduct of a
> publisher, of a doctor, or of an overzealous uncle.

570 F.3d at 1107.  The Court goes on to state that the promise must, of course, be "clear and well defined,"

570 F.3d at 1108.  "Thus a general monitoring policy, or even an attempt to help a particular person, on

the part of an interactive computer service such as Yahoo does not suffice for contract liability.  This

makes it easy for Yahoo to avoid liability: it need only disclaim any intention to be bound. *See Workman

v. United Parcel Serv. Inc.*, 234 F.3d 998, 1001 (7th Cir. 2000).  In *Workman*, an employee of UPS sued

UPS for demoting him in violation of his employment contract with UPS.  The employee relied on his

employee handbook with UPS as his contract.  Assuming the handbook did constitute an employment contract, UPS could not be held liable because the handbook specifically stated, "[T]his Policy Book is not a contract of employment and does not affect your rights as an employee of UPS."  In the KING case, Paragraph 4.2 does not set forth some vague "general monitoring policy" but instead sets forth a well-defined statement of FACEBOOK's promise to its almost 3 billion users not to disable a user's account except on the application of specifically articulated conditions.  FACEBOOK does not choose the "easy" method of avoiding liability suggested by the *Barnes* Court – Yahoo does not disclaim any intention to be bound.  Just the opposite is true – as the contract law discussion covered in the previous section of this Memorandum makes clear, FACEBOOK has at least a duty to apply Paragraph 4.2 to its users in "good faith" if not in a "fair and reasonable"manner.  Because FACEBOOK made a clear promise to its users in Paragraph 4.2, FACEBOOK is not immune under Sec. 230(c)(1) for violating the terms of Paragraph 4.2.

Interestingly, the *Barnes* Court even states another reason why a promise is not "immune" under Sec. 230(c)(1) – waiver:

> One might also approach this question from the perspective of waiver.  The objective intention to be bound by a promise—which, again, promissory estoppel derives from a promise that induces reasonably foreseeable, detrimental reliance—also signifies the waiver of certain defenses.  A putative promisor might defend on grounds that show that the contract was never formed (the lack of acceptance or a meeting of the minds, for example) or that he could not have intended as the evidence at first suggests he did (unconscionability, duress, or incapacity, for example).  Such defenses go to the integrity of the promise and the intention it signifies; they usually cannot be waived by the agreement they purport to undermine. But once a court concludes a promise is legally enforceable according to contract law, it has implicitly concluded that the promisor has manifestly intended that the court enforce his promise.  By so intending, he has agreed to depart from the baseline rules (usually derived from tort or statute) that govern the mine-run of relationships between strangers.  Subsection 230(c)(1) creates a baseline rule: no liability for publishing or speaking the content of other information service providers. Insofar as Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline.

570 F.3d at 1108-1109.  Whether the promise made by FACEBOOK to deal with its users according to the standard set out in Paragraph 4.2 is considered from the viewpoint of a contract promise or a waiver, FACEBOOK is not immune under Sec. 230(c)(1).  FACEBOOK may to able to show, once it stops "hiding the ball" and reveals the facts upon which it relied to disable KING's Facebook Account, that it acted in "good faith" in disabling KING's Facebook Account if Paragraph 4.2 is considered to be a

discretionary promise to which a subjective standard applies, or that it acted in a "fair and reasonable" manner if an objective standard applies, but these are issues which await discovery about the underlying facts.  There is no justification for delaying discovery when the underlying facts need to be determined.

**VI. Conclusion**

FACEBOOK promises in Paragraph 4.2 of its TOS, which constitutes its contract with KING and its almost 3 billion other users, that it will not disable their accounts unless FACEBOOK makes the determination that a user has "clearly, seriously, or repeatedly breached our Terms or Policies, including in particular our Community Standards."  FACEBOOK's users rely on this promise by allowing FACEBOOK to use their profiles to make money selling ads to them in return for being allowed to use FACEBOOK's service and store their precious content in their accounts.  FACEBOOK users assume, based on FACEBOOK's promise in Paragraph 4.2, that their account content is safe from destruction and always available to them as long as they do not run afoul of the standards set out in Paragraph 4.2.  Under clear case law, FACEBOOK must apply its standards in Paragraph 4.2 at least in "good faith," if not in a "fair and reasonable manner," and FACEBOOK is not "immune" under 47 Sec. 230(c)(1) for the promise it has made in Paragraph 4.2.

Now, FACEBOOK claims that Paragraph 4.2 is nothing but a fraud, a con, a delusion.  It claims that, even though it sets forth standards it will follow in Paragraph 4.2, it has no intention of applying the standards and can actually do anything it wants in its "sole discretion" and is not subject to review by any court and jury about whether it acts at least in "good faith" in its application of Paragraph 4.2. FACEBOOK claims to be its own judge, jury, and executioner in its application of Paragraph 4.2. FACEBOOK claims for itself "carte blanche" to act in bad faith in its application of Paragraph 4.2 because it claims it is "beyond" the reach of the law which will never be able to determine if it acted in good faith or bad faith.  Quite appropriately, FACEBOOK has now changed its name to "META" from the Greek word for "beyond."  One wonders how many users FACEBOOK would have if it worded Paragraph 4.2 as follows: "We can arbitrarily at any time for any reason or no reason at all terminate your account at which time any content you have on your account will unavailable.  We can act in bad faith if we want to and you have no power to challenge our termination of your account in court."  This is exactly what FACEBOOK is arguing in this case.  One also wonders how many of FACEBOOK's almost 3 billion users

Plaintiffs' Memorandum in Opposition to Motion to Stay Discovery - Civ. No. 3:21-cv-04573-EMC

know that this is FACEBOOK's position.

The truth is that FACEBOOK is not beyond the reach of the law.  KING is entitled to discovery of the facts underlying FACEBOOK's disabling of her Facebook Account and destruction of her account content.  There is no justification for staying discovery in this case.  In this matter of first impression regarding the proper legal construction and application of Paragraph 4.2, KING is hopeful that this Court will not allow FACEBOOK to treat KING like dirt under its shoes as it has so far.  This is not a small matter.  KING stands in the same shoes as FACEBOOK's almost 3 billion other users.

DATED: San Francisco, California, November 2, 2021.


                      /s/ Samuel P. King, Jr.
                      SAMUEL P. KING JR.
                      Attorney for Plaintiffs appearing Pro Hac Vice