1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    ADRIENNE SEPANIAK KING, et al.,            Case No. 21-cv-04573-EMC

8                    Plaintiffs,

9              v.                               **ORDER GRANTING DEFENDANT'S
                                                MOTION TO DISMISS FIRST
10   FACEBOOK, INC.,                            AMENDED COMPLAINT**

11                   Defendant.                 Docket No. 28

12
13

14         Adrienne Sepaniak King and Christopher Edward Sepaniak King are mother and son.

15   They filed suit against Defendant Facebook, Inc. after the company disabled the account that Ms.

16   King had with Facebook.  According to the Kings, Facebook claimed that the account was

17   disabled because Ms. King had violated Community Standards (even though she had not).

18   Facebook also refused to give specifics to the Kings as to how Ms. King had violated Community

19   Standards.  The Kings have brought claims for, *e.g.*, breach of contract and infliction of emotional

20   distress.  Currently pending before the Court is Facebook's motion to dismiss.

21         Having considered the parties' briefs as well as the oral argument of counsel, the Court

22   hereby **GRANTS** Facebook's motion but gives Ms. King leave to amend her claim for breach of

23   the implied covenant of good faith and fair dealing.

24              **I.        FACTUAL & PROCEDURAL BACKGROUND**

25         In the operative first amended complaint ("FAC"), the Kings allege as follows.

26         Ms. King had a personal account with Facebook for about ten years until November 17,

27   2020, when she discovered that it had been disabled.  *See* FAC ¶¶ 1, 12.  Prior to the account

28   being disabled, Ms. King had accumulated about 1,000 "friends."  She had shared both political

1    and nonpolitical information.  (According to Ms. King, most political information reflected a

2    conservative point of view.)  *See* FAC ¶¶ 1, 13-14.

3         Ms. King discovered her Facebook account had a problem on or about November 17,

4    2020, when she tried to log into her account but was not successful.  On November 19, she

5    received a message from Facebook stating that her account had been disabled, but no reason was

6    provided as to why.  *See* FAC ¶ 1.  Below is the full message she received.

7              Your Account Has Been Disabled

8              For more information please visit the Help Center.

9              Your account was disabled on November 17, 2020.  If you think
               your account as disabled by mistake you can submit more
10             information via the Help Center for up to 30 days after your account
               was disabled.  After that, your account will be permanently disabled
11             and you will no longer be able to request a review.

12   FAC ¶ 16.

13        Mr. King – Ms. King's son who lives with her – tried to reinstate her account.  They

14   subsequently received a message from Facebook that the account had been disabled because "'it

15   did not follow our Community Standards.  This decision can't be reversed.'"  FAC ¶ 1; *see also*

16   FAC ¶ 17 (full text of message).  No specifics were provided about the purported violation of

17   Community Standards, and, although the Kings thereafter made further inquiry, Facebook did not

18   respond.  *See* FAC ¶¶ 1, 18.

19        Mr. King persisted still over the next few months.  He received the following message

20   from Facebook on or about March 9, 2021:

21             I am told that the review (I placed) was rejected and that the user
               (your mother) should have been told what is the policy area they
22             were violating.  Unfortunately I do not have much else to add.  As
               for the downloading of data, it seems there should be a way to ask
23             for your data.  There should be a flow somewhere, but the person
               dealing with the problem was not sure what that was.  Maybe a
24             search can help?  Let me know otherwise.

25             Sorry man, sorry it took so long and sorry we don't know much
               more, I suppose for FB to share with me would be absurd and not
26             proper, so I suspect I cannot help you much more than this (which I
               am sure is not very satisfactory) [followed by a frowning emoji]

27

28   FAC ¶ 19.  According to the Kings, Ms. King did not violate any Facebook Community

United States District Court
Northern District of California

1   Standards.  *See* FAC ¶¶ 20-21.

2        Apparently, not only is Ms. King's account gone but also any reference to her "anywhere

3   in facebook.com is . . . gone."  FAC ¶ 26.

4        Based on, *inter alia*, the above allegations, the Kings have asserted the following causes of

5   action:

6        (1) Breach of contract (brought by Ms. King only).

7        (2) Violation of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(2)(A)

8            (brought by Ms. King only).

9        (3) Intentional or reckless infliction of emotional distress (brought by Ms. King only).

10       (4) Negligent or grossly negligent infliction of emotional distress (brought by Ms.

11           King only).

12       (5) Intentional, reckless, grossly negligent, and/or negligent infliction of emotional

13           distress and loss of consortium (brought by Mr. King only).

14       (6) Declaratory and injunctive relief (brought by Ms. King only).

15       (7) Breach of the implied covenant of good faith and fair dealing (brought by Ms. King

16           only).

17       (8) Conversion (brought by Ms. King only).

18                                    **II.    DISCUSSION**

19   A.    Legal Standard

20        Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

21   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

22   complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

23   Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

24   after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

25   *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must

26   . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765

27   F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true

28   and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

United States District Court
Northern District of California

*Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

In their opposition, the Kings argue that Facebook is improperly basing its motion to dismiss on affirmative defenses.  *See* Opp'n at 1-2 (arguing that "[a] 12(b)(6) motion cannot rely on affirmative defenses which have not yet been pled and required to be pled in an Answer"; also arguing that Facebook should have to "file an Answer stating its affirmative defenses, and meanwhile [be] require[d] . . . to answer discovery requests [on] basic questions" such as what did Ms. King do that violated Community Standards).  But there is only one argument that Facebook makes that is based on an affirmative defense (*i.e.*, immunity under the CDA).  Otherwise, Facebook is contending that the Kings have failed to plead essential elements of their claims.  Furthermore, a defendant can bring a 12(b)(6) motion based on an affirmative defense so long as the defense is obvious on the face of the complaint.  *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) ("When an affirmative defense is obvious on the face of a complaint, however, a defendant can raise that defense in a motion to dismiss.").

B.     CDA Claim (Second Cause of Action)

As noted above, Ms. King has asserted a single federal claim based on the CDA.  The Court dismisses the CDA claim because there is no private right of action under the statute.

