RUSSEL DAVID MYRICK 270803
The RDM Legal Group
7979 Ivanhoe Ave, Ste 200
La Jolla, CA 92037-4505
Tel. No. 888-482-8266
Fax No. 858-244-7930
Email: russel@rdmlg.com

SAMUEL P. KING, JR. 1396
735 Bishop Street, Suite 304
Honolulu, Hawaii 96813
Tel. No. 808-384-6325
Fax No. 808-533-4745
Email: sam@kingandking.com
Pro Hac Vice

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIENNE SEPANIAK KING, | ) Civ. No. 3:21-cv-04573-EMC |
| | ) |
| Plaintiff, | ) SECOND AMENDED COMPLAINT |
| | ) FOR DAMAGES AND SPECIFIC |
| vs. | ) PERFORMANCE; DEMAND FOR |
| | ) JURY TRIAL |
| FACEBOOK, INC., a Delaware corporation, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

SECOND AMENDED COMPLAINT
FOR DAMAGES AND SPECIFIC PERFORMANCE

Plaintiff ADRIENNE SEPANIAK KING ("KING"), through undersigned counsel, states for her Second Amended Complaint for Damages and Specific Performance against Defendant FACEBOOK, INC. ("FACEBOOK") as follows:

PRELIMINARY STATEMENT

1.    KING had a Personal Account ("King Facebook Account") with FACEBOOK which she established approximately in approximately 2008 to her recollection. Over the years, KING used the King Facebook Account extensively and eventually had about 1,000 "Friends" around the world. On the King Facebook Account, KING shared personal information about family and non-political material, and KING shared political material and discussed political topics from a conservative point of view. On or about November 17, 2020, KING discovered, when she attempted to log on to the King Facebook Account, that she was unable to do so. In attempting to discover the problem, on or about November 19, 2020, KING received a message from FACEBOOK that her account had been "disabled." No reason was given for FACEBOOK's disabling of KING's account. On or about November 19, 2020, KING and Christopher King ("CKing"), KING's son who lives with her in Hawaii, attempted to reinstate KING's account but received a message from FACEBOOK that her account was disabled because "it did not follow our Community Standards. This decision can't be reversed." No explanation was provided to KING by FACEBOOK as to what had been uploaded to the King

2

Facebook Account that "did not follow our Community Standards," or as to which particular Community Standards were allegedly not followed, or as to how particular identified Community Standards were not followed. Despite further attempts made by KING and CKing with FACEBOOK to discover why the King Facebook Account was permanently disabled, FACEBOOK made no further communication back to KING.

2.  FACEBOOK's permanent disabling of the King Facebook Account and FACEBOOK's refusal to provide KING with any explanation about the details of how the King Facebook Account had supposedly failed to follow FACEBOOK's Community Standards violated FACEBOOK's contract (Terms of Service ("TOS")) between FACEBOOK and KING and caused KING damages because of her inability to access the content of the King Facebook Account.

3.  KING seeks 1) contract damages in excess of $75,000 against FACEBOOK for breach of the contract and breach of the covenant of good faith and fair dealing implied in the contract between KING and FACEBOOK, and 2) specific performance relief requiring FACEBOOK to provide KING with an explanation of why the King Facebook Account was disabled so that KING can seek appropriate appeal and review with FACEBOOK regarding the disabling of the King Facebook Account as provided in the TOS and requiring FACEBOOK to reestablish the King Facebook Account and provide KING with unlimited access to all of the data, material, and

3

content of the King Facebook Account (which includes reinstatement of all posts and communications sent by KING to other users of FACEBOOK (this would include reestablishing information about KING's email address and phone number for users of *facebook.com* searching for KING) and by other users of FACEBOOK to KING).

JURISDICTION AND VENUE

4. Plaintiff brings this action pursuant to diversity of citizenship jurisdiction provided in 28 USC 1332(a)(1) because KING and FACEBOOK are citizens of different states as further alleged below and the amount in controversy exceeds $75,000.

