RUSSEL DAVID MYRICK 270803
The RDM Legal Group
7979 Ivanhoe Ave, Ste 200
La Jolla, CA 92037-4505
Tel. No. 888-482-8266
Fax No. 858-244-7930
Email: russel@rdmlg.com

SAMUEL P. KING, JR. 1396
735 Bishop Street, Suite 304
Honolulu, Hawaii 96813
Tel. No. 808-384-6325
Fax No. 808-533-4745
Email: sam@kingandking.com
Pro Hac Vice

Attorneys for Plaintiffs


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIENNE SEPANIAK KING and CHRISTOPHER EDWARD SEPANIAK KING, | ) Civ. No. 3:21-cv-04573-EMC<br>)<br>) PLAINTIFFS' MEMORANDUM IN |
| Plaintiffs, | ) OPPOSITION TO DEFENDANT'S<br>) MOTION TO DISMISS PLAINTIFF'S<br>) SECOND AMENDED COMPLAINT |
| vs. | )<br>) |
| META PLATFORMS, INC., fka FACEBOOK, INC., a Delaware corporation, | )<br>) Hearing Date: 3/24/22 |
| Defendant. | ) Hearing Time: 1:30 pm (San Francisco)<br>) Judge: Edward M. Chen |
| _____ | ) |

## <u>TABLE OF CONTENTS</u>

**I. Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    **A. First Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    **B. Court Order Dismissing FAC With Leave to Amend** . . . . . . . . . . . . . . . . . . . . . . . 1

    **C. Second Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**II. FACEBOOK's Motion to Dismiss Plaintiff's Second Amended Complaint Should**
    **be Denied** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    **A. This Court should deny FACEBOOK's implied motion for reconsideration** . . . . . . 7

    **B. The SAC does not plead causes of action in violation of the Order** . . . . . . . . . . . . 9

    **C. The SAC does state a "cognizable remedy" for the causes of action pled**
    **in the SAC** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        **1. Even if FACEBOOK did not have a duty to preserve KING's**
        **Facebook Account content, the value of the content is still the**
        **measure of damages for FACEBOOK's breach of the implied**
        **covenant of good faith and fair dealing** . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        **2. If there was a breach by FACEBOOK of the implied covenant of**
        **good faith and fair dealing, then the destruction of the content**
        **of KING's Facebook Account was proximately caused by**
        **FACEBOOK's breach** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        **3. This is not a case involving "lost" data as claimed by FACEBOOK** . . . . . . . 13

        **4. The value of KING's Facebook Account content is not "speculative"**
        **and has measurable pecuniary value** . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        **5. If damages are inadequate to provide a remedy for KING in this**
        **case, then KING is entitled to specific performance** . . . . . . . . . . . . . . . . 16

**III. Even if damages cannot be shown to be at least $75,000, this Court still has**
    **jurisdiction over the state law causes of action for breach of contract/implied**
    **covenant and specific performance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**IV. Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

TABLE OF AUTHORITIES

**Cases**

*Foley v. Interactive Data Corporation*, 765 P.2d 373 (Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McMahon v. Craig*, 176 Cal. App. 4th 222 (Cal. App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Whalen v. Villegas*, 968 N.Y.S.2d 343 (Dist. Ct. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Young v. Facebook, Inc.*, 2010 WL 4269304 (N.D.Cal. Oct 25, 2010) . . . . . . . . . . . . . . . . . . . . . . 17


**Statutes**

28 USC 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18


**Rules**

Federal Rules of Civil Procedure, Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff ADRIENNE SEPANIAK KING ("KING") hereby responds to the Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion") filed by Defendant META PLATFORMS, INC. ("META") (formerly known as and originally named in this case as "FACEBOOK, INC." ("FACEBOOK")) filed on January 28, 2022, with this Memorandum in Opposition ("MIO").

I. Introduction

A. First Amended Complaint On September 10, 2021, KING and CHRISTOPHER EDWARD SEPANIAK KING ("CKING") filed their First Amended Complaint ("FAC") in this case. The FAC alleged eight causes of action: 1) breach of contract; 2) violation of the CDA; 3) intentional and reckless infliction of emotional distress; 4) negligent or grossly negligent infliction of emotional distress; 5) intentional, reckless, grossly negligent, and/or negligent infliction of emotional distress and loss of consortium; 6) declaratory and injunctive relief; 7) breach of the implied covenant of good faith and fair dealing; and 8) conversion. All causes of action were brought by KING, except for cause of action #5 which was brought by CKING.

FACEBOOK filed a 12(b)(6) motion to dismiss the FAC on September 24, 2021.

B. Court Order Dismissing FAC With Leave to Amend After briefing and argument, this Court issued its Order Granting Defendant's Motion to Dismiss First Amended Complaint ("Order") on November 12, 2021. The Order dismissed with prejudice Counts 2, 3, 4, 5, 6, and 8. The Order concentrated on an extended discussion of Counts 1 and 7 and application of "CDA immunity" to these two Counts. Ultimately, the Order stated that CDA immunity applied to Count 1, the "breach of contract" claim, but not to Count 7, the "breach of the implied covenant of good faith and fair dealing" claim. As to Count 7, the Order gave KING (CKING's only claims in Count 5 were dismissed with prejudice leaving KING as the only Plaintiff) leave to amend noting that Count 7 was dismissed without prejudice because "the claim as currently pled is not viable because Ms. King has not sufficiently pled any cognizable damages as a result of Facebook's conduct." The Order also gave KING leave to amend Count 7 for specific performance "(in spite of her arguable waiver) to the extent that she can do so in good faith." The Order noted "[a]ny amendment must also take into account whether there is a

1

reasonable basis to assert diversity jurisdiction (in particular, the amount in controversy) given the rulings made by the Court herein."