The specific provision in the CDA cited by Ms. King is 47 U.S.C. § 230(c)(2).  Section 230 is titled "protection for private blocking and screening of offensive material."  Subsection (c)(1) is the provision providing for CDA immunity.  *See* 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.").  Subsection (c)(2) – the

4

provision invoked by the Kings – is titled "Civil liability" and provides as follows:

> No provider or user of an interactive computer service shall be held liable on account of –
>
> (A)    any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> (B)    any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

*Id.* § 230(c)(2).

Nothing on the face of § 230(c)(2) provides for an affirmative claim thereunder. Ms. King admits as much, and instead asserts in the FAC that she has an implied right of action under the statute. *See* FAC ¶ 36 (asserting that "[t]here is an implied cause of action for damages for violations by the provider of an 'interactive computer service' . . . of 47 U.S.C. [§] 230(c)(2)(A)"); *see also* ¶¶ 33-35 (alleging that Facebook disabled Ms. King's account "for reasons not permitted by [the statute]," "without good faith in violation of [the statute]," and "violated her right to constitutionally protected material without good faith in violation of [the statute]"). But that position lacks merit because the statute talks about the *lack* of liability. It provides a source of immunity beyond that provided under (c)(1).

Furthermore, Ms. King has cited no authority that holds or otherwise states that there is an implied right of action under § 230(c)(2). In fact, if anything, the authority suggests that there is no private right of action under the CDA at all. *See, e.g.*, *Doe v. Egea*, 2015 U.S. Dist. LEXIS 82632, at *4-5 (S.D. Fla. Jun. 25, 2015) (holding that § 223(a) of the CDA, which is a criminal statute that prohibits the making of obscene or harassing telecommunications, does not give rise to a private right of action); *Nuzzi v. Loan Nguyen*, No. 07-2238, 2009 U.S. Dist. LEXIS 144530, at *7 (C.D. Ill. May 18, 2009) (noting the same; citing cases in support); *see also Belknap v. Alphabet, Inc.,* 504 F. Supp. 3d 1156, 1161 (D. Or. 2020) (noting that, "because § 230 is mostly a liability shield, § 230 is less likely to offer a private right of action than would provisions of the Communications Decency Act criminalizing harassing conduct, provisions that courts have

1   uniformly concluded create no private right of action"); *Millan v. Facebook, Inc.*, No. A161113,

2   2021 Cal. App. Unpub. LEXIS 1994, at *4 (Mar. 25, 2021) (noting that § 230(c)(2)(A) "provides

3   an immunity, so even if Facebook acted discriminatorily, at most that would deprive it of the

4   immunity that the statute provides[;] [plaintiff] has not explained how Facebook's failure to

5   acquire immunity under section (c)(2)(A) could establish its liability to him, so the trial court

6   correctly sustained Facebook's demurrer to this claim").

7        In the opposition brief, Ms. King does little to advance her position that there is an implied

8   right of action.  She simply argues that there is a difference between § 230(c)(1) and § 230(c)(2),

9   as Justice Thomas noted in his concurrence in the denial of a writ of certiorari in *Malwarebytes,*

10   *Inc. v. Software Grp. USA, LLC*, 141 S. Ct. 13 (2020).  That is, "if a company unknowingly *leaves*

11   *up* illegal third-party content, it is protected from publisher liability by § 230(c)(1); and if it *takes*

12   *down* certain third-party content in good faith, it is protected by § 230(c)(2)(A)."  *Id.* at 15

13   (emphasis added).  Ms. King then uses this distinction articulated by Justice Thomas to

14   springboard into a strained argument on an implied right of action under § 230(c)(2).

> We argue, as does Justice Thomas, that Sec. 230(c)(1) does not
> apply to material which an interactive computer service (Big Tech)
> decides will be "not up" (material that is either taken down or barred
> from uploading).  If the limited protection provided by Sec.
> 230(c)(2)(A) does not apply to a decision by an interactive computer
> service to either take down or bar material, then Sec. 230(c)(2)
> provides a basis for an implied federal cause of action.  Just as
> Congress provided protection for an interactive computer service in
> Sec. 230(c)(1) for any material left "up," the intent of Congress was
> to provide an implied federal cause of action against an interactive
> computer service for a decision to block or take down material,
> especially material that is "constitutionally protected," not covered
> by Sec. 230(c)(2)(A).

22   Opp'n at 20.  But her argument contains a non-sequitur.  Even if (c)(1) were deemed to immunize

23   materials left up and (c)(2) immunizes the taking down of material, nothing in that logic implies

24   the creation of an implied federal cause of action for conduct not immunized.

25        Additionally, Ms. King does not *substantively* address any of the traditional factors that are

26   considered in deciding whether Congress has meant for there to be a private right of action.  *See*

27   *Nisqually Indian Tribe v. Gregoire*, 623 F.3d 923, 929-30 (9th Cir. 2010) (noting that the

28   dispositive question is whether Congress intended to create a private right of action, such that the

United States District Court
Northern District of California

6

1   text of the statute and the legislative history should be considered; other factors to consider include

2   whether the plaintiff is one of the class for whose especial benefit the statute was enacted, whether

3   it is consistent with the underlying purposes of the legislative scheme to imply a private right of

4   action, and whether the cause of action is one traditionally relegated to state law); *see also Lil'*

5   *Man in the Boat, Inc. v. City & Cty. of S.F.*, No. 19-17596, 2021 U.S. App. LEXIS 20953, at *11

6   (9th Cir. July 15, 2021) (noting the same). In *Atkinson v. Facebook, Inc.*, No. C-20-5546 RS

7   (N.D. Cal.), Judge Seeborg noted that the plaintiff "does not, and cannot, point to any textual

8   support in § 230 for a private right of action." *Id.* (Docket No. 75) (Order at 9).

9       The Court therefore dismisses the CDA claim. The dismissal is with prejudice as

10  amendment would be futile.[1]

11  C.    Claim for Declaratory and Injunctive Relief (Sixth Cause of Action)

12      In the claim for declaratory and injunctive relief, Ms. King asks for (1) a declaration that

13  Facebook breached its contract with her; (2) the issuance of an order compelling Facebook to

14  reinstate her account "in toto," FAC ¶ 53; and (3) the issuance of an order enjoining Facebook

15  "from disabling [her] Account, either temporarily or permanently, except for the reasons permitted

16  by 47 U.S.C. [§] 230(c)(2)(A) [*i.e.*, the CDA]." FAC ¶ 54.