5. If, for any reason, this Court determines that KING has not pled a valid claim for at least $75,000 in damages, this Court still has discretion to retain supplemental jurisdiction over KING's California state law claims for breach of contract and breach of the implied covenant of good faith and fair dealing pursuant to 28 USC 1367. Although this Court has dismissed KING's claim for relief under federal law as set forth in her original Complaint and First Amended Complaint, this Court still has discretion to retain KING's California state law breach of contract and breach of the implied covenant of good faith and fair dealing causes of action if this Court finds that KING has not pled a valid claim for at least $75,000 in damages. This Court should exercise such discretion and retain jurisdiction over KING's California state causes of action in consideration of judicial economy and efficiency

4

to avoid KING's filing of the exact same claims with the exact same issues in California state court which have already been resolved by this Court, especially as the parties will be referring to this Court's decisions in this case in any potential future California proceeding.

6.   Specific performance relief is authorized as a remedy for breach of contract and breach of the implied covenant of good faith and fair dealing.

7.   In its Terms of Service, FACEBOOK has a provision entitled "Disputes" (paragraph 4 of Section 4 entitled "Additional Provisions") which provides in part:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms [of Service] or the Facebook products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court of the Northern District of California or a state court located in San Mateo County.  You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms [of Service] and any claim, without regard to conflict of law provisions.

Based on this forum-selection provision of FACEBOOK's Terms of Service, with respect to venue, Plaintiff has filed this action in the United States Federal District Court for the Northern District of California.

PARTIES

8.   KING is, and at all times relevant to this Complaint has been, a resident and citizen of the State of Hawaii.

9.   FACEBOOK is, and at all times relevant to this Complaint has been, a for-

5

profit corporation incorporated in the State of Delaware and has its principal offices and place of business in the State of California.

STATEMENT OF FACTS

10.   KING had a Personal Account with FACEBOOK ("King Facebook Account") which she established in approximately 2008 to her recollection.  The establishment of the King Facebook Account by KING with FACEBOOK was established based on a contract between KING and FACEBOOK pursuant to the provisions of FACEBOOK's Terms of Service ("TOS").

11.   Over the years, KING used the King Facebook Account extensively and eventually had about 1000 "Friends" around the world.

12.   On the King Facebook Account, KING shared personal information about family and non-political material and reposted personal information from other sources and friends.  KING also shared political material and discussed political topics from a conservative point of view, and KING often reposted material from other sources with no added comment (for example, various articles about COVID-19, global warming, etc.).  In turn, KING received on the King Facebook Account numerous posts from friends, relatives, and persons interested in her various posts. KING estimates that over 90% of posts to the King Facebook Account were "public" so that the posts to the King Facebook Account could be viewed by anyone.

13.   On or about November 17, 2020, KING discovered, when she attempted

6

to log on to the King Facebook Account, that she was unable to do so.

14.   In attempting to discover why she was unable to log in to the King

Facebook Account, on or about November 19, 2020, KING received the following

message from FACEBOOK:

> Your Account Has Been Disabled
>
> For more information please visit the Help Center.
>
> Your account was disabled on November 17, 2020.  If you think your account was disabled by mistake you can submit more information via the Help Center for up to 30 days after your account was disabled.  After that, your account will be permanently disabled and you will no longer be able to request a review.

No reason was given for FACEBOOK's disabling of KING's account.

15.   The notice from FACEBOOK on November 19, 2020, as set out in

paragraph 14 above, was sent pursuant to a decision made by FACEBOOK pursuant

to section 2 of paragraph 4 of FACEBOOK's TOS ("paragraph 4.2") which provided

on November 19, 2020:

> Account suspension or termination
>
> We want Facebook to be a place where people feel welcome and safe to express themselves and share their thoughts and ideas.  If we determine that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable access to your account.  We may also suspend or disable your account if you repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons.
>
> Where we take such action we'll let you know and explain any option you have to request a review, unless doing so may expose us or others

7

to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; or where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

You can learn more about what you can do if your account has been disabled and how to contact us if you think we have disabled your account by mistake.

If you delete or we disable your account, these Terms shall terminate as an agreement between you and us. but the following provisions will remain in place: 3, 4.2-4.5.