In the discussion of the Order with respect to Count 1 "Breach of Contact" and Count 7 "Breach of Implied Covenant of Good Faith and Fair Dealing," this Court noted that "[t]he two causes of action are related" (Opinion at 10).  This Court cited case law stating that "the covenant [of good faith and fair dealing] is implied as a supplement to the express contractual covenants to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract," and "[t]he implied covenant of good faith and fair dealing does not impose substantive terms and conditions beyond those to which the  parties actually agreed" (*id*., pp. 10-11).

The Order noted that all parties agreed that the Facebook Terms of Service ("TOS") which existed on the date KING's Facebook Account was disabled (November 17, 2020) constituted the contract between KING and FACEBOOK.

The Order summarized the three ways which KING alleged breach of the TOS by FACEBOOK with her: 1) FACEBOOK disabled her account even though she had not violated any of Facebook's Community Standards as FACEBOOK claimed that she had; 2) FACEBOOK destroyed the content of KING's Facebook Account after disabling it; and 3) FACEBOOK refused to give her any specifics as to how she had purportedly failed to follow FACEBOOK's Community Standards (*id*., p. 11).  The Order rejected KING's first claim of breach holding that FACEBOOK had no duty to retain any of the content of KING's Facebook Account (*id*., pp. 11-12).

Regarding KING's claim that FACEBOOK breached its contract with her by disabling her account, this Court held that "it finds that she has a viable theory for breach of contract and/or the implied covenant [of good faith and fair dealing]" (*id*., p. 12).  In answer to FACEBOOK's claim that it had "complete and unfettered discretion" to disable any users account so there could be no breach of contract, this Court held that "the Court is not  convinced at this juncture that that discretion is entirely unrestrained," especially because the TOS did not use the term "sole discretion" (*id*., p. 13).  The Order further stated, "Moreover, by providing a standard by which to evaluate whether an account should be

disabled, the Terms of Service suggest that Facebook's discretion to disable an account is to be guided by the articulated factors and cannot be entirely arbitrary. . . .  At the very least, there is a strong argument that the implied covenant of good faith and fair dealing imposes some limitations on the exercise of discretion so as to not entirely eviscerate users' rights" (*id.*, pp. 13-14).

Regarding KING's complaint that FACEBOOK provided no explanation about how she had supposedly failed to follow FACEBOOK's Community Standards, the Order stated, "Finally, the Court finds a viable theory for breach of the implied covenant based on Ms. King's contention that Facebook failed to give her an adequate explanation as to how she purportedly violated Community Standards" (*id.*, pp. 13-14).  Because paragraph 4.2 of the TOS states "we'll let you know" if we take action to terminate an account "and explain any options you have to request a review," the Order held, "Thus, here it is plausible that Facebook is obligated to provide at least some information in addition to the fact that the account has been suspended or terminated – *e.g.*, enough information about why the account was suspended or terminated such that an 'appeal' could properly be made (*i.e.*, to follow through with 'options you have to request a review'" (*id.*, p. 14).

The Order concludes, "Based on the Court's analysis above, Ms. King has a claim for breach of contract (or breach of the implied covenant) based on Facebook's disabling of her account, as well as the failure to provide a more specific explanation as to why the account was disabled" (*id.*).

The Order then goes on to discuss the need for KING to make a better claim for damages and comments, "Given the limitations on peculiar value, it is difficult to see how, *e.g.*, the photographs allegedly destroyed have some kind of economic value independent of any emotional attachment. Moreover, as indicated by the text of Sec. 3355, Facebook could be liable only if it had *notice* of the peculiar value (at least absent willful wrongdoing). . . .  Ms. King suggests that these are questions of fact that cannot be resolved at the 12(b)(6) phase, but she first needs to make factual allegations to support the plausibility of her theory" (*id.*, p. 16).

The Order holds that in order for KING to make out a claim for specific performance on her breach of contract claim or on her implied covenant claim, she must show that "(1) the contract terms are sufficiently definite; (2) consideration is adequate; (3) there is substantial similarity of the requested performance  to  the  contractual  terms;  (4) there is a mutuality of remedies; and  (5) plaintiff's legal

remedy is inadequate" (*id*., p. 17).

Having held that KING stated viable claims for breach of contract and breach of the implied covenant of good faith and fair dealing if she could show adequate damages, and that, if damages was an inadequate remedy, KING could plead a case of specific performance if the five necessary factors for such a claim were properly pled, this Court went on to discuss "CDA immunity."  The immunity issue was discussed with respect to the only claims this Court had not, up to the point of the discussion about the immunity issue, dismissed.  "The only claim that the Court has not, at this point, dismissed with prejudice is the claim for breach of contract/implied covenant based on the disabling of Ms. King's account and the failure to provide a specific explanation" (*id*.).  With respect to the immunity issue, this Court held "that Facebook has CDA immunity for the contract/implied covenant claim to the extent that claim is based on Facebook's disabling of Ms. King's account."  This Court also held that, "to the extent Ms. King's contract/implied covenant claim is based on Facebook's failure to provide an explanation for the disabling of her account, the Court finds that CDA immunity does not apply" (*id.*, p. 22).