17      In its motion, Facebook argues that the claim should be dismissed because it is not an

18  independent cause of action but rather simply reflects the remedies sought by Ms. King. Ms. King

19  does not disagree. The Court therefore dismisses the cause of action with prejudice.[2]

20  D.    Claims for Infliction of Emotional Distress (Third Through Fifth Causes of Action)

21      The claims for infliction of emotional distress – intentional, reckless, grossly negligent,

22

23  _____

24  [1] Because the Court is dismissing the CDA claim, there is no federal question jurisdiction.
    Plaintiffs suggest that there is still diversity jurisdiction over the remaining state law claims.
    Facebook has not, at this juncture, made an argument that diversity jurisdiction is lacking. The

25  Court, in ruling on this motion, is not making any definitive ruling as to whether there is diversity
    jurisdiction in this case. The Court has a sua sponte obligation to ensure that there is subject

26  matter jurisdiction. However, at this point, the record is not sufficiently developed as to whether,
    *e.g.*, Plaintiffs can establish by a preponderance of the evidence that the amount in controversy has

27  been satisfied.

28  [2] This does not mean that injunctive or declaratory relief is not available for any claims Ms. King
    might successfully assert.

United States District Court
Northern District of California

and negligent – are brought by both Kings.  Ms. King's claims are based on Facebook's disabling of her account, not properly engaging with her to address the issue, and destroying the content associated with her account.  Mr. King's claims are based on the "emotional distress caused by FACEBOOK to [his mother]," which has caused him to suffer "severe emotional distress."[3]  FAC ¶ 49; *see also* Opp'n at 22 (asserting that Mr. King's "claims are based on his status as a 'bystander' to KING's 'direct' claims for IIED and NIED"; he "witnessed the trauma FACEBOOK caused to KING by FACEBOOK's wrongful conduct").

The elements of a claim for intentional infliction of emotional distress ("IIED") are as follows:

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . . Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.  The defendant must have engaged in conduct intended to inflict injury or engaged in with the realization that injury will result.

*Carlsen v. Koivumaki*, 227 Cal. App. 4th 879, 896 (2014) (internal quotation marks omitted).

As for the claim for negligent infliction of emotional distress, there is no such "'independent tort'"; rather, the claim is simply one of "'negligence to which the traditional elements of duty, breach of duty, causation, and damages apply."  *Belen v. Ryan Seacrest Prods., LLC*, 65 Cal. App. 5th 1145, 1165 (2021).

Regarding the IIED claim, Facebook argues, *inter alia*, that the Kings have failed to allege outrageous conduct, an intent to cause or reckless disregard of causing emotional distress, and severe or extreme emotional distress.  The Court need only address the argument that the Kings have failed to allege outrageous conduct.  It agrees with Facebook that, as a matter of law,

---

[3] In the FAC, Mr. King also claimed a "loss of society, affection, assistance, and conjugal fellowship with KING, all to the detriment of his relationship with his mother."  FAC ¶ 49.  However, in the opposition, Mr. King admits that he has no basis to claim a loss of consortium because, "[u]nder present California law, . . . there is no claim of a child for loss of companionship, affection, etc. related to an injured parent."  Opp'n at 22.  He adds, however, that he is making the claim "for possible appeal at a later time" since "a number of commentators . . . have urged the California Supreme Court to reverse this position."  Opp'n at 22.

United States District Court
Northern District of California

1    Facebook's conduct, as alleged, is not outrageous.  "A defendant's conduct is considered to be

2    outrageous if it is so extreme as to exceed all bounds of that usually tolerated in a civilized

3    community.  Liability for IIED does not extend to mere insults, indignities, threats, annoyances,

4    petty oppressions, or other trivialities."  *Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.*, 39

5    Cal. App. 5th 995, 1007 (2019).  *See, e.g.*, *McNaboe v. Safeway Inc.*, No. 13-cv-04174-SI, 2016

6    U.S. Dist. LEXIS 2493, at *16 (N.D. Cal. Jan. 7, 2016) (stating that "[t]here is nothing, as a matter

7    of law, extreme and outrageous about the act of terminating an employee on the basis of unproven

8    or false or even malicious accusations"); *Kassa v. BP W. Coast Prods., LLC*, No. C-08-02725

9    RMW, 2008 U.S. Dist. LEXIS 61668, at *22 (N.D. Cal. Aug. 11, 2008) (stating that, "[f]or better

10   or worse, 'civilized community' tolerates run-of-the-mill breaches of contract; such conduct is not

11   sufficiently 'extreme and outrageous' for a claim of intentional infliction of emotional distress");

12   *Yurick v. Superior Court*, 209 Cal. App. 3d 1116, 1124-25, 1129 (1989) (holding that allegations

13   by an employee that her supervisor called her senile and a liar in front of coworkers on numerous

14   occasions was not outrageous conduct as a matter of law).  The Kings argue that "[b]eing

15   publically [sic] embarrassed and humiliated publically [sic] by a Big Tech company on the internet

16   for supposedly violating its 'Community Standards' is hardly a trivial assault on KING's psyche."

17   Opp'n at 20.  But the conduct at issue here is far less serious than that, *e.g.*, in *Yurick* where the

18   court still found no outrageous conduct.  In any event, the Kings's argument presupposes that

19   Facebook *broadcast* that Ms. King's account was disabled for failure to comply with Community

20   Standards.  Although it may be inferred that Ms. King's friends knew her account was not

21   working, there is no indication that they knew *why* and that Facebook was responsible for

22   publication of the why.  The IIED claim as to both Kings is therefore dismissed with prejudice.

23          As for the negligence claim, it too is meritless because the Kings have failed to make

24   allegations to support Facebook having any kind of duty to them.  In the opposition, the Kings

25   argue that Facebook had, at the very least, "a duty to protect KING's property (the content of the

26   King Facebook Account) independent of any contractual relationship between FACEBOOK and

27   King."  Opp'n at 21.  But the Kings have failed to explain *why* Facebook has such a duty to them.

28   The Kings have not pointed to, *e.g.*, a duty "imposed by law," a duty "assumed by [Facebook]"

1   (*i.e.*, "in which the emotional condition of the plaintiff[s] is an object"), or a duty existing "by

2   virtue of a special relationship." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985

3   (1993). Regarding a legal duty,

> *Biakanja* [*v. Irving*, 49 Cal. 2d 647 (1958)] "is the leading California case discussing whether a legal duty should be imposed absent privity of contract." In *Biakanja*, the California Supreme Court held that whether the defendant in a specific case "will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors," including (1) "the extent to which the transaction was intended to affect the plaintiff," (2) "the foreseeability of harm to [the plaintiff]," (3) "the degree of certainty that the plaintiff suffered injury," (4) "the closeness of the connection between the defendant's conduct and the injury suffered," (5) "the moral blame attached to the defendant's conduct," and (6) "the policy of preventing future harm."