16.  On or about November 19, 2020, KING, with the assistance of CKing who is KING's son who lives with her in Hawaii and who is also a computer engineer, then attempted to seek an explanation from FACEBOOK about why her account was disabled in order to reinstate her account but received the following message from FACEBOOK:

**My Personal Account Was Disabled**

If you think your account was disabled by mistake, please enter the following information and we will consider your profile for review. You can submit more information here for up to 30 days after your account was disabled.  After that, your account will be permanently disabled and you will no longer be able to request a review.

Only submit this form if your account has been disabled for violating Facebook's Community Standards.  If you can't access your account for a different reason, please return to the Help Center to find the appropriate contact channel.

**We Cannot Review the Decision to Disable Your Account**
Your Facebook account was disabled because it did not follow our Community Standards.  This decision can't be reversed.

8

Second Amended Complaint - 3:21-cv-04573-EMC

No explanation was provided by FACEBOOK to KING as to what had been uploaded to the King Facebook Account that "did not follow our Community Standards," or as to which particular Community Standards were allegedly not followed, or as to how particular identified Community Standards were not followed.

17.   Despite further attempts made by KING and CKing with FACEBOOK to discover why the King Facebook Account was permanently disabled, FACEBOOK made no further communication back to KING.

18.   Further attempts by CKing to contact persons working at FACEBOOK over the next few months to discover why KING's account was permanently disabled were unsuccessful.  The most recent communication received by CKing from an employee of FACEBOOK who was attempting to assist KING and CKing to discover why the King Facebook Account was disabled by FACEBOOK was received on or about March 9, 2021, and stated:

> I am told that the review (I placed) was rejected and that the user (your mother) should have been told what is the policy area they were violating.  Unfortunately I do not have much else to add.  As for the downloading of data, it seems there should be a way to ask for your data. There should be a flow somewhere, but the person dealing with the problem was not sure what that was.  Maybe a search can help?  Let me know otherwise.
>
> Sorry man, sorry it took so long and sorry we don't know much more, I suppose for FB to share with me would be absurd and not proper, so I suspect I cannot help you much more than this (which I am sure is not very satisfactory) [followed by a frowning emoji]

Second Amended Complaint - 3:21-cv-04573-EMC

As alleged above, FACEBOOK never gave KING a reason for disabling the King

Facebook Page beyond a general reference to a claim by FACEBOOK that the King

Facebook Account had not followed the FACEBOOK Community Standards, without

any specifics (KING was never advised by FACEBOOK what "policy area" she was

"violating"), and KING and CKing were never able to locate any "flow" which could

be used for KING to obtain the data from the King Facebook Account.

19.   KING did nothing which would have caused the King Facebook Account

not to follow any of FACEBOOK's Community Standards which would in turn have

caused the King Facebook Account to be temporarily disabled or permanently

disabled by FACEBOOK according to paragraph 4.2.   FACEBOOK breached

paragraph 4.2 when it disabled the King Facebook Account.

20.  FACEBOOK did not act in good faith by permanently disabling KING's

Facebook Account and by claiming that FACEBOOK acted pursuant to the

FACEBOOK's TOS and Community Standards.