As noted above, the Order concludes by stating that all of KING's [and CKING's] claims are dismissed "except for one" of KING's claims – "specifically, Ms. King's claim for breach of the implied covenant based on Facebook's failure to provide an explanation for the disabling of her account."  The Order states that this claim is not viable in the FAC because that FAC "has not sufficiently pled any cognizable damages as a result of Facebook's conduct."  The Order states an amended complaint "must take into account . . . diversity jurisdiction (in particular, the amount in controversy)."  The Order also permits KING to file an amended complaint for specific performance "(in spite of her arguable waiver) to the extent that she can do so in good faith."

C. Second Amended Complaint With this Court's Order as a guide, KING filed her Second Amended Complaint ("SAC") on December 10, 2021.  The concluding paragraph of the Order gave KING leave to file an amended complaint on her claim for "breach of the implied covenant based on Facebook's failure to provide an explanation for disabling her account."  The problem with this summary with regard to drafting the SAC was that in many portions of the Order, "breach of contract" and "breach of the implied covenant of good faith and fair dealing" were so closely tied and discussed and referenced, it  appeared that  there were  two ways to  state the same cause of action for FACEBOOK's failure to

provide an explanation for disabling KING's Facebook Account.  For example, as referenced above, this Court held as to breach of contract ***and*** breach of the implied covenant, "to the extent Ms. King's ***contract/implied covenant claim*** is based on Facebook's failure to provide an explanation for the disabling of her account, the Court finds that CDA immunity does not apply"   The first way was to plead "breach of contract" because the TOS specifically stated that FACEBOOK would "let you know" and "explain any options you have to request a review" – in other words, there was a breach of contract by FACEBOOK in failing to follow the terms of the TOS and failing to let KING "know" why her account had been disabled so she could "request a review."  The second way was to plead "breach of the implied covenant of good faith and fair dealing" which, as the Court stated in the Order, has to be tied in to a specific contractual obligation of the TOS, namely to "let you know" and "explain any options you have to request a review."

The SAC pled the first way in the First Cause of Action (Breach of Contract).  This Cause specifically references the breach of contract as tied in to FACEBOOK's "disabling the King Facebook Account without providing KING sufficient information to allow her to engage in an appeal and review with FACEBOOK of its decision to disable the Facebook Account." (*See* SAC, paragraph 29).  This Cause goes on the allege, "FACEBOOK failed to state to KING how FACEBOOK applied the standard by which to evaluate whether an account should be disabled set out in paragraph 4.2 in disabling the King Facebook Account and acted in an entirely willful and arbitrary manner is disabling the King Facebook Account" (*id*., paragraph 30).

The SAC pled the second way in the Second Cause of Action (Breach of the Implied Covenant of Good Faith and Fair Dealing), again referencing FACEBOOK's obligation to "let you know and explain any options you have to request a review" (*id*., paragraphs 35 & 36).

The SAC pled the Third Cause of Action (Specific Performance), alleging the five factors necessary to maintain this caus of action.  Paragraph 42 alleges the definite contract terms which KING seeks to require FACEBOOK to perform (paragraph 4.2 of the TOS requires FACEBOOK "to provide KING with sufficient information about why FACEBOOK disabled the King Facebook Account so that KING could request an appeal and review by FACEBOOK of FACEBOOK's decision to disable the King Facebook Account."  Paragraph 42 also alleges that there was sufficient consideration for the TOS

contract between KING and FACEBOOK because "KING allowed her name and account to be used by FACEBOOK so that FACEBOOK could earn income from advertising directed toward KING." Paragraph 43 states that an award of damages would not be sufficient to compensate KING "for the loss of about ten years of effort as set forth in paragraph 24 above." Paragraphs 43, 44, and 45 seek to require FACEBOOK to fulfill the obligations of its contract with KING by at least providing her with reasons why her Facebook Account was terminated. Finally, paragraph 43 alleges "mutuality of remedies ("Just as FACEBOOK could seek an order from a court pursuant to paragraph 4.2 requiring KING to delete any content which violated the TOS instead of unilaterally terminating the KING Facebook Account, so KING is entitled to seek an order from a court requiring FACEBOOK to comply with its obligations under paragraph 4.2 to provide KING with sufficient information to seek a review or appeal of FACEBOOK's action which disabled the King Facebook Account.").

Regarding this Court's holding that KING was required to plead her damages with more specificity, paragraph 24 of the SAC sets out KING's damages in detail. In the Order, this Court stated, as quoted above, "Given the limitations on peculiar value, it is difficult to see how, *e.g.*, the photographs allegedly destroyed have some kind of economic value independent of any emotional attachment." As paragraph 24 sets out in detail, the loss of content for KING was not merely "photographs" for which she had an "emotional attachment." Paragraph 24 sets out in detail how, over a period of ten years, KING accumulated photographs, videos, comments, connections, insights into history, etc. literally all over the world in her quest to create a wealth of information from which she could write about her discoveries for the benefit of her family, her grandchildren, and people interested in the history of the parts of the world she visited. KING did not lose merely "photographs to which she had an emotional attachment," she lost ten years of work and careful planning which were intended to lead to her writing (which she had already started with her biography of her husband's great-grandfather, Captain James Anderson King, and her presentation of that biography to Hawaii's local Scottish society). Paragraph 24 states that KING spent at least $100,000 in her endeavors to accumulate the information on which she intended to rely for her writing, well in excess of the jurisdictional minimum of $75,000.