11  *Daniels v. Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150, 1181 (2016). In the case at

12  bar, even if factors (1), (2), and (4) weigh somewhat in the Kings' favor, the remaining factors

13  weigh strongly in Facebook's favor. The Court therefore dismisses the negligence claim as well.

14  The dismissal is with prejudice as amendment would be futile.

15  E.   <u>Breach-of-Contract Claim and Claim for Breach of the Implied Covenant and Fair Dealing</u>

16       <u>(First and Seventh Causes of Action)</u>

17       The Court now turns to the main claims in the instant case – *i.e.*, Ms. King's claims for

18  breach of contract and the implied covenant of good faith and fair dealing. The two causes of

19  action are related because

> [e]very contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement. Simply stated, the burden imposed is that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. Or, to put it another way, the implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.

24  *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (1990) (internal

25  quotation marks omitted); *see also Avidity Partners, LLC v. State of Cal.*, 221 Cal. App. 4th 1180,

26  1204 (2013) (stating that "'the covenant is implied as a supplement to the express contractual

27  covenants, to prevent a contracting party from engaging in conduct which (while not technically

28  transgressing the express covenants) frustrates the other party's rights to the benefits of the

United States District Court
Northern District of California

contract'") (emphasis omitted).  Of course, "[t]he implied covenant of good faith and fair dealing does not impose substantive terms and conditions beyond those to which the parties actually agreed." *Id.*

In the instant case, Ms. King alleges that she had a contract with Facebook based on its Terms of Service[4] and that Facebook breached that contract and/or the implied covenant undergirding the contract in three ways: (1) Facebook disabled her account even though she had not violated any Community Standards; (2) after disabling her account, Facebook destroyed content associated with the account; and (3) Facebook refused to give her any specifics as to how she had purportedly failed to follow Community Standards.

     1.   Destruction of Content

The Court addresses first Ms. King's contention that Facebook breached the Terms of Service or the implied covenant of good faith and fair dealing by destroying content associated with her account.[5]  This argument lacks merit.  Ms. King has not pointed to any provision in the Terms of Service that suggests Facebook would not destroy content (or, conversely, that Facebook had an obligation to retain content).  Moreover, the destruction of content, following the disabling of an account, does not injure a user's core contractual right – the right to use Facebook's social media platform.  *See Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992) ("[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. . . . [U]nder traditional contract principles, the

---

[4] Both parties agree that the correct Terms of Service are those attached to the Pricer declaration (submitted in support of the motion to dismiss).  *See* Pricer Decl. ¶ 3 & Ex. A (stating that Exhibit A is a true and correct copy of the Terms of Service as of October 22, 2020, *i.e.*, shortly before Ms. King learned that her account had been disabled); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (noting that the incorporation-by-reference doctrine "permits us to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading" and extends "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint").

[5] At the hearing, Facebook suggested that the content associated with Ms. King's account may not have been destroyed; however, for purposes of this motion, the Court accepts Ms. King's allegation of destruction as true.

United States District Court
Northern District of California

implied covenant of good faith is read into contracts 'in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.'").  The fact that Facebook recognized in the Terms of Service that a user "own[s] the intellectual property rights . . . in any content that you create and share on Facebook," TOS § 3.3, does not mean that Facebook implicitly agreed to preserve that intellectual property. In fact, § 3.3 of the Terms of Service simply states that the user gives Facebook a license to that intellectual property.  The Terms of Service say nothing about the duty of Facebook to retain user postings.

The Court therefore dismisses this theory of liability, and with prejudice on the basis of futility.

2.    Disabling of Account

While the Court does not find Ms. King's argument on the destruction of content persuasive, it finds that she has a viable theory for breach of contract and/or the implied covenant based on Facebook's disabling of her account.  Ms. King points to § 4.2 of the Terms of Service, which provides as follows:

[§ 4.2] Account suspension or termination

We want Facebook to be a place where people feel welcome and safe to express themselves and share their thoughts and ideas.

**If we determine that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable access to your account.**  We may also suspend or disable your account if you repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons.

Where we take such action we'll let you know and explain any options you have to request a review unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; or where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

You can learn more about what you can do if your account has been disabled and how to contact us if you think we have disabled your account by mistake.

If you delete or we disabled your account, these Terms shall

12

1

terminated as an agreement between you and us, but the following
provisions will remain in place: 3, 4.2-4.5.

2

TOS § 4.2 (bold added).  According to Ms. King, under § 4.2, Facebook could disable her account

3

only if she had, *e.g.*, violated Community Standards and she did not do so; thus, Facebook's

4

disabling of her account was unwarranted and a breach of the Terms of Service (or the implied

5

covenant).

6

In response, Facebook asserts that it could not have breached the Terms of Service (or even

7

the implied covenant) when it disabled Ms. King's account because § 4.2 gives it complete and

8

unfettered discretion as to whether to disable an account.  Facebook points to the language "If we

9

determine" and "we may suspend."  Although the Terms of Service do give Facebook some

10

discretion to act, *see Pub. Storage v. Sprint Corp.*, No. CV 14-2594, 2015 U.S. Dist. LEXIS

11

30204, at *42 (C.D. Cal. Mar. 9, 2015) (noting that "the phrase 'if Lessee determines' vests the

12

Lessee with a measure of discretion to determine whether the premises are appropriate"), the Court

13

is not convinced at this juncture that that discretion is entirely unrestrained.  Notably, the Terms of

14

Service did not include language providing that Facebook had "sole discretion" to act.  *Compare,*

15

*e.g.*, *Chen v. PayPal, Inc.*, 61 Cal. App. 5th 559, 570-71 (2021) (noting that contract provisions