21.  FACEBOOK breached its covenant of good faith and fair dealing as

implied in paragraph 4.2 because FACEBOOK refused to state the reasons why

KING's Facebook Account had been permanently disabled, FACEBOOK refused to

state what occurred on KING's Facebook Account which did not follow

FACEBOOK's Community Standards, FACEBOOK refused to state what provision

or provisions of FACEBOOK's Community Standards were not followed on the King

10

Facebook Account, FACEBOOK refused to state how any specifically identifiable Community Standard had not been followed on the King Facebook Account, FACEBOOK refused to communicate with KING and CKing on her behalf when she requested a dialog with FACEBOOK about the reasons for the permanent disabling of the King Facebook Account, and FACEBOOK destroyed all of the King Facebook Account and all data, material, and content related to and/or stored with or under the King Facebook Account which was in no way objectionable or failed to follow any of FACEBOOK's Community Standards.  Paragraph 4.2 specifically provides that in a case where FACEBOOK disables an account, it will "let you know and explain any options you have to request a review."  As set forth above in this paragraph, FACEBOOK failed to provide at least some information in addition to the fact that KING's account had been disabled – *e.g.*, enough information about why KING's account was disabled such that an "appeal" could properly be made pursuant to paragraph 4.2 (*i.e.*, to follow through with "any options you have to request a review").  This failure by FACEBOOK to provide information to KING and to engage in any dialogue whatsoever with KING about why her account was disabled and what her options might be to appeal and to request a review with FACEBOOK of FACEBOOK's decision to disable the King Facebook Account constituted a breach of FACEBOOK's implied covenant of good faith and fair dealing imposed by law on FACEBOOK to accomplish the purposes of paragraph 4.2.

11

22.  Not only did FACEBOOK breach its implied covenant of good faith and fair dealing imposed by law on paragraph 4.2, FACEBOOK was intentionally malicious in disabling the King Facebook Account and refusing to engage in any dialogue whatsoever with KING regarding the reasons FACEBOOK disabled the King Facebook Account in violation of FACEBOOK's obligations under paragraph 4.2.  This malicious behavior by FACEBOOK is evident from: 1) FACEBOOK's repeated refusal over a period of months to follow the terms of paragraph 4.2 in spite of the continued entreaties by KING and CKing on behalf of KING to explain why FACEBOOK terminated the King Facebook Account; 2) FACEBOOK's November 19, 2020, notice to KING that on the one hand she could request a review if she thought FACEBOOK disabled her account by "mistake" and yet on the other hand that the decision to disable her account could not be reviewed and "can't be reversed" in violation of the provisions of paragraph 4.2; 3) FACEBOOK's notice to CKing from a FACEBOOK employee on March 9, 2021, that KING "should have been told what is the policy area they were violating" where no such explanation was received from FACEBOOK in spite of repeated requests for such an explanation; and 4) from FACEBOOK's notorious abuse of users who share content with a conservative viewpoint like KING.

23.  FACEBOOK's breach of its implied covenant of good faith and fair dealing, denying KING a chance to request an appeal and a review of FACEBOOK's

decision to disable her account, especially to request a review on the basis that FACEBOOK made a mistake in disabling her account as KING did not violate FACEBOOK's Community Standards, and denying KING a chance to recover her King Facebook Account data, material, and content has caused KING damages in excess of $75,000 as set forth in paragraph 24.

24.   KING's passion for most of her adult life has been the study of history, especially related to World War II.  Her personal home library consists of about 3,000 books, of which about 75% involve history on every topic from ancient Egypt and Rome to the rise of Islam to the crusades, to medieval history, to the Renaissance, to post-Renaissance history, to the Industrial Revolution, to American, European, Middle Eastern, Asian, Hawaiian, and general world history, to World War I, to World War II, to modern history.  Her library also consists of books regarding biographies and autobiographies of great world leaders throughout history, and also consists of books on religion, art history, and music history.

In connection with her study of and interest in history, KING has taken many trips to Europe and Asia to visit the historical locations she has read about all her life. KING took a family trip to Europe in 1999 and especially visited WWII battlefields and cemeteries.  She took a family trip to Egypt and Jordan in 2004-2005.  KING's more recent trips to historical sites have been to Singapore (2008-2009), Italy (Rome, Naples, Salerno, Anzio, Paestum 2015), Germany (Hamburg and Berlin 2019),

13

Greece (2019), and Turkey (Istanbul 2019). KING is also an extremely active member of Rotary International which she joined in 2010. Since 2014, KING has attended five annual Rotary International Conventions held in cities around the world. This year KING is the President-Elect of the Waikiki Rotary Club where she has been Chairperson of the Waikiki Rotary Club's International Service Committee since 2013. KING has attended Rotary International Conventions in Sydney (2014), Seoul (2016), Atlanta (2017), Toronto (2018), and Hamburg (2019). KING attended and participated in Rotary meetings or projects in Japan (2014 & 2017), Taiwan (2017), and Burma (Myanmar) (2017).