II. FACEBOOK's Motion to Dismiss Plaintiff's Second Amended Complaint Should be Denied.

A. This Court should deny FACEBOOK's implied motion for reconsideration. FACEBOOK has now filed its 12(b)(6) Motion to dismiss the SAC. It is clear that FACEBOOK is materially upset with this Court's Order. We all understand that FACEBOOK (now META) is one of the biggest corporations the world, valued at over one trillion dollars with about three billion users, and that FACEBOOK expects to get its way with the federal courts every time it cries "immunity," regardless of how abusively it treats its users. Why should FACEBOOK care how abusively it treats KING, even refusing to provide any explanation at all of how she supposedly failed to follow its Community Standards? She is only one of three billion users – no loss to FACEBOOK. FACEBOOK could literally treat tens of thousands of users the way it has treated KING, not care, not even blink an eye, and be rewarded with "immunity" by the federal courts. Now, all of a sudden, with this Court's Order, FACEBOOK has failed to completely crush KING, and it does not mind letting this Court know how upset it is that this Court did not simply "tow the party line" and let FACEBOOK move on to continue to do whatever it feels like doing. FACEBOOK just cannot help venting about this Court's Order at p. 16 of its Motion. The Order clearly held that FACEBOOk was not immune from abusing its promise to KING "to provide at least some information in addition to the fact that the account has been suspended [and] terminated" (Motion, p. 16). Instead of recognizing this Court's clear holding, FACEBOOK refers to this Court's citation to FACEBOOK's promise in paragraph 4.2 of the TOS, for which FACEBOOK is not immune, by use the words "term" and "plausible" in quotation marks, suggesting that this Court's elevation of the language in paragraph 4.2 to a promise from which FACEBOOK is not immune as faulty reasoning on this Court's part. Even though this Court held that the language in paragraph 4.2 was clear and enforceable in a cause of action for "contract/implied covenant," FACEBOOK argues:

> As this Court noted, the "term" Ms. King is seeking to enforce through specific performance is a "plausible" implied promise by Facebook "to provide at least some information in addition to the fact that the account has been suspended [and] terminated." Op. at 14. That implied promise, assuming it exists, provides no specifics as to what additional information Facebook must provide, when Facebook must provide it, or how the parties can know whether performance is sufficient. It also is directly contradicted by "the express terms of the Terms of Service," which, as this Court recognized, "do not require Facebook to provide information to a user beyond the fact that the account has

been suspended or terminated." Op. at 14.  An implied promise that contradicts express contractual terms and provides no "clearly ascertainable" standard as to what "precise act" is required cannot possibly meet the heightened level of contractual specificity required to support a specific performance remedy.

> This Court's prior order suggested that the details of Facebook's supposed duty to provide "at least some information in addition to the fact that the account has been suspended or terminated" might be measured by looking at the information that is required to pursue "review . . . of Facebook's decision" by Facebook. SAC ¶ 45.  But such a measure is found nowhere in the Terms of Service, and in fact conflicts with what the Terms of Service provide.  The Terms of Service do not guarantee any review process at all.  They say only that, in most (but not all) circumstances, Facebook will "let you know" if it decides to terminate your account, and will "explain any options you have to request a review." Ex. A at 5 (emphasis added).  As shown by the word "any" in the latter phrase, review will not necessarily be available, even if the phrase "any options you have to request a review" could be construed guarantee some type of review process. it certainly does not guarantee the particular, litigation-like review process Ms. King imagines (see SAC 45).

(*Id*.).  This is not an argument, this is a motion for reconsideration.  It is a trillion dollar temper tantrum – the very idea that a federal court would have the temerity to tell FACEBOOK what to do and put FACEBOOK in the almost impossible situation of having to explain to KING what she did that failed to follow FACEBOOK's Community Standards!  How can FACEBOOK possibly meet such a high burden?  What will FACEBOOK say?  What is the world coming to?!

FACEBOOK then goes on to suggest that KING failed to follow the "actual review process that was available to Ms. King" (Motion, pp. 16-17).  FACEBOOK states, "As explained on the help page embedded within the Terms of Service, users in Ms. King's position could seek review of their account termination by filling out a short online form that required only three pieces of information: 'full name,' 'login email address or mobile phone number,' and photo ID" (Motion, p. 17).   Of course, this suggestion by FACEBOOK completely ignores the allegations of the SAC (which are taken as true for purposes of FACEBOOK's 12(b)(6) Motion, and which FACEBOOK does not even contest) which show that on November 19, 2020, FACEBOOK sent a message to KING stating in the first part of the message that she should "please enter the following information and we will consider your profile for review."  In the last part of the message, instead of providing KING with any options for review, the message states, with the first line in bold type:

Plaintiff's MIO to Defendant's Motion to Dismiss SAC  - Civ. No. 3:21-cv-04573-EMC

**We Cannot Review the Decision to Disable Your Account**
Your Facebook account was disabled because it did not follow our Community Standards.  This decision can't be reversed.