16

allowed "PayPal to place a hold on a payment or on a certain amount in a seller's account when it

17

'believes there may be a high level of risk' associated with a transaction or the account[,] [a]nd per

18

the express terms of the contract, it may do so '*at its sole discretion*'"; although plaintiffs alleged

19

that "'there was never any high level of risk associated with any of the accounts of any' appellants,

20

. . . this ignores that the user agreement makes the decision to place a hold PayPal's decision – and

21

PayPal's alone").  Moreover, by providing a standard by which to evaluate whether an account

22

should be disabled, the Terms of Service suggest that Facebook's discretion to disable an account

23

is to be guided by the articulated factors and cannot be entirely arbitrary.  *Cf. Block v. Cmty.*

24

*Nutrition Ins.*, 467 U.S. 340, 349, 351 (1984) (stating that the "presumption favoring judicial

25

review of administrative action . . . may be overcome by specific language or specific legislative

26

history that is a reliable indicator of congressional intent" – *i.e.*, "whenever the congressional

27

intent to preclude judicial review is 'fairly discernible in the statutory scheme'").  At the very

28

least, there is a strong argument that the implied covenant of good faith and fair dealing imposes

13

1    some limitation on the exercise of discretion so as to not entirely eviscerate users' rights.

2         3.    Explanation for Disabling of Account

3         Finally, the Court finds a viable theory for breach of the implied covenant based on Ms.

4    King's contention that Facebook failed to give her an adequate explanation as to how she

5    purportedly violated Community Standards.  On their face, the Terms of Service state:

6              Were we take such action [account suspension or termination] **we'll**
               **let you know** and explain any options you have **to request a**
7              **review**, unless doing so may expose us or others to legal liability;
               harm our community of users, compromise or interfere with the
8              integrity or operation of any of our services, systems or Products; or
               where we are restricted due to technical limitations; or where we are
9              prohibited from doing so for legal reasons.

10   Terms of Service § 4.2 (emphasis added).  Admittedly, the express terms of the Terms of Service

11   do not require Facebook to provide information to a user beyond the fact that the account has been

12   suspended or terminated.  But, as noted above, "the implied covenant imposes upon each party the

13   obligation to do everything that the contract presupposes they will do to accomplish its purpose.

14   This rule was developed in the contract arena and is aimed at making effective the agreement's

15   promises."  *Careau*, 222 Cal. App. 3d at 1393 (internal quotation marks omitted).  Thus, here, it is

16   plausible that Facebook is obligated to provide at least some information in addition to the fact

17   that the account has been suspended or terminated – *e.g.*, enough information about why the

18   account was suspended or terminated such that an "appeal" could properly be made (*i.e.*, to follow

19   through with "options you have to request a review").

20        4.    Remedies

21        Based on the Court's analysis above, Ms. King has a claim for breach of contract (or

22   breach of the implied covenant) based on Facebook's disabling of her account, as well as the

23   failure to provide a more specific explanation as to why the account was disabled.  However,

24   Facebook argues that, to the extent any claim survives, it is still defective because Ms. King has

25   failed to allege cognizable damages caused by the purported breach.  *See* Mot. at 6 ("Plaintiffs do

26   not articulate how Facebook caused any pecuniary harm through its application of its Terms of

27   Service.").  The Court agrees.  The FAC suggests that much of the injury allegedly suffered by

28   Ms. King is emotional distress or injury to reputation.  But this kind of injury is generally not

14

1    compensable for a breach of contract.  *See Frangipani v. Boecker*, 64 Cal. App. 4th 860, 865-66,

2    75 Cal. Rptr. 2d 407 (1998) ("[T]he invariable rule [is] pronounced by a legion of cases that

3    damages are not recoverable for mental suffering or injury to reputation resulting from breach of

4    contract."); *see also Roberts v. L.A. Cty. Bar Ass'n*, 105 Cal. App. 4th 604, 617 (2003) (same);

5    *Allen v. Jones*, 104 Cal. App. 3d 207, 211 (1980) ("The great majority of contracts involve

6    commercial transactions in which it is generally not foreseeable that breach will cause significant

7    mental distress as distinguished from mere mental agitation or annoyance.  Accordingly, the rule

8    has developed that damages for mental suffering or injury to reputation are generally not

9    recoverable in an action for breach of contract.").

10    Ms. King contends, however, that she has still suffered a pecuniary injury because the

11    content associated with her account (*e.g.*, photographs) "is no longer available to her."  Opp'n at 9.

12    Ms. King contends that, even though this content has "peculiar value" to her, that does not mean

13    that it is not compensable.  She points to California Civil Code § 3355 which provides as follows:

14    "Where certain property has a peculiar value to a person recovering damages for deprivation

15    thereof, or injury thereto, that may be deemed to be its value against one who had notice thereof

16    before incurring a liability to damages in respect thereof, or against a willful wrongdoer."  Cal.

17    Civ. Code § 3355.

18    The Court rejects Ms. King's arguments for two reasons.  First, as noted above, Facebook

19    was not obligated to retain her property for her.  Second, even if it were, "[p]eculiar value under

20    Civil Code section 3355 refers to a property's unique *economic* value, not its sentimental or

21    emotional value." *McMahon v. Craig*, 176 Cal. App. 4th 222, 237 (2009) (emphasis added).  For

22    example, an animal has been deemed to have peculiar value when "its pedigree, reputation, age,

23    health, and ability to win dog shows" were taken into account – *i.e.*, there were "special

24    characteristics which increase the animal's monetary value, not its abstract value as a companion

25    to its owner." *Id.*  There could also be peculiar value to, *e.g.*, a family portrait independent of any

26    emotional value.

27    "[W]hen the subject matter has its chief value in its value for use by
      the injured person, if the thing is replaceable, the damages for its
28    loss are limited to replacement value, less an amount for

15

depreciation. . . . If the subject matter cannot be replaced, however, as in the case of a destroyed or lost family portrait, the owner will be compensated for its special value to him, as evidenced by the original cost, and the quality and condition at the time of the loss. Likewise an author who with great labor has compiled a manuscript, useful to him but with no exchange value, is entitled, in case of its destruction, to the value of the time spent in producing it or necessary to spend to reproduce it.  In these cases, however, damages cannot be based on sentimental value. Compensatory damages are not given for emotional distress caused merely by the loss of the things, except that in unusual circumstances damages may be awarded for humiliation caused by deprivation, as when one is deprived of essential articles of clothing."