For all her personal and Rotary trips, KING has taken thousands of photographs since 1999. From photographs taken by KING prior to opening the King Facebook Account, KING selected and organized into photo albums hundreds of photographs printed out with comments about either the historical significance of the areas shown in the photographs or about the significance to Rotary of the areas and people shown in the photographs when the experiences were fresh in her mind. It has been KING's plan for many years to compile all of these albums into a memoir of her life and her comments on her discoveries about the historical locations she has visited and, with respect to Rotary, the significance of Rotary International in the world (especially related to Rotary's international projects in connection with KING's chairpersonship of the International Service Committee of the Waikiki Rotary Club).

14

KING was especially interested in compiling these memoirs, comments, and observations into a summary format for the benefit of her children and grandchildren and friends who have often expressed an interest in her extensive travels throughout the world and her comments about the locations she has photographed and their significance in world history or for Rotary.  KING has been especially inspired to compile her comments and memoirs by the over 20 handwritten volumes of similar material compiled by her mother-in-law regarding her many travels around the world and a similar memoir with photographs and comments complied by a good friend of hers who traveled all over the world working for various federal and other government and charitable agencies.  As an example of KING's plans to compile her observations and research into historical facts, just last month, KING completed, after at least 50 hours of effort, a written/photographic history of her husband's Scottish great-grandfather, Captain James Anderson King, who was a significant figure in the late 1800s in Hawaiian history.  She delivered her compilation of Cpt. King's history in a lecture to the Caledonian Society of Hawaii (Hawaii's Scottish historical society – there are Caledonian societies throughout the world).

A few years after the time KING began using FACEBOOK and set up the King Facebook Account, KING discovered that FACEBOOK was offering not just a platform to upload her photographs, comments, and reminiscences at least while she was alive, but also a "memorialization page" which would be available to persons

15

selected by KING after her death.  The "memorialization page" was described by

former FACEBOOK head of security, Max Kelly, in a 2009 blog post as follows:

> By memorializing the account of someone who has passed away, people
> will no longer see that person appear in their Suggestions.  When an
> account is memorialized, we also set privacy so that only confirmed
> friends can see the profile or locate it in search. We try to protect the
> deceased's privacy by removing sensitive information such as contact
> information and status updates.  Memorializing an account also prevents
> anyone from logging into it in the future, while still enabling friends and
> family to leave posts on the profile Wall in remembrance.

KING was intrigued by this service being advertised by FACEBOOK for its users

because FACEBOOK was providing not only a location for KING to store all her

photographs and comments during her lifetime, but also a location which would last

in perpetuity to memorialize her desire to present her perspective about her

discoveries about traveling and history which was consistent with her desire to leave

a legacy for her children, grandchildren, and friends interested in her observations

and travels.

Based on FACEBOOK's advertisement of its "memorialization page" and the

service FACEBOOK provided for uploading photographs and travel comments,

KING began using FACEBOOK exclusively for uploading her selected travel

photographs and comments with the expectation of saving them in perpetuity and

using them as a source to write memoirs and histories similar to the history she

compiled about Cpt. King.  KING estimates that over the approximately ten years of

Second Amended Complaint - 3:21-cv-04573-EMC

using FACEBOOK before the King Facebook Account was disabled, she spent thousands of hours organizing and selecting travel photographs and making comments about the photographs and uploading the photographs and comments to her Facebook Account. KING stopped printing out photographs or making photograph albums because her Facebook Account was more convenient and permanent and did not involve storing photo albums and preserving physical photographs. KING also uploaded to the King Facebook Account her photographs with comments related to Rotary travels and the significance of Rotary around the world. Many contacts KING has made through Rotary were available only through her Facebook Account because many Rotary members around the world do not have ready access to or do not use email for communication and instead use Facebook accounts. For example, KING made a number of close Rotary friends in Taiwan and Burma (Myanmar) who communicated with her exclusively through the King Facebook Account, but who can no longer communicate with KING because her account was disabled by FACEBOOK.

The photographs which KING has selected, commented upon, and uploaded into her Facebook Account since approximately 2009 are not just valuable in preserving KING's comments and observations but are also valuable because of the photographs and comments from hundreds of friends on her Facebook Account who uploaded their photographs and comments which supplemented KING's photographs

17

and comments.