(SAC, paragraph 16).  FACEBOOK did not provide KING with the very options it is now claiming she had when her Facebook Account was disabled.  The fact that FACEBOOK admits that it should have provided KING with options for review and refused to so is one of the main reasons KING alleged that FACEBOOK acted wilfully and in bad faith.  Failure by FACEBOOK to provide information to KING is also the main reason this Court granted KING leave to file an amended complaint.  FACEBOOK does not like being told what to do, even by a federal judge – in fact, *especially* by a federal judge who is supposed to grant FACEBOOK immunity whenever FACEBOOK cries for it.

B. The SAC does not plead causes of action in violation of the Order.  FACEBOOK claims that the SAC should only have pled one cause of action – breach of the implied covenant of good faith and fair dealing – and claims that Counts 1 and 3 of the SAC (Breach of Contract and Specific Performance respectively) are pled in violation of the Order.  This is not true.  As explained above in part I(C), the SAC carefully tracked the Order regarding counts which KING was allowed to plead.  At p. 7 of the Motion, FACEBOOK claims that Count One "alleges that Facebook 'breached paragraphs 3.1 and 4.2 of the [Terms of Service] in three ways: (1) by 'disabling the King Facebook Account,' (2) by failing to 'provid[e] . . . sufficient information to allow [Ms. King] to engage in an appeal,' and (3) by 'destroying all of the data, material, and content of the King Facebook Account.'" This is an incorrect summary of the allegation.  The allegation is that FACEBOOK breached its contract with KING by the *combination* of all three actions.  In the FAC, KING did not add the second element to the "Breach of Contract" cause of action (FAC, paragraph 30).  The SAC recognizes this Court's ruling that a breach of contract claim requires an allegation that FACEBOOK failed to provide KING sufficient information to allow her to engage in an appeal – this is an element of the breach of contract claim which KING did not believe was required when she filed her FAC, but which KING accepts as this Court's ruling for purposes of drafting the SAC.  Elements 1 and 3 of the breach of contract claim constitute breaches by FACEBOOK because FACEBOOK breached its duty to provide KING with sufficient information to

9

allow her to engage in an appeal.

As mentioned in part I(C) above, the second cause of action of the SAC specifically entitled "Breach of Implied Covenant of Good Faith and Fair Dealing" is based on the same failure of FACEBOOK to provide KING with sufficient information to allow her to engage in an appeal. This cause of action also alleges that FACEBOOK acted with "wanton and willful conduct in its breach of its covenant of good faith and fair dealing." As stated in part II(A) above, FACEBOOK admits in its Motion that KING was supposed to be provided with a chance to seek an appeal, but FACEBOOK advised KING via message to her on November 19, 2020, that it "cannot review its decision to disable your account" and, "The decision can't be reversed." Clearly, for purposes of FACEBOOK's 12(b)(6) Motion, the second count of the SAC properly alleges "willful" wrongdoing – that is, recognizing and admitting that it has a duty to provide an appeal process and then denying it for no reason to KING.

Likewise for counts 1 and 2 of the SAC, count 3 (Specific Performance) tracks the amendment allowed by the Order. FACEBOOK claims that KING's injunctive relief claim was dismissed with prejudice because it was not an independent cause of action (Motion, p. 7), but this is not true. KING agreed that a cause of action for specific performance "simply reflects the remedies sought by Ms. King" (Order, p. 7). Because this Court dismissed the FAC's causes of action, obviously the remedies sought for the causes of action (like specific performance) were dismissed along with them. In the last paragraph of the Order, this Court stated KING was permitted to file an amended complaint with respect to a cause of action for breach of the implied covenant (which KING does in the SAC in counts 1 and 2) *and* "with respect to damages and for specific performance (in spite of her arguable waiver) to the extent that she can do so in good faith" (Order, p. 24). KING believes that she has in good faith pled causes of action involving the breach of the covenant of good faith and fair dealing, and the SAC cause of action for specific performance is associated with these causes of action. The Specific Performance cause of action addresses the five elements necessary for specific performance as discussed in part I(C) above.

C. The SAC does state a "cognizable remedy" for the causes of action pled in the SAC. The bulk of FACEBOOK's argument is that KING fails to allege any "cognizable remedy" for breach of the

implied covenant (Motion, pp. 8-17).  The gist of FACEBOOK's argument is that KING alleges that her damages (loss) related FACEBOOK's alleged breach of contract/implied covenant are measured by the value of the content of her Facebook Account, BUT 1) FACEBOOK had no duty to preserve this content so there was no breach by FACEBOOK, 2)  even if there was a breach by FACEBOOK, the breach was not the "proximate cause" of the loss, 3) even if there was a breach by FACEBOOK, the parties "did not contemplate damages for lost account content," 4) even if there was a breach by FACEBOOK, KING's claimed damages are "speculative," and 5) even if there was a breach by FACEBOOK, KING's damages had no value at all.