*Id.* (quoting the Restatement Second of Torts § 911).

Given the limitations on peculiar value, it is difficult to see how, *e.g.*, the photographs allegedly destroyed have some kind of economic value independent of any emotional attachment. Moreover, as indicated by the text of § 3355, Facebook could be liable only if it had *notice* of the peculiar value (at least absent willful wrongdoing).  *See* Cal. Civ. Code § 3355 (providing that "[w]here certain property has a peculiar value to a person recovering damages for deprivation thereof . . . , that may be deemed to be its value against one who had notice thereof before incurring a liability to damages in respect thereof, or against a willful wrongdoer").  Ms. King suggests that these are questions of fact that cannot be resolved at the 12(b)(6) phase, but she first needs to make factual allegations to support the plausibility of her theory.

Finally, the Court notes that, theoretically, Ms. King could have argued that her claim for breach of contract or the implied covenant should not be dismissed because, even if she had no viable claim for damages, she could still seek specific performance as a remedy.  Ms. King did invoke specific performance as a remedy in her pleading (at least for her claim for breach of contract).  *See* FAC at 13 (labeling the first cause of action as "Breach of Contract/Specific Performance"); FAC ¶ 31 (alleging that, "if monetary damages are not awarded or are inadequate to compensate KING for the breach of contract by FACEBOOK, [she is entitled to] an award of specific performance requiring FACEBOOK to reinstate the King Facebook Account, all content and data associated with the King Facebook Account, and reinstatement of KING's name for any person searching for her name through facebook.com").

The problem for Ms. King is that, in its motion to dismiss, Facebook made various

1    arguments as to why specific performance is not a viable remedy, *see* Mot. at 7 (arguing that Ms.

2    King must show that "(1) the contract's terms are sufficiently definite; (2) consideration is

3    adequate; (3) there is substantial similarity of the requested performance to the contractual terms;

4    (4) there is a mutuality of remedies; and (5) plaintiff's legal remedy is inadequate"), but she failed

5    to respond to any of the contentions in her opposition brief.

6           Accordingly, the claim for breach of contract or the implied covenant – predicated on the

7    disabling of Ms. King's account and the failure to provide a specific explanation – is dismissed.

8    F.     Conversion Claim (Eighth Cause of Action)

9           "Conversion is the wrongful exercise of dominion over the property of another.  The

10   elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the

11   property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3)

12   damages."  *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015) (internal quotation marks omitted).  In

13   her claim for conversion, Ms. King alleges that she owned the content on her account with

14   Facebook – which "included items of great and special value to [her] such as personal records,

15   family photographs and other personal photographs accumulated over years of being a Facebook

16   user, . . . contact information with hundreds of family, friends, and business associates," etc. – and

17   that Facebook "destroyed the entire content . . . without any justification."  FAC ¶¶ 63-64.

18          The Court dismisses the conversion claim because Ms. King has failed to allege a wrongful

19   act with respect to the alleged destruction of content.  As noted above, Facebook was not under

20   any obligation not to destroy (or to otherwise retain) the content associated with her account.  The

21   dismissal of this claim is with prejudice.

22   G.     CDA Immunity

23          Based on the analysis above, all of the claims asserted by the Kings are dismissed, some

24   with prejudice.  The only claim that the Court has not, at this point, dismissed with prejudice is the

25   claim for breach of contract/implied covenant based on the disabling of Ms. King's account and

26   the failure to provide a specific explanation.

27          In deciding whether this claim should be dismissed with or without prejudice, the Court

28

United States District Court
Northern District of California

17

1    must consider Facebook's argument that it has CDA immunity under 47 U.S.C. § 230(c)(1).[6]

2    Because the Court agrees with Facebook on CDA immunity with respect to the disabling of Ms.

3    King's account, it denies Ms. King leave to amend as amendment would be futile.

4         Section 230(c)(1) of the CDA provides: "No provider or user of an interactive computer

5    service shall be treated as the publisher or speaker of any information provided by another

6    information content provider."  47 U.S.C. § 230(c)(1).  Facebook emphasizes that § 230(c)(1)

7    protects an interactive computer service provider from liability for its exercise of traditional

8    editorial functions, which includes *both* whether to post content and to withdraw content.  *See*

9    Mot. at 19.  *See, e.g.*, *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th

10   Cir. 2008) (stating that "any activity that can be boiled down to deciding whether to exclude

11   material that third parties seek to post online is perforce immune under section 230"); *Barnes v.

12   Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (stating that "publication involves reviewing,

13   editing, and deciding whether to publish or to withdraw from publication third-party content").

14        In response, the Kings present two arguments: (1) under *Barnes*, there can be only CDA

15   immunity for the tort claims, not for claims based on breach of contract or the implied covenant;

16   and (2) the specific immunity claimed by Facebook – *i.e.*, § 230(c)(1) – applies only where a

17   plaintiff seeks to hold a defendant liable for information that the defendant has published and not

18   for information that the defendant has withdrawn or removed (which is protected by § 230(c)(2)

19   instead, a provision that Facebook has not invoked).  As discussed below, the Kings recognize

20   their second argument is foreclosed by Ninth Circuit precedent; however, they are still making the

21   argument to preserve it for appeal.

22        1.    Tort v. Contract Claims

23        As noted above, the Kings' first argument – that CDA immunity does not apply to

24   contract-based claims – is based on the Ninth Circuit's decision in *Barnes*.  In *Barnes*, the plaintiff

25   sued Yahoo after it failed to take down fraudulent profiles that had been created by her ex-

26

27   ─────────────────

28   [6] At the hearing, Facebook noted that it is not, at this juncture, making an argument of CDA immunity based on § 230(c)(2) because resolution of that issue would turn on disputed facts and thus the issue would not be the proper subject of a 12(b)(6) motion.