The "photographs" KING selected to upload to the King Facebook Account consisted not only of still photographs but of videos with sound.

Of the at least 10 international trips KING has taken since she started using her Facebook account to preserve her travel experiences (Singapore, Italy (Rome, Cassino, Salerno, Naples, Anzio, and Paestum), Germany (Hamburg and Berlin), Greece, Turkey (Istanbul), Sydney, Seoul, Atlanta, and Toronto, Japan (2014 & 2017), Taiwan(2017), and Burma (Myanmar) 2017), KING estimates that each trip cost an average of $10,000 (some significantly more because they lasted for several weeks each) so that it would cost her at least $100,000 to recreate all her photographs of these places and people she met and re-experience all of these places and people, not to mention the thousands of hours KING spent selecting hundreds of photographs from thousands of photographs to upload to her Facebook Account and making comments regarding the photographs when the events were fresh in her mind.  Even if KING were able to recreate many of the photographs and videos that she uploaded to the King Facebook Account, many of the photographs and videos and KING's reactions and comments to the photographs and videos relate to spontaneous events which occurred as she was present over the years and are irreplaceable.  At this point, KING, it appears, will also be unable to recover all the valuable photographs and comments made by other FACEBOOK users regarding her uploaded photographs and

18

comments because any comments sent by other FACEBOOK users to KING have also been destroyed.

This paragraph of the Second Amended Complaint contains as much information about KING's damages as she can recollect without having access to the data, material, and content of the King Facebook Account to make an even more accurate statement of her damages and her claims in this Second Amended Complaint. KING is prejudiced, and being denied Due Process, in not being able to give a full accounting of her damages because FACEBOOK has refused to provide KING access to the King Facebook Account. KING is entitled to discovery and access to the King Facebook Account to refresh her recollection in order to be allowed fairly to make a full accounting of her damages and a full statement of the facts pertinent to this Second Amended Complaint.

25. As FACEBOOK was the custodian of the data, material, and content of the King Facebook Account, FACEBOOK was aware of the data, material, and content being uploaded by KING to the King Facebook Account, and FACEBOOK could easily have determined the value of the data, material, and content of the King Facebook Account to KING.

26. Up to this point in this litigation, FACEBOOK has claimed that its TOS does not guarantee that FACEBOOK will preserve the content of FACEBOOK's user accounts, but this is not true. FACEBOOOK's business model, and one of the

19

attractions about FACEBOOK for FACEBOOK's users, is that FACEBOOK will preserve user content during the lifetime of the users.   FACEBOOK further guarantees preservation of user content by promising its users, according to the terms of paragraph 4.2, that an account will be disabled and an account's content made unavailable (destroyed), only if a user breaches the TOS according to the standard set forth by FACEBOOK in paragraph 4.2.  FACEBOOK further guarantees preservation of user content by promising to provide an appeal and review process in paragraph 4.2 if FACEBOOK decides to disable a user account.  FACEBOOK further provides for preservation of user content by providing, as set forth in paragraph 24 of this Second Amended Complaint above, for a "memorialization page" even after a user is deceased – FACEBOOK could not provide such an incentive if its business model did not include a promise and guarantee that user content would be preserved during a user's lifetime.  KING saw some memorialization pages of some of her deceased FACEBOOK friends before the King Facebook Account was disabled which further encouraged her belief that she would be able to create a memorialization page for the King Facebook Account data, material, and content.

<u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>
[Breach of Contract]

27.  KING restates and realleges all allegations and statements in paragraphs

20

1-26 above.

28.  During the entire time that the contract between KING and FACEBOOK existed (this "contract" was FACEBOOK's Terms of Service ("TOS")), KING did not violate any of the terms of the contract as set out in the TOS, and KING did not violate any of FACEBOOK's Community Standards.  At all times KING was a qualified user of the King Facebook Account pursuant to paragraph 3.1 of the TOS.