       1. Even if FACEBOOK did not have a duty to preserve KING's Facebook Account content, the value of the content is still the measure of damages for FACEBOOK's breach of the implied covenant of good faith and fair dealing.  FACEBOOK makes the argument that because this Court held that FACEBOOK had no duty to preserve the content of KING's Facebook Account, the content of KING's Facebook Account cannot be used as a measure of damages for KING's "cognizable remedy" (Motion, pp. 8-9).  KING did not understand the Order to make such a ruling.  It is true that this Court rejected KING's argument regarding the FAC that she "suffered a pecuniary injury because the content associated with her account (*e.g.*, photographs) 'is no longer available to her'" (Order, p. 15).  This Court stated two reasons for the rejection of KING's argument, the first being that "Facebook was not obligated to retain her property for her" (*id.*).  KING understood this Court's rejection of KING's argument to have been made in the context of KING's argument that FACEBOOK *did* have a duty to retain her property.  Given this Court's reasoning that FACEBOOK *did not* have a duty to retain KING's property, this does not mean that the property cannot be used as a measure of damages for FACEBOOK's breach of its implied duty of good faith and fair dealing.  In other words, while FACEBOOK may not have had a duty to retain KING's Facebook Account content, this does not mean that FACEBOOK could destroy KING's Facebook Account content in the process of breaching a different duty that it did owe to KING – that is, the implied duty of good faith and fair dealing.  Otherwise, the implied duty of good faith and fair dealing would have no meaning – FACEBOOK could disable an account with no reasons given, as it did in this case, and moot out the issue of any appeal by

the user of the disabled account by simply destroying the account.  After the destruction of the account, there would be nothing for the user to appeal about, nothing to reinstate.  If it was the intent of this Court in its Order to allow FACEBOOK to go this far (avoid its implied duty by simply destroying the KING Facebook Account), then why did the Order provide for leave to file an amended complaint?  If there is to be any penalty against FACEBOOK for the breach of the implied covenant of good faith and fair dealing in disabling an account, the damage can only be measured by the content of the account. Without this penalty, all FACEBOOK has to do is breach the implied duty, destroy the account, and simply say to the user, "What are you going to do about it?"  If this is the result intended by this Court's Order, then there truly is not much left to argue about, but, as stated above, KING does not believe that this was the intent or import of the Order.

   2) If there was a breach by FACEBOOK of the implied covenant of good faith and fair dealing, then the destruction of the content of KING's Facebook Account was proximately caused by FACEBOOK's breach.  FACEBOOK argues, "The only breach at issue here is Facebook's failure to provide Ms. King with 'an adequate explanation' regarding its account termination decision. . . . Because that breach occurred after Ms. King lost access to her photos, it cannot be the 'proximate cause' of the loss'" (Motion, p. 10).  This is a bizarre argument.  First, if this argument is valid, why did this Court permit KING to file an amended complaint on the issue of the breach of the implied covenant? If FACEBOOK could first disable an account and then breach its implied covenant "after" disabling the account with impunity because of a supposed "lack of proximate cause," then the implied covenant has no meaning.  As was stated in the previous section of this MIO, this would be FACEBOOK's "What are you going to do about it?" defense.  It is not likely that this Court intended this result by its Order. Second, the breach did not occur "after" KING lost access to her Facebook Account.  KING only clearly lost access to her Facebook Account after FACEBOOK breached its implied covenant and refused to reconsider its disabling decision.  Third, KING has alleged willful and bad faith conduct on the part of FACEBOOK – FACEBOOK admits in its Motion that it had a process for appealing a disabling decision, yet FACEBOOK refused to allow KING to engage in that process.  It is clear that when FACEBOOK disabled KING's Account, FACEBOOK had already decided that it would not allow her

any appeal rights – in other words, it is a fair inference from the pleading in the SAC that the breach of the implied covenant by FACEBOOK occurred at or before the time of the disabling decision which is the reason FACEBOOK was so quick to deny KING her appeal rights and to refuse to comply with the requirements of its implied covenant.

3 This is not a case involving "lost" data as claimed by FACEBOOK.  FACEBOOK claims that the "parties clearly did not contemplate damages for lost account content because . . . the Terms of Service specifically provide that 'under no circumstances will [Facebook] be liable to you for any lost . . . data'" (Motion, p. 11).  This is a specious argument because this case clearly does not involve "lost" data.  Provision 4.3 of the TOS states, "We cannot predict when issues might arise with our Products.  Accordingly, our liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any *lost* profits, revenues, information, or data . . . ." [emphasis added].  This provision is set forth in Sec. 3 of the TOS entitled, "Limits on liability."  Clearly, as a matter of contract interpretation, a limitation of liability for "lost" data stemming from an inability to "predict when issues might arise with our Products" has nothing to do with the intentional destruction of account data associated with a breach of the implied covenant of good faith and fair dealing which this case involves.

4. The value of KING's Facebook Account content is not "speculative" and has measurable pecuniary value.  FACEBOOK claims that, to the extent that KING's Facebook Account content is to be considered the measure of damages in this case, the content is "speculative" and has no "measurable pecuniary value" (Motion, pp. 11-13).  FACEBOOK refers to the content of KING's Facebook Account with the derisive term "vacation photos" to diminish the value and significance of the content, which is consistent with FACEBOOK's attitude in this case regarding the worthlessness of KING as a FACEBOOK user.  FACEBOOK's "What are you going to do about it?" attitude is consistent.