United States District Court
Northern District of California

boyfriend.  She had two theories of liability: (1) Yahoo negligently provided or failed to provide

services that it undertook to provide and (2) Yahoo made a promise to her to remove the profiles

but failed to do so.  *See Barnes*, 570 F.3d at 1099.  In deciding whether there was § 230(c)(1)

immunity, the Ninth Circuit stated that "courts must ask whether the duty that the plaintiff alleges

the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'

If it does, section 230(c)(1) precludes liability."  *Id.* at 1102.  The Ninth Circuit ultimately held

that Yahoo was protected by CDA immunity with respect to the "negligent undertaking" claim

because, there, the plaintiff sought to treat Yahoo as a publisher of the indecent profiles.  *See id.* at

1103 (stating that "the undertaking that Barnes alleges Yahoo failed to perform with due care

[was] [t]he removal of the indecent profiles that her former boyfriend posted on Yahoo's website[,]

[b]ut removing content is something publishers do, and to impose liability on the basis of such

conduct necessarily involves treating the liable party as a publisher of the content it failed to

remove").

      However, it reached a different conclusion on the promissory estoppel theory.

> . . . [W]e inquire whether Barnes' theory of recovery under
> promissory estoppel would treat Yahoo as a "publisher or speaker"
> under the [CDA].
>
> . . . [S]ubsection 230(c)(1) precludes liability when the duty the
> plaintiff alleges the defendant violated derives from the defendant's
> status or conduct as a publisher or speaker.  In a promissory estoppel
> case, as in any other contract case, the duty the defendant allegedly
> violated springs from a contract – an enforceable promise – not from
> any non-contractual conduct or capacity of the defendant.  Barnes
> does not seek to hold Yahoo liable as a publisher or speaker of third-
> party content, but rather as the counter-party to a contract, as a
> promisor who has breached.
>
> . . . .
>
> . . . . Contract liability here would come not from Yahoo's
> publishing conduct, but from Yahoo's manifest intention to be
> legally obligated to do something, which happens to be removal of
> material from publication.  Contract law treats the outwardly
> manifested intention to create an expectation on the part of another
> as a legally significant event.  That event generates a legal duty
> distinct from the conduct at hand, be it the conduct of a publisher, of
> a doctor, or of an overzealous uncle.
>
> . . . .

One might also approach this question from the perspective of waiver. . . . [O]nce a court concludes a promise is legally enforceable according to contract law, it has implicitly concluded that the promisor has manifestly intended that the court enforce his promise.  By so intending, he has agreed to depart from the baseline rules (usually derived from tort or statute) that govern the mine-run of relationships between strangers.  Subsection 230(c)(1) creates a baseline rule: no liability for publishing or speaking the content of other information service providers.  Insofar as Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline.

*Id.* at 1108-09.  Accordingly, the Ninth Circuit held that, "insofar as Barnes alleges a breach of

contract claim under the theory of promissory estoppel, subsection 230(c)(1) of the [CDA] does

not preclude her cause of action."  *Id.* at 1109; *see also In re Zoom Video Comms. Priv. Litig.*, No.

C-20-2155 LHK, 2021 U.S. Dist. LEXIS 47085, at *38-39 (N.D. Cal. Mar. 11, 2021) (finding

CDA immunity with respect to most of plaintiffs' "Zoombombing" claims – *i.e.,* that "'failures of

Zoom's security protocols' allowed unauthorized participants" to disrupt Zoom meetings with

harmful content such as racial slurs or pornography; but denying motion to dismiss contract claims

since they did not "derive from Zoom's status or conduct as a 'publisher' or 'speaker'").[7]

Facebook acknowledges *Barnes* but contends that it does not "establish a categorical rule

that contract-based claims can never be subject to Section 230(c)(1) immunity"; rather, the Ninth

Circuit "explicitly stated that 'what matters is not the *name* of the cause of action [but rather]

whether the cause of action inherently requires the court to treat the defendant as the 'publisher or

speaker' of content provided by another.'"  Reply at 13 (quoting *Barnes*, 570 F.3d at 1101-02).

Facebook emphasizes that "[t]he *Barnes* court held that Yahoo's specific promise to remove

content . . . show[ed] a 'manifest intention to be legally obligated to do something' – not [in] its

discretionary role as a publisher."  Reply at 14.

Facebook's position has support in the case law.  For example, in *Atkinson*, Judge Seeborg

of this District noted that, "[t]hough [plaintiff's] claim is styled as a contract cause of action, he is

---

[7] *See, e.g.*, *Zoom*, No. C-20-2155 LHK (N.D. Cal.) (Docket No. 126) (FAC ¶ 230) (alleging that, under implied contracts, "Defendant was obligated to provide Plaintiffs and Class members with Zoom meetings that were suitable for their intended purpose of providing secure video conferencing services, rather than other video conferencing services vulnerable to unauthorized access, incapable of providing safety and security, and instead actually utilized to track its users' personal data for commercial purposes").

1    really accusing Facebook of utilizing its community standards to make classic publishing

2    decisions [*e.g.*, regarding COVID-related postings].  Therefore, § 230(c)(1) immunizes Facebook

3    from his state law causes of action."  *Atkinson*, No. C-20-5546 RS (Docket No. 75) (Order at 10).

4    And a California appellate court commented as follows in *Murphy v. Twitter, Inc.*, 60 Cal. App.

5    5th 12 (2021):

6           Unlike in *Barnes*, where the plaintiff sought damages for breach of a
            specific personal promise made by an employee to ensure specific
7           content was removed from Yahoo's website, the substance of
            Murphy's complaint accuses Twitter of unfairly applying its general
8           rules regarding what content it will publish and seeks injunctive
            relief to demand that Twitter restore her account and refrain from
9           enforcing its Hateful Conduct Policy.  Murphy does not allege
            someone at Twitter specifically promised her they would not remove
10          her tweets or would not suspend her account.  Rather, Twitter's
            alleged actions in refusing to publish and banning Murphy's tweets,
11          as the trial court in this case observed, "*reflect paradigmatic
            editorial decisions* not to publish particular content" that are
12          protected by section 230.

13   *Id.* at 29 (emphasis added).

14          Ms. King protests still that, by stating in its Terms of Service that it would only withdraw

15   content (*i.e.*, disable accounts) based on certain criteria, Facebook essentially waived any CDA

16   immunity it had and took on a contractual obligation, the breach of which could result in liability.