29.  FACEBOOK breached paragraphs 3.1 and 4.2 of the TOS with KING by 1) disabling the King Facebook Account because KING did not breach any of the terms of her contract with FACEBOOK and did not violate any of the terms of the contract as set out in FACEBOOK's TOS, and KING did not cause the King Facebook Account not to "follow" any of FACEBOOK's Community Standards which would have permitted FACEBOOK to disable the King Facebook Account according to paragraph 4.2 of the FACEBOOK TOS, 2) by disabling the King Facebook Account without providing KING sufficient information to allow her to engage in an appeal and review with FACEBOOK of its decision to disable the Facebook Account, and 3) by destroying all of the data, material, and content of the King Facebook Account.

30.  FACEBOOK failed to state  to KING how FACEBOOK applied the standard by which to evaluate whether an account should be disabled set out in paragraph 4.2 in disabling the King Facebook Account and acted in an entirely willful

21

and arbitrary manner in disabling the King Facebook Account.

31.  KING is entitled to an award of monetary damages in excess of $75,000 against FACEBOOK in an amount to be determined by a jury at the trial of this case for the above-stated breach of contract by FACEBOOK pursuant to this Court's diversity jurisdiction as provided in 28 USC 1332(a)(1).

32.  Even if KING is not entitled to an award of monetary damages in excess of $75,000, KING is entitled to an award of damages in an amount to be determined by a jury at the trial of this case on KING's California state law claim for breach of contract which this Court has discretion to retain pursuant to 28 USC 1367.

SECOND CAUSE OF ACTION
[Breach of Implied Covenant of Good Faith and Fair Dealing]

33.  KING restates and realleges all allegations and statements in paragraphs 1-32 above.

34.  There was an implied covenant of good faith and fair dealing in the contract between FACEBOOK and KING (this "contract" was FACEBOOK's Terms of Service ("TOS")).

35.  Paragraph 4.2 of the TOS provided that if an account was disabled that FACEBOOK would "let you know and explain any options you have to request a review."  Pursuant to this provision of the TOS, there was an implied covenant of good faith and fair dealing such that FACEBOOK was obligated to provide at least

22

some information to KING, in addition to the fact that the King Facebook Account had been disabled, so that KING could pursue a proper appeal to and/or review by FACEBOOK regarding the disabling of the King Facebook Account by FACEBOOK.

36. FACEBOOK breached its implied covenant of good faith and fair dealing with KING as set forth in paragraph 4.2 of the TOS by refusing to give KING any reasonable or detailed explanation, in addition to the fact that the King Facebook Account was disabled, as to how the King Facebook Account failed to "follow" FACEBOOK's Community Standards, and by ignoring KING's repeated and reasonable requests for information concerning how the King Facebook Account failed to "follow" FACEBOOK's Community Standards, and by ignoring CKing's repeated and reasonable requests to FACEBOOK on behalf of KING for information concerning how the King Facebook Account failed to "follow" FACEBOOK's Community Standards.

37. FACEBOOK also breached its covenant of good faith and fair dealing by destroying all of the data, material, and content of the King Facebook Account which included data, material, and content which FACEBOOK never claimed failed to "follow" its Community Standards, and by failing to provide KING with any explanation at all as to why this non-offensive data, material, and content was destroyed or otherwise made unavailable to KING.

38. FACEBOOK acted with wanton and willful conduct in its breach of its

23

covenant of good faith and fair dealing with KING.

39.  KING is entitled to an award of damages in excess of $75,000 against FACEBOOK in an amount to be determined by a jury at the trial of this case against FACEBOOK for the above-stated breach of the implied covenant of good faith and fair dealing by FACEBOOK pursuant to this Court's diversity jurisdiction as provided in 28 USC 1332(a)(1).

40.  Even if KING is not entitled to an award of monetary damages in excess of $75,000, KING is entitled to an award of damages in an amount to be determined by a jury at the trial of this case on KING's California state law claim for breach of the implied covenant of good faith and fair dealing which this Court has discretion to retain pursuant to 28 USC 1367.

<u>THIRD CAUSE OF ACTION</u>
[Specific Performance]

41.  KING restates and realleges all allegations and statements in paragraphs 1-40 above.

42.  As set forth above, FACEBOOK was required by paragraph 4.2 of the FACEBOOK's Terms of Service ("TOS"), the contract between FACEBOOK and KING with respect to the King Facebook Account, to provide KING with sufficient information about why FACEBOOK disabled the King Facebook Account so that KING could request an appeal and review by FACEBOOK of FACEBOOK's

24

decision to disable the King Facebook Account. There was sufficient consideration for this contract between FACEBOOK and KING because KING allowed her name and account to be used by FACEBOOK so that FACEBOOK could earn income from advertising directed toward KING.

43. Although an award of damages to KING would compensate her to a certain degree for the loss of the data, material, and content of the King Facebook Account, the award of damages would be difficult to compute, but are, as alleged above in excess of $75,000. Nonetheless, an award of damages could never fully compensate KING for the loss of about ten years of effort as set forth in paragraph 24 above. It would be more appropriate for this Court to order FACEBOOK to comply with the terms of paragraph 4.2 so that a fair determination can be made regarding an appeal or review of FACEBOOK's action taken to disable the King Facebook Account and the possible reestablishment of the King Facebook Account. Just as FACEBOOK could seek an order from a court pursuant to paragraph 4.2 requiring KING to delete any content which violated the TOS instead of unilaterally terminating the KING Facebook Account, so KING is entitled to seek an order from a court requiring FACEBOOK to comply with its obligations under paragraph 4.2 to provide KING with sufficient information to seek a review or appeal of FACEBOOK's action which disabled the King Facebook Account.

44. FACEBOOK breached its obligation pursuant to paragraph 4.2 set forth

in paragraph 42 above by refusing to provide KING with sufficient information about why FACEBOOK disabled the King Facebook Account so that KING could request an appeal and review by FACEBOOK of FACEBOOK's decision to disable the King Facebook Account.

45.  This Court should order FACEBOOK to: 1) provide sufficient information to KING about why the King Facebook Account was disabled so that KING can request a proper appeal and review by FACEBOOK of FACEBOOK's decision to disable the King Facebook Account, which information should include at a minimum what occurred on KING's Facebook Account which did not follow FACEBOOK's Community Standards, what provision or provisions of FACEBOOK's Community Standards were not followed on the King Facebook Account, and how any specifically identifiable Community Standard had not been followed on the King Facebook Account; 2) provide KING with access to the data, material, and content of the King Facebook Account so that KING can copy the data, material, and content of the King Facebook Account and make a full accounting of her damages applicable to this Second Amended Complaint and be provided Due Process in this case; 3) reinstate the King Facebook Account; 4) reinstate all posts made to the King Facebook Account and made by KING to other FACEBOOK accounts; and 5) reinstate KING's name and contact information in *facebook.com*.

26

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for compensatory damages in excess of $75,000 against FACEBOOK in an amount to be determined by a jury at the trial of this case pursuant to this Court's jurisdiction as provided in 28 USC 1332(a)(1) for FACEBOOK's breach of contract and breach of the implied covenant of good faith and fair dealing, and damages in an amount to be determined by a jury at the trial of this case on KING's California state law claims for breach of contract and breach of the implied covenant of good faith and fair dealing which this Court has discretion to retain pursuant to 28 USC 1367.  Further, KING prays for specific performance relief as set forth in the Third Cause of Action above.

DATED: San Francisco, California, December 10, 2021.


_____/s/ Samuel P. King, Jr._____
SAMUEL P. KING, JR.
Attorney Pro Hac Vice for Plaintiffs

27

Second Amended Complaint - 3:21-cv-04573-EMC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIENNE SEPANIAK KING and | ) Civ. No. 3:21-cv-04573-EMC |
| | ) |
| Plaintiff, | ) |
| | ) DEMAND FOR JURY TRIAL |
| vs. | ) |
| | ) |
| FACEBOOK, INC., a Delaware corporation, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial in this case on all issues triable by a jury.

DATED: San Francisco, California, December 10, 2021.


        /s/ Samuel P. King, Jr.
        SAMUEL P. KING, JR.
        Attorney Pro Hac Vice for Plaintiffs