As paragraph 24 of the FAC alleges, the content of KING's Facebook Account was vastly more than just a collection of "vacation photos."  As paragraph 24 alleges, FACEBOOK is shameless in doing all it can to attract users to its site.  Although this Court has ruled that FACEBOOK has no duty to retain

user content, no one would be using FACEBOOK except for the maintenance of the content uploaded by all its users.  Because KING has been denied the opportunity to engage in discovery, KING has been unable to explore the "implied" terms of the TOS – for example, while the TOS may not refer to any "duty" of FACEBOOK to maintain content of users, what would FACEBOOK state in discovery regarding its *practice* of maintaining user content, whether it would randomly destroy user content for no reason, and what it determines to be the expectation of users who sign up for accounts with FACEBOOK.  *See* for example *Foley v. Interactive Data Corporation*, 765 P.2d 373, 383 (Cal. 1988) (terms of a contract can be implied by the parties' conduct during the life of the contract).  Not only is it very likely that FACEBOOK's practice is to maintain user content, but, as paragraph 24 alleges, KING was attracted not just by the ability to store immense amounts of data with FACEBOOK, but also by FACEBOOK's offer to make content available on a "memorialization page" even after KING's death for the benefit of KING's family, friends, and followers.  FACEBOOK has no problem using tactics to attract users and maintain their accounts to make billions of dollars through advertising to its three billion users, but it appears to be the first to disclaim any loyalty to users at all when its discretion to terminate user accounts is challenged.  This is a very impressive business model if the courts allow FACEBOOK to get away with it, on top of FACEBOOK's crying for "immunity" every time it is challenged.  There is no justification for allowing FACEBOOK to impose this business model on its users, and KING should be allowed to engage in discovery regarding implied terms of the TOS regarding maintenance by FACEBOOK of user content.

Paragraph 24 sets out in detail how to value irreplaceable material according to the *McMahon v. Craig*, 176 Cal. App. 4th 222 (Cal. App. 2009), case cited in the Order at pp. 15-16.  "If the subject matter cannot be replaced, however, as in the case of a destroyed or lost family portrait, the owner will be compensated for its special value to him, as evidenced by the original cost, and the quality and condition at the time of loss."  As alleged in paragraph 24, this replacement value is over $100,000.  "Likewise an author who with great labor has compiled a manuscript, useful to him but with no exchange value, is entitled in case of its destruction, to the value of the time spent in producing it or necessary to spend to reproduce it."  Paragraph 24 sets out in detail how much time and energy over a

period of at least ten years carefully selected photographs from thousands taken to support KING's plan to write books and memoirs about the places she has visited around the world.   KING also kept comments she made related to the photographs and comments others made enhancing the value and significance of the photographs.  These allegations must be taken as true for purposes of FACEBOOK's 12(b)(6) Motion.  If FACEBOOK wants to belittle KING's claims about her efforts and intentions, FACEBOOK can make this attempt in discovery, but for now, KING has alleged a solid case for proof of damages which are "peculiar" to her, but which are not speculative and not based on mere "emotional" value.  FACEBOOK's citation to the denial of summary judgment by a trial court in the "lost wedding pictures" case, *Whalen v. Villegas*, 968 N.Y.S.2d 343 (Dist. Ct. 2013), has nothing to do with KING's claimed damages which relate specifically to the *McMahon* case.

It should also be noted that this Court held in its Opinion at p. 16 that "Facebook could be liable only if it had *notice* of the peculiar value (at least absent willful wrongdoing)."  Clearly FACEBOOK had "notice" of the content of KING's Facebook Account, otherwise how did FACEBOOK dig so deeply into KING's Facebook Account so as to determine that she had failed to follow FACEBOOK's Community Standards.  To make such a determination, FACEBOOK had to have intimate knowledge of the contents of KING's Facebook Account – this is a reasonable inference from the allegations of the SAC.  If FACEBOOK wants to raise some defense about the use of AI to search for key words, for example, or some similar creative defense, that is not an issue to be considered in a 12(b)(6) motion.  Also, the "notice" issue only applies "at least absent willful wrongdoing."  KING has alleged "willful" conduct on the part of FACEBOOK – FACEBOOK knew it had the implied duty to advise KING about the reasons for the disabling action so that KING could present a descent appeal to FACEBOOK, and FACEBOOK refused to grant KING such information or even a bare appeal with no information.  It is a reasonable inference from the facts pled to this point that this conduct by FACEBOOK was willful.

In short, what FACEBOOK typically and derisively refers to as KING's "photo-based damages theory" (Motion, p. 13), is in fact a detailed summary of damages suffered by KING (absent any claim of "emotional" value) based on FACEBOOK's willful conduct, and these damages are in excess of $100,000.  Whatever defenses FACEBOOK may later have in this litigation to KING's properly pled

15

claim for over $100,000 in damages even FACEBOOK concedes should not be considered by this Court ruling on FACEBOOK's 12(b)(6) Motion. *See* Motion, 18, citing to *Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka*, 599 F.3d 1102 (9th Cir. 2010).

      5. If damages are inadequate to provide a remedy for KING in this case, then KING is entitled to specific performance. As this Court pointed out in its Order at p. 16, "Finally, the Court notes that, theoretically, Ms. King could have argued that her claim for breach of contract or the implied covenant should not be dismissed because, even if she had no viable claim for damages, she could still seek specific performance as a remedy." In fact, this Court specifically granted KING leave to plead a specific performance cause of action in connection with pleading a cause of action for breach of the implied covenant of good faith and fair dealing (Order, p. 24). While the calculation of damages in this case is difficult, but not impossible as set forth in the previous section of this MIO, the truly adequate remedy for KING would be reinstatement of her Facebook Account or at least retrieval of the content of her Facebook Account. As this Court noted in its Order, FACEBOOK had never said that KING's Facebook Account is not presently retrievable. KING refers to the content as being "destroyed" because from her point of view it is "destroyed," but FACEBOOK continues to play its "hide and seek" game, consistent with its willful behavior in this case, and not provide information regarding why KING's Facebook Account was disabled, or even whether the content is still retrievable. Our guess is that the content is still retrievable, otherwise why would FACEBOOK provide an "appeal" process for reinstated disabled accounts. To the extent that this Court would like to view the content of KING's Facebook Account to determine the validity of the allegations made in paragraph 24 of the SAC, FACEBOOK hides the evidence to weaken KING's case – FACEBOOK's conduct is truly despicable and consistently willful.

      FACEBOOK is correct to argue that KING may never get her content back or her Facebook Account reinstated if FACEBOOK is compelled by an order for specific performance to provide KING with reasons for its disabling decision and a chance for KING to engage in appeal procedures which should have been provided by FACEBOOK, but at least compelling FACEBOOK to do what it is contractually obligated to do is a good start. For some inexplicable reason, FACEBOOK is desperate

not to reveal the reasons why it disabled KING's Facebook Account.  Once it is forced to do so by a specific performance order, the pathetic inadequacy of its reasons may well be revealed and indicate that KING did not fail to follow FACEBOOK's Community Standards.

As set forth in section I(C) above, KING made all proper good faith allegations to satisfy a cause of action for specific performance.  The terms of the TOS regarding FACEBOOK's duty to advise KING about the reasons why her Facebook Account failed to follow Community Guidelines and provide her an avenue of appeal are "sufficiently definite."  For now, this would be all this Court would have to order as a matter of specific performance to be consistent with the TOS.  Consideration for the contract between FACEBOOK and KING is adequate.  As the Court stated in *Young v. Facebook, Inc.*, 2010 WL 4269304 (N.D.Cal. Oct 25, 2010), "While users do not pay for the services [of Facebook] directly, Facebook benefits from user activity through the sale of advertising."  Users allow FACEBOOK to use their personal identification information for advertising.  There is consideration on both sides.  The requested action for FACEBOOK to take – provide KING with reasons why her Facebook Account was disabled and provide her with her contractual avenue for appeal – is "substantially similar" (in fact, it is exactly similar) to the contractual terms as this Court has already ruled.  There is a mutuality of remedies - both FACEBOOK and KING can go to court to enforce the provisions of the TOS.  Finally, if the legal remedy of a damages award is inadequate, then specific performance is appropriate.

III. Even if damages cannot be shown to be at least $75,000, this Court still has jurisdiction over the state law causes of action for breach of contract/implied covenant and specific performance.

As pled in the SAC, even if this Court finds pursuant to a 12(b)(6) motion that KING has not credibly pled at least $75,000 in damages necessary for this Court to retain diversity jurisdiction, this Court still has discretion  pursuant to 28 USC 1367 to retain jurisdiction over the state causes of action it permitted KING to pursue in an amended complaint.  While FACEBOOK concedes this point, it argues, "Thus, a court has 'discretion' to retain jurisdiction over state law claims remaining in a case after the dismissal of federal claims, but in situations like this where 'the amended complaint supersedes the original complaint, . . . case should be treated as though the plaintiff has pleaded no basis of federal

jurisdiction' and 'retaining jurisdiction of the non-federal claims is improper'" (Motion, p. 19).  This is an interesting argument for a party who spent much of its Motion claiming that KING was only allowed to plead one cause of action and that two of KING's causes of action were not allowed to be pled in the SAC.  Now FACEBOOK argues that KING should have pled the dismissed federal cause of action in the SAC, even though this Court dismissed the federal cause of action, in order to obtain the benefit of 28 USC 1367.  Maybe FACEBOOK should make up its mind what it wants other than to crush all claims KING presents.  It clearly would have been inappropriate for KING to replead the dismissed federal cause of action in the face of this Court's Order allowing only certain causes of action to be pled in an amended complaint.  The Court's Order is an interim order which cannot be appealed until this case is completed.  The FAC is still part of this case for purposes of considering the application of 28 USC 1367.  KING requests that this Court retain jurisdiction even if this Court finds that damages of $75,000 have not been pled simply because this entire case would simply move to state court and start all over again after so much consideration by this Court.  This would constitute an unnecessary waste of judicial resources.

## IV. Conclusion

For the reasons stated above, FACEBOOK's Motion should be denied, and KING should be allowed to proceed with discovery.

DATED: San Francisco, California, February 18, 2022.

_____/s/ Samuel P. King, Jr._____

SAMUEL P. KING, JR.                                    Attorney for
Plaintiff ADRIENNE SEPANIAK KING

Plaintiff's MIO to Defendant's Motion to Dismiss SAC  - Civ. No. 3:21-cv-04573-EMC