17   She points out that, in *Barnes*, the Ninth Circuit noted that

18          [o]ne might . . . approach this question from the perspective of
            waiver.  The objective intention to be bound by a promise . . . also
19          signifies the waiver of certain defenses. . . . [O]nce a court
            concludes a promise is legally enforceable according to contract law,
20          it has implicitly concluded that the promisor has manifestly intended
            that the court enforce his promise.  By so intending, he has agreed to
21          depart from the baseline rules (usually derived from tort or statute)
            that govern the mine-run of relationships between strangers.
22          Subsection 230(c)(1) creates a baseline rule: no liability for
            publishing or speaking the content of other information service
23          providers.  Insofar as Yahoo made a promise with the constructive
            intent that it be enforceable, it has implicitly agreed to an alteration
24          in such baseline.

25   *Barnes*, 570 F.3d at 1108-09.

26          Although Ms. King's position is not without any merit, she has glossed over the nature of

27   the "promise" that Facebook made in its Terms of Service.  In the Terms of Service, Facebook

28   simply stated that it would use its discretion to determine whether an account should be disabled

United States District Court
Northern District of California

based on certain standards.  The Court is not convinced that Facebook's statement that it would

exercise its publishing discretion constitutes a waiver of the CDA immunity based on publishing

discretion.  In other words, all that Facebook did here was to incorporate into the contract (the

Terms of Service) its right to act as a publisher.  This by itself is not enough to take Facebook

outside of the protection the CDA gives to "'paradigmatic editorial decisions not to publish

particular content.'"  *Murphy*, 60 Cal. App. 5th at 29.  Unlike the very specific one-time promise

made in *Barnes*, the promise relied upon here is indistinguishable from "'paradigmatic editorial

decisions not to publish particular content.'"  *Id.*  It makes little sense from the perspective of

policy underpinning the CDA to strip Facebook of otherwise applicable CDA immunity simply

because Facebook stated its discretion as a publisher in its Terms of Service.

Accordingly, the Court holds that Facebook has CDA immunity for the contract/implied

covenant claim to the extent that claim is based on Facebook's disabling of Ms. King's account.

Because there is CDA immunity, it would be futile for Ms. King to try to amend the claim.

However, to the extent Ms. King's contract/implied covenant claim is based on Facebook's

failure to provide an explanation for the disabling of her account, the Court finds that CDA

immunity does not apply.  This specific claim is tied to an implied promise, one that does not

depend on Facebook's status as a publisher to make "'paradigmatic editorial decisions not to

publish particular content.'"  *Id.*  Instead, the implied promise is to explain its decision.  Although

Facebook contends that "a claim seeking to limit the *manner* in which a publishing decision was

made, still seeks to treat Facebook as a publisher," Reply at 14 (emphasis in original), the Court is

not persuaded.  That Facebook has the editorial discretion to post or remove content has little do to

with the implied promise to explain why content was removed.

2.      Section 230(c)(1) v. Section 230(c)(2)

In their second argument, the Kings contend that none of their claims is barred by CDA

immunity because Facebook has ignored the distinction between § 230(c)(1) immunity (invoked

by Facebook) and § 230(c)(2) immunity (not invoked by Facebook).  Sections 230(c)(1) and (2)

provide as follows:

(c)      Protection for "Good Samaritan" blocking and screening of

United States District Court
Northern District of California

offensive material

(1)     Treatment of publisher or speaker.  No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2)     Civil liability.  No provider or user of an interactive computer service shall be held liable on account of –

(A)     any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B)     any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C. § 230(c).  According to the Kings, § 230(c)(1) provides protection to an interactive computer service provider only where it publishes information; where an interactive computer service provider removes information, § 230(c)(1) does not apply and only § 230(c)(2) can be relied on to provide protection.  In support, the Kings rely on Justice Thomas's concurrence in *Malwarebytes v. Enigma Software Group USA, LLC*, 141 S. Ct. 13, 15 (2020) (concurring in denial of petition for writ of certiorari; stating that "the statute suggests that if a company unknowingly leaves up illegal third-party content, it is protected from publisher liability by §230(c)(1)[,] and if it takes down certain third-party content in good faith, it is protected by §230(c)(2)(A)").

The Kings, however, acknowledge that Justice Thomas's concurrence is simply that – a concurrence – and thus not binding.  More to the point, the Kings acknowledge that binding Ninth Circuit authority holds that § 230(c)(1) covers both a decision to publish content or a decision to remove content.  (Indeed, Justice Thomas cited the Ninth Circuit's decision in *Barnes* as reaching an improper holding.  *See id.* at 17 ("[B]y construing §230(c)(1) to protect *any* decision to edit or remove content, courts have curtailed the limits Congress placed on decisions to remove content.") (emphasis in original).)  The Kings have simply made their argument to preserve it for appeal.  *See* Opp'n at 19 (stating that "the argument in this section of the MIO is made to preserve the issue for appeal to an en banc panel of the Ninth Circuit and ultimately, if necessary, for cert application

1  where Justice Thomas will obviously be an enthusiastic recipient").

2  ### III.    CONCLUSION

3       For the foregoing reasons, the Court grants Facebook's motion to dismiss in its entirety.

4  All claims are dismissed with prejudice, except for one – specifically, Ms. King's claim for breach

5  of the implied covenant based on Facebook's failure to provide an explanation for the disabling of

6  her account.  This claim for failure to provide an explanation is dismissed without prejudice

7  because CDA immunity does not apply.  However, the claim as currently pled is not viable

8  because Ms. King has not sufficiently pled any cognizable damages as a result of Facebook's

9  conduct.  Furthermore, Ms. King has waived any claim for specific performance.  The Court gives

10  Ms. King leave to amend this singular cause of action with respect to damages and for specific

11  performance (in spite of her arguable waiver) to the extent that she can do so in good faith.  Any

12  amendment must also take into account whether there is a reasonable basis to assert diversity

13  jurisdiction (in particular, the amount in controversy) given the rulings made by the Court herein.

14       Ms. King shall file an amended complaint by **December 10, 2021**.  Facebook shall respond

15  to the amended complaint by **January 7, 2022**.  Until the pleadings are resolved, the Court

16  continues the stay of discovery.

17       This order disposes of Docket No. 28.

18

19       **IT IS SO ORDERED**.

20

21  Dated: November 12, 2021

22

23  _____

24  EDWARD M. CHEN
   United States District Judge

25

26

27

28

*United States District Court*
*Northern District of